## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Clara De Leon and Eric W. Mirsberger Jr., individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>DraftKings, Inc.; Crown NY Gaming Inc.,<br><br>*Defendants*. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Clara De Leon and Eric W. Mirsberger Jr. ("Plaintiffs"), individually and on behalf of all others similarly situated, brings this class action against Defendants DraftKings, Inc., and its subsidiary Crown NY Gaming LLC, (collectively "DraftKings" or "Defendants"). Plaintiffs make the following allegations based on personal knowledge as to their own acts, and upon information and belief and the investigation of counsel as to all other matters.

### <u>INTRODUCTION</u>

1.      Online sports gambling was legalized in New York in January 2022. Since then, over $56 billion has been wagered by New Yorkers. Among the dominant players in New York's sports betting landscape is the operator DraftKings. For the fiscal year ending March 2025, DraftKings has reported over $6 billion bets handled to the New York State Gaming Commission.[1]

2.      About 96% of sports betting customers lose money, which is a natural deterrent

---

[1] https://gaming.ny.gov/system/files/documents/2025/01/monthly-mobile-sports-wagering-report-draftkings.pdf

to continuing as a customer of DraftKings.[2] Thus, unlike with other industries, where a customer, once acquired, will reliably provide repeat business, most of DraftKings' customers will be incentivized to stop using the platform, all things being equal. Those who irrationally keep betting despite the losses—often because of a gambling addiction—will eventually "crap out," meaning that DraftKings will lose the customer. Thus, DraftKings' business model requires it to find ways to keep customers betting even as they lose money, and to recruit new bettors to its platform. DraftKings manages to keep the customers flowing through carefully designed promotions and user interfaces that make it easy to start gambling and hard to stop.

3.    Plaintiffs bring this action because DraftKings has crossed the line in its efforts to recruit fresh blood, deceiving New Yorkers and misleading them into betting more money and more frequently and resulting in their losing large amounts of money.

4.    DraftKings advertises an all-upside gambling experience, falsely promising new users that they will get free money which they can wager without any risk. In reality, DraftKings has created an all-upside opportunity only for itself: the fine-print terms of its promotions require new users to deposit and gamble almost exclusively with their own money, which they almost always lose. DraftKings also engages in other, undisclosed, manipulations, forcing those users who are able to initially win to make worse and worse bets until their funds are exhausted.

5.    These unethical and fraudulent practices by DraftKings are the present face of competition in the obscenely profitable, and formerly illegal, industry.

6.    DraftKings' business model has long involved pushing the boundaries of the

---

[2] Wayne J. Taylor, et al., *Online Gambling Policy Effects on Tax Revenue and Irresponsible Gambling*, SMU Cox School of Business Research Paper No. 24-7, Jun. 10, 2024, https://dx.doi.org/10.2139/ssrn.4856684 (last visited Dec. 15, 2024).

law, misleading consumers, and luring naïve gamblers into developing addictions.

7.      DraftKings uses false promises of the opportunity to win big with no risk to lure users into committing more money to the platform than they otherwise would have. DraftKings uses these tactics to identify and cultivate the people it wants on its platform: those who are susceptible to these sorts of advertisements and most likely to lose a lot of money sports betting. In other words, marks.

8.      DraftKings' activities in New York are a textbook example of its pattern of skirting and sometimes flat-out ignoring laws and regulations intended to protect consumers.

9.      DraftKings targeted its promotions at new customers who may have been cautious about risking their money but had the potential to become cash cows for the company, regularly placing losing bets on sporting events.

10.     Rather than put its own money on the line to give customers an all-upside taste of gambling, as its advertisements suggest, DraftKings is using misleading promotions to lure new users into believing that creating and funding an account on DraftKings is far more financially advantageous than it is.

11.     Only after new users sign up, make a deposit, and start losing bets does the true nature of their bargain with DraftKings become clear. At that point, DraftKings attempts to instill long-term gambling habits in new users by forcing them to make many bets to comply with the fine print—many more bets than they initially were led to believe would be required— while chasing the promises DraftKings made in its advertisement and new-user promotions.

12.     Most users do not recoup their money, let alone win the additional money they were promised by DraftKings' misleading advertisements.

13.     Indeed, despite DraftKings advertising the promise of customers winning big,

the company is really only interested in keeping customers gambling wildly and therefore eventually losing big. And as soon as a user reveals a propensity to consistently make better bets—meaning bets that take advantage of an arbitrage in DraftKings' odds-making—the company drastically limits the size and frequence of bets that user can make so that they can't cost the company too much money.

14.    In short, while DraftKings advertises an all-upside gambling experience to new users, it is actually offering one that is almost all down-side.

15.    One of DraftKings' deceptive practices is a promotion that promises users that they can place a bet at no risk to them ("Risk-Free Bet" or "No Sweat Bet").

16.    These purportedly no-risk bets, however, were not as advertised. The promotion requires that the customer deposit funds and place the bet with their own money.  If a customer loses their bet, they are not returned to their original position. Instead, their accounts are credited with an expiring "Bonus Bet" rather than the amount the user initially wagered in U.S. dollars.

17.    Receiving "Bonus Bets" when the original bet loses does not make the original bet "Risk-Free" as advertised.  "Bonus Bets" cannot be withdrawn for cash. Instead, they must be both wagered and won before they have any cash value.

18.    Furthermore, wagers made with Bonus Bets are not paid out like wagers made with U.S. dollars. A winning $100 bet made with U.S. dollars at even odds recovers the $100 stake plus the $100 winnings less the sportsbook's cut (known as the "vig" or "rake") of ~9%, which results in a payment of approximately $191. By contrast, a winning bet made with a $100 Bonus Bet converts only to $100 US dollars less vig, which results in a payment of approximately $91.

19.    Thus, the new customer responding to the no-risk advertisement can get their money back only if they win their second bet, which is not risk free, and even then, with the vig subtracted.

20.    The Bonus Bet is thus worth significantly less than the initial bet, meaning that the money the customers was induced to gamble was never in fact risk-free as advertised.

21.    DraftKings further engages in deceptive practices through its near-ubiquitous advertisements that offer to match a new user's deposit up to $1,000. This promotion, too, is misleading and inaccurate.

22.    In order to receive the promised matching amount, users have to deposit up to 5x the matching amount and then bet up to 25x the matching amount on long-shot bets that users have low odds of winning, all within a relatively short period of time. Even then, and even if they win, customers do not actually receive a cash match of their deposit as the promotion implies. Instead, they receive "DK Dollars" equal to their deposit amount. Like "Bonus Bets," "DK Dollars" are not redeemable for cash and must be wagered and won before they have any value.

23.    DraftKings has invested heavily in large-scale marketing, including television and print advertisements, in-arena marketing, and extensive internet and social media advertising to publicize each of these materially deceptive promotions.

24.    These advertisements allowed DraftKings to sign up a multitude of new customers, including Plaintiffs. But little did these new customers know that the representations and omissions upon which they relied were misleading and false.

25.    DraftKings' actions in promulgating these marketing representations and omissions violate New York consumer protection statutes as well as New York common law, as

discussed in detail below.

26.     Reasonable consumers, including Plaintiffs, were misled to their detriment. They did not receive the advertised benefit of the promotions, and they placed larger bets and more bets than they would have but-for the misleading advertising.

27.     DraftKings also deliberately targets players it should know are experiencing gambling addictions. Rather than cutting a user off when they begin showing signs of a gambling problem, DraftKings pairs them with "VIP Hosts" who milk them for every dollar they have, often by encouraging them to use more misleading promotions like those described herein.

28.     DraftKings trains its VIP Hosts to deploy a specific playbook of tactics including contacting their assigned users when they have not logged on to the platform in a few days or have just experienced a sizeable loss and luring them back with offers of promotions that require them to deposit more of their own money and place more bets.

29.     As expected, some of these targeted people developed debilitating gambling addictions as a result of DraftKings' carefully orchestrated schemes to draw them in with misrepresentations and then force them to engage in habit-forming behavior to meet the promotional terms as they chase after DraftKings' illusory promises.

30.     Plaintiffs seek injunctive relief, actual, statutory, and punitive damages to compensate themselves and the Class for the injury inflicted on them by DraftKings and to prevent DraftKings from continuing to deceive consumers.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of

interest and costs, and this is a class action in which at least one member of the class is a citizen of a different state than Defendant. The number of members of the proposed class in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

32.    This Court has personal jurisdiction over Defendant because it regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

33.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant does business in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

34.    Plaintiff Clara De Leon is a resident of New York, living in Manhattan.

35.    Plaintiff De Leon first created an account on DraftKings while located in Illinois in 2018 after seeing advertisements for DraftKings promotions on television. Her DraftKings username is cmdeleon23.

36.    In January 2023, while residing and physically located in Manhattan, Plaintiff De Leon made her first deposit on DraftKings and opted-in to a DraftKings no-risk bet promotion that she saw advertised in digital media as described in further detail below. Plaintiff De Leon was surprised to discover that she did not get her original stake back when she lost her purportedly no-risk bet and instead received an expiring "Bonus Bet."

37.    Plaintiff Eric W. Mirsberger Jr. is a resident of New York, living in Long Island City.

38.    Plaintiff Mirsberger first created an account on DraftKings in October 2023.  His

DraftKings username is Vanburenboys173.

39.     Within approximately one year of creating his account, Plaintiff Mirsberger had lost more than $45,000 on DraftKings.

40.     Around the time Plaintiff Mirsberger created his account, he opted-in to promotions on the DratKings app that purported to offer him the opportunity to place a bet at no-risk. Plaintiff Mirsberger was surprised and dismayed to discover that when he lost the bets that were purportedly no-risk, he was not credited back his original stake but only an expiring "Bonus Bet."

41.     Plaintiff Mirsberger also opted-in to numerous deposit match promotions that he saw advertised in digital media, on the DraftKings platform and that were directly offered to him by DraftKings "VIP Hosts." Plaintiff Mirsberger was aggrieved when he discovered he did not receive the cash value of his deposit match as DraftKings had led him to believe he would and instead was required to gamble many times his initial deposit just to receive DraftKings credits that had to be further wagered to be converted to money.

42.     Defendant DraftKings, Inc. is a Nevada gambling and entertainment corporation headquartered in Boston, Massachusetts. As of April 2023, DraftKings is a publicly traded company that trades on the Nasdaq Stock Exchange.

43.     Defendant Crown NY Gaming Inc. is a privately held company incorporated in Delaware with its principal place of business in Boston, Massachusetts. Crown NY Gaming Inc. is a subsidiary of DraftKings and is the licensed mobile sports wagering operator with the New York State Gaming Commission for DraftKings' sportsbook.

## FACTUAL ALLEGATIONS

**A.  Sports legalization in New York and DraftKings' sordid early history in the state**

44.    In 2018, the Supreme Court ruled in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), that a federal law could not prohibit states from legalizing sports betting within their borders. State legislatures moved quickly and, as of January 2025, sports betting has been legalized in 38 states and Washington, DC.

45.    As a result, the market for sports betting has exploded. The total US revenue of sportsbooks exploded from $430 million in 2018 to $10.92 billion in 2023.[3]

46.    Sports betting was legalized in New York in January 2022. In the first year of legal sports betting in the state, New York residents wagered $16.2 billion. Of this $16.2 billion, $4.5 billion in bets were placed DraftKings, making it the second largest sportsbook in the state.[4]

47.    This rapid expansion of the sports betting industry has fueled a race to recruit new consumers. Sportsbook operators have bombarded the state with advertisements and promotions to capture valuable market share.

48.    Long before online sports betting was legalized in New York, DraftKings began offering "daily fantasy sports" contests to New York consumers, including sometimes to those who were under the age of eighteen.

49.    In practice, "daily fantasy sports" is sports betting by another name. In these

---

[3] Mike Reynolds, *American Gaming Association: Legal sports betting hits record revenue in 2023*, S&P GLOBAL, Feb. 21, 2024, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/american-gaming-association-legal-sports-betting-hits-record-revenue-in-2023-80522087 (last visited Nov. 27, 2024).

[4] Mike Mazzeo, *NY Sports Betting Market has Record-Setting First Year*, LEGAL SPORTS REPORT, Jan. 9, 2023, https://www.legalsportsreport.com/97261/2022-ny-sports-betting-revenue-record-setting-first-year/ (last visited Jan. 14, 2024)

contests, users bet on the performance of athletes in sporting events, but in doing so they "compete" against each other rather than the sportsbook, which keeps a portion of the pot.

50.     Daily fantasy sports are very popular with adolescents, which gives DraftKings an important advantage in terms of brand recognition and a head start in turning young people into reliable sports betters on its platform.[5]

51.     In the years before the recent wave of sports betting legalization, regulators across the country raised alarms around DraftKings' daily fantasy sports offering, its advertising, and its lax enforcement of age restrictions.

52.     DraftKings uses its daily fantasy sports offering to give potential future users of DraftKings' sportsbook a taste of gamified sports betting through daily fantasy sports contests that are not materially different from sports betting in terms of their potential to form addictions.

53.     DraftKings is aware that underage users, many under eighteen, explore its platform and sometimes enter fantasy sports contests.

54.     Today in New York and elsewhere, DraftKings continues to skirt and violate the law with misleading advertising targeting vulnerable young people.

**B. DraftKings operates a digital sportsbook in New York and reaps massive profits**

55.     DraftKings partners with Del Lago Resort and Casino to operate in New York. DraftKings does some brick-and-mortar business at Del Lago Resort and Casino, but the vast majority of DraftKings' business in New York comes through its digital sportsbook.

56.     To place bets through DraftKings' online sportsbook, users download DraftKings' mobile application from the Apple App Store or the Google Play Store onto their

---

[5] Michael Sekich, *Drawing the Line of Scrimmage: Global Perspective of Daily Fantasy Sports in the Advertising Space*, 12 PENN. ST. J.L. & INT. AFF. 178, 202 (2023).

cellphones, verify that they are located within New York by allowing DraftKings' mobile application to access their phone's location, and then can place bets on live and upcoming sporting events.

57.    As a result of this model, bets are frequently placed on DraftKings using cellular data networks.

58.    When a bet is placed using a cellular data network, it is routed through cellular towers according to the cellular networks settings and tower availability. These cellular towers then transmit the bets through fiber-optic or other wired connections to their destination servers.

59.    Even when a bet is placed using a mobile phone located in New York and the bet is processed by DraftKings on a server located in New York, the bet will often be routed through wired electronic communication infrastructure located in other states.

60.    Furthermore, many DraftKings users place bets using home Wi-Fi networks that are connected directly to electronic wires.

61.    On information and belief, the data associated with a substantial portion of DraftKings bets placed on Wi-Fi networks are transmitted on electronic wires across state lines even when the destination server is located in the same state as the user because internet service providers route data traffic to reduce latency and optimize bandwidth and that often results in cross-state data routing.

62.    DraftKings cannot prevent data associated with the placing of bets in New York—or other states—from crossing into other states, including potentially states where DraftKings is not legally permitted to operate its sportsbook.

63.    DraftKings also uses interstate electronic wires to transmit money earned through its users' bets across state lines.

64.     Every user deposit relies on at least one of a variety of methods including credit and debit cards, Venmo, Paypal, electronic wire transfer (for large transfers only), and through a Swedish third-party electronic funds transfer company called Trustly.

65.     Many, if not all, of these methods of funds transfer involve the use of "electronic payment rails" and other wired facilities of interstate commerce.

66.     Furthermore, DraftKings makes money when users place and lose bets on its platform.

67.     When a New York user loses a bet on DraftKings' platform, money is transferred into a DraftKings' bank account that is either located in New York or another state.

68.     On information and belief, DraftKings does not indefinitely leave the millions of dollars in revenue it earns in New York segregated in a bank account located in New York. Instead, DraftKings regularly transfers funds it receives from bets in New York—and other states—into its general business accounts located in Boston, Massachusetts and elsewhere.

69.     Furthermore, DraftKings permits users to bet with funds deposited in one state while located in another state where DraftKings operates.

70.     According to the New York State Gaming Commission's records, DraftKings is one of the two most popular sportsbooks in the state, with over $6.8 billion dollars wagered by New Yorkers on the platform in 2023.

71.     DraftKings reinvests a lot of its revenue in hooking more users on sports betting.

72.     DraftKings' sales and marketing expenses totaled $1.2 billion in 2023.[6] DraftKings ran TV, radio, social media, email, billboard, and print advertising. The ads

---

[6] https://www.statista.com/statistics/1379464/sales-marketing-expenses-draftkings-worldwide/#:~:text=In%202023%2C%20the%20fantasy%20sports,based%20company%20spent%20in%202020

showcased various promotions that DraftKings was running, typically targeting new users and promising bonuses and no-risk bets for signing up and making a deposit.

73.    As DraftKings has repeatedly said in its annual 10–K reports, "Achieving growth in our community of users may require us to increasingly engage in sophisticated and costly sales and marketing efforts."

74.    DraftKings' target audience for these marketing efforts is new users and casual gamblers—those who are most likely to lose money and who might turn into high-value addictive gamblers losing thousands of dollars a month to DraftKings.

75.    In fact, DraftKings, will often limit or even outright ban "sharps," gamblers who are sophisticated and make too many winning bets, while naïve losing consumers are targeted with more and more deceiving promotions to encourage their gambling more money with more frequency.

76.    DraftKings could set standardized bet limits for all its users, but instead it dynamically limits the maximum allowable bet for each individual user in order to maximize the amount naïve and addictive gamblers lose to the company while minimizing the company's exposure to more successful bettors. The practice of dynamically limiting amounts to prevent bettors from winning too much is just one more fact that DraftKings does not disclose in its advertising.

77.    DraftKings' CEO has admitted that the company is only interested in serving bettors who are likely to lose money on its platform: "This is an entertainment activity. People who are doing this for profit are not the people we want."[7]

---

[7] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, ROLLING STONE, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

78.     DraftKings is not, however, following a traditional "entertainment" industry business model of trying to "entertain" as many customers as possible.

79.     Instead, DraftKings is seeking to exclude customers who are successful at betting while trapping those who are not. The latter customers, many of whom end up losing more than they can afford, are the source of most of DraftKings' revenues.

80.     DraftKings mines its user data to identify the most potentially-lucrative users—those with developing gambling addictions—and then intentionally targets them with personalized outreach to increase the amount and frequency of their wagering on DraftKings.

81.     As further described below, DraftKings designs its promotional offers to lure in and identify those users most likely to become consistent gamblers.

82.     These promotional offers include a deposit match up to $1,000 and "Risk-Free" (later termed "No Sweat") bets. But rather than coming through on the large-print offers made to new users in advertisements for these promotions, DraftKings contradicts the large-print offers by inserting difficult to read, legally-opaque fine print terms hidden behind hyperlinks that are only available when a user is about to opt-in to the promotions and, thereafter, by enforcing complicated rules that DraftKings knows will be overlooked and misunderstood.

83.     Not only do these false promises lure consumers into opening and funding accounts on DraftKings, but they also lure many users including the Plaintiffs into wagering larger amounts and more frequently than they otherwise would.

84.     This was DraftKings' goal all along. DraftKings knows that the money it invests to sign up a customer often pays for itself many times over. According to McKinsey partner Dan Singer, "When a market opens up, you've got to get out there and start acquiring, because being the first book that someone downloads gives you roughly twice as much action as being

the second or the third."[8]

85.    As the sports betting market in New York becomes more saturated, DraftKings has begun turning its attention from recruiting new customers at any cost to retaining the most vulnerable customers it already has hooked on its platform.

86.    The customer retention stage is much more profitable for DraftKings than the initial customer acquisition stage.[9]

87.    Originally, DraftKings and other sportsbooks used to make good on the promises they made to new users of cash deposit matches and no-risk bets—where you get cash back if you lose. However, to do so, they hemorrhaged profit as they entered new markets.

88.    As the Washington Post has reported, "the days of companies giving away straightforward deposit matches worth thousands of dollars are largely over. Instead, sportsbooks are deploying increasingly complicated deals that advertise a big dollar figure but are far less generous [than advertised] upon closer examination."[10]

89.    Today, while DraftKings still makes the same bold promises in their ads, it now gives users "Bonus Bets" and "DK Dollars" that cannot be cashed out and must be used on the platform in accordance with complicated and unintuitive terms.

90.    In an online gambling marketplace saturated by sign-up promotions targeting vulnerable individuals with big "free" or "risk-free" dollar figures—some of which are truly risk-free and some of which, like those offered by DraftKings, are not—consumer confusion

---

[8] Danny Funt, *Sportsbooks Are Sweating Their Billion Dollar Marketing Bet*, WASHINGTON POST, Sept. 27, 2022, https://www.washingtonpost.com/sports/2022/09/27/caesars-fanduel-draftkings-commercials/ (last visited Nov. 15, 2024).
[9] *Online Sportsbook: A Shift In Player Retention?*, GAMING AMERICA, Mar. 17, 2023 https://gamingamerica.com/magazine/7296/online-sportsbook-a-shift-in-player-retention (last visited Nov. 15, 2024).
[10] *Supra* note 8.

reigns. DraftKings exploits that confusion.

**C. DraftKings intentionally targets susceptible users and grooms them to become addictive gamblers**

91.     Gambling products are not typical consumer products. Both the current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and the World Health Organization treat addiction to gambling in the same diagnostic category as addiction to heroin, cocaine, and tobacco.

92.     Indeed, as online sportsbooks exploded in 2021, the National Council on Problem Gambling reported overall increases of 43% in calls and 84% in online chats in just one year.[11]

93.     States that have legalized sports betting have seen dramatic increases in calls to gambling addiction helplines. In Connecticut, for example, helpline calls jumped 91% in the first year after legalization. In the first year after Virginia legalized sports gambling, calls climbed 387%.

94.     Gambling addiction is particularly prevalent in young men, not coincidentally a key demographic for DraftKings.

95.     According to Keith Whyte, executive director of the National Council on Problem Gambling, "We believe that the risks for gambling addiction overall have grown 30 percent from 2018 to 2021, with the risk concentrated among young males 18 to 24 who are sports bettors."[12]

---

[11] *National Problem Gambling Helpline Modernization Project*, NATIONAL COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/problem-gambling/helpline-modernization/#:~:text=In%202021%2C%20calls%20to%20the%20National%20Problem%20Gambling,we%20expect%20these%20numbers%20to%20continue%20to%20grow (last visited Nov. 21, 2024).
[12] Meghan Gunn, *These are the Real Dangers of the Sports Betting Boom for Young Men*, NEWSWEEK MAGAZINE, Mar. 22, 2023 https://www.newsweek.com/2023/04/07/sports-betting-boom-linked- rising-gambling-addiction-anxiety-suicide-1789055.html (last visited Nov. 15, 2024)

96.     And the earlier kids get exposed to gambling through online games and other avenues, studies suggest, the more severe their gambling problems are likely to be later on.[13]

97.     According to a spokesperson for Gamblers Anonymous, there has been "a dramatic increase in the number of young men developing compulsive gambling issues and showing up to meetings since online sports gambling became legal."[14]

98.     Unsurprisingly, DraftKings's target demographic overlaps heavily with the group most at risk of gambling addiction. As of 2021, 90% of DraftKings' users nationwide were male and more than half were in their teens, twenties, or early thirties.

99.     DraftKings touts that its "[s]ophisticated data science drives marketing decisions," which "delivers the right message, to the right user at the right time," to maximize return on investment.[15]

100.     DraftKings targeted marketing often reaches young people, particularly young men, who are not yet old enough to legally gamble.

101.     As one Illinois high-school sophomore told his school newspaper, which published a lengthy investigation of the rise of sports betting among classmates, "[after betting was legalized in Illinois] I saw more posts about it and stuff like that on social media, which made me want to [bet] more just because I saw it more," he said. "Before, I hadn't really seen that sort of thing on social media."[16]

---

[13] Ardeshir S. Rahman, et al., *The relationship between age of gambling onset and adolescent problematic gambling severity*, JOURNAL OF PSYCHIATRIC RESEARCH, Vol. 46, No. 5, 2012.
[14] Maxwell Strachan, *The Rise of Mobile Gambling is Leaving People Ruined and Unable to Quit*, VICE, Sept. 6, 2022, https://www.vice.com/en/article/ake7gk/therise-of-mobile-gambling-is-leaving-people-ruined-and-unable-to-quit (last visited Dec. 2, 2024).
[15] https://www.slidebook.io/company/draftkings/presentation/4482ce71d778bb9781863ed375bebca1-/slide-/4482ce71d7-78bb9781863ed375bebca1_24/ (last visited Nov. 21, 2024).
[16] Alexis Rogers, *"You can just lie, most people do": The rise of underage sports betting*, THE EVANSTONIAN, Apr. 20, 2023, https://www.evanstonian.net/sports/2023/04/20/you-can-just-lie-most-people-do-the-rise-of-underage-sports-betting/ (last visited Nov. 22, 2024).

17

102.    DraftKings' posts on TikTok have received 45.5 million "likes." On information and belief, a substantial portion of these "likes" are from individuals under the age of twenty-one years old who are being intentionally targeted with DraftKings' marketing.

103.    DraftKings also places physical advertising where it knows it will be seen by many underage users. For example, Ohio regulators recently fined the company $250,000 for advertising outside a college football stadium and targeting customers who are under legal betting age.[17]

104.    DraftKings routinely runs promotions encouraging gambling on collegiate sporting events.

---

[17] Sean McDonnel, *Ohio: Barstool, DraftKings agree to $750K in fines for targeting underage people, advertising 'free' bets*, CDC GAMING, Feb. 15, 2023, https://cdcgaming.com/brief/ohio-barstool-draftkings-agree-to-750k-in-fines-for-targeting-underage-people-advertising-free-bets/ (last visited Nov. 21, 2024).



*Figure 1: A post from DraftKings on X (formerly Twitter) publishing betting odds for the College Football National Championship; dated November 5th, 2024. (https://x.com/DKSportsbook/status/1853961644109382110)*

105.    Not only does DraftKings intentionally target its marketing to boys and young men, DraftKings also designs its product and its promotions so that once they download the DraftKings app, they quickly form gambling habits, often before they reach legal gambling age.

106.    One example of this, described more fully below, is the way that DraftKings' deposit match promotions work. First, to satisfy the hidden terms of the promotion a user must wager 25x the amount of the bonus, necessitating a long series of bets. Second, if the user completes enough bets, they receive the bonus in "DK Dollars," meaning they then have to place even more wagers in hopes of finally receiving the cash deposit match they were

promised.

107.    Digital mediums, like computers and cell phones that host DraftKings, increases the likelihood of habit-forming behavior through portability and connectivity, which provide greater ease-of-use, ready availability, rapid gratification, and a tendency to enable "context-independent" cues that trigger habit response.[18]

108.    Furthermore, habits are most often formed as the result of goal-directed behavior, which DraftKings enables by requiring users to chase arduous playthrough requirements.

109.    Goals drive people to form habits by encouraging repeat actions, even when they are actively aware of not wanting to develop an undesirable habit. Because most people are unaware of the habit-cuing influencing their behavior, they often attribute the formation of an undesirable habit to the pull of temptations or suppressed desires.

110.    DraftKings designs its promotions—which have among the highest playthrough requirements in the industry—to maximize the likelihood that users will begin to develop habits while completing them.

111.    Furthermore, DraftKings identifies certain users who exhibit the potential to gamble lots of money very quickly and assigns them "VIP Hosts:" DraftKings employees who are trained and incentivized to get users to gamble more and more money.

112.    DraftKings' VIP Hosts are trained to make DraftKings users feel like they are their friends and like they are getting personalized attention.

113.    However, VIP Hosts are only pretending to be user's friends. In reality, VIP Hosts follow a standardized playbook that is carefully designed to entice their assigned users to

---

[18] Bas Verplanken, *The Psychology of Habit: Theory, Mechanisms, Change, and Contexts*, Springer Nature Switzerland AG, 2018, https://link.springer.com/book/10.1007/978-3-319-97529-0

return to DraftKings' platform often and gamble more.

114.    DraftKings is aware that users often feel a kinship with their VIP hosts and tell them when they are struggling with gambling addiction.

115.    Despite this, DraftKings' VIP Hosts are not given adequate training to identify users in the throes of gambling addictions or adequate resources to respond when a user is exhibiting signs of a gambling problem.

116.    Instead, the VIP Hosts are given a single mission from DraftKings: keep the most valuable users frequently gambling and gambling big.

117.    VIP Hosts are incentivized to ignore even obvious signs of gambling addiction.

118.    Even when a user explicitly states that they are gambling too much or beyond their means, VIP Hosts are trained not continue encouraging them to gamble on DraftKings.

119.    VIP Hosts are trained to follow a gambler's activity on the platform and to follow up with them at strategic moments when they might otherwise take a break from gambling or stop gambling all together.

120.    DraftKings collects copious amounts of data on its players' behavior and is capable of identifying players who are developing or have developed gambling addictions.

121.    DraftKings does not use this data to prevent users from gambling beyond their means or engaging in destructive behavior.

122.    Instead, DraftKings uses its data on users' betting patterns to deploy its VIP Hosts to ensure that even when a user has just experienced a large loss or is trying to take a break from the platform, they get a message that will ensure they are back on the platform as soon as possible.

123.    Among the tactics that VIP Hosts are trained to use is offering users deposit

match promotions after they have experienced a large loss or have been absent from the platform for several days.

124.    DraftKings has its VIP Hosts do this because these promotions are themselves designed to encourage users to gamble more and to develop and entrench gambling habits.

125.    In short, DraftKings uses its data and trains its hosts to induce rather than prevent problem gambling.

**D. DraftKings' "Risk-Free Bet" and "No-Sweat Bet" promotions**

126.    DraftKings offers a variety of promotions to new users that falsely state they can try out the platform without any risk of losing money. The dollar amount that can be placed "Risk-Free" or "No Sweat" varies but can be as much as $1,000.

127.    Such tantalizing offers have been effective at persuading new users to open betting accounts they may not otherwise have opened and to wager amounts they may not otherwise have risked. That is what happened to the Plaintiffs De Leon and Mirsberger. After DraftKings' lured Plaintiffs and others into placing bets based on the promise that they would be risk-free, Plaintiffs discovered that the money they wagered had in fact been lost.

128.    Since at least 2020, DraftKings has advertised no-risk gambling promotions to countless people watching MLB, NFL, NBA, and NHL games on television.

129.    For those not watching televised sports, DraftKings ads for no-risk promotions were inescapable on New York highways and public transportation.

130.    DraftKings has also advertised risk-free betting on Twitter, Instagram, Facebook, and TikTok feeds of millions of potential users through direct advertising and paid partnerships with influencers.



*Figure 3: Post on Twitter (now X) from user @SoManyWays2Joey (host of a popular NHL podcast on a network partnered with DraftKings) advertising a "Risk-Free Bet" up to $1,000; dated July 14, 2022. (https://x.com/SoManyWays2Joey/status/1547647893254746116)*

131.    Finally, DraftKings often directly emails its users including Plaintiffs encouraging them to log in and place no-risk bets.

132.    These no-risk bets involve substantially more risk than DraftKings' promotional materials lead customers to believe. When a customer loses their initial bet, they are not in the same position as they were before placing the wager.

133.    DraftKings' advertising misleading implied the contrary and concealed several key feature of the no risk promotion that would have allowed customers to determine that opting into the promotions did, in fact, involve risk of losing their money.

134.    First, DraftKings misrepresented that a user could place a bet at no risk to themselves when there was necessarily risk, because a consumer cannot simply cash out a refund if they lose, but instead must place another bet (the so-called "Bonus Bet") that they receive in the event they lost their original wager.

135.    Second, DraftKings misleadingly implied that a user could be restored to their

original position if they original bet lost because they would receive a "Bonus Bets."

136.    When a user places a bet as part of a no-risk promotion, they are wagering their own money.  If the customer loses their initial bet, their account is debited the amount of their loss in U.S. dollars (in this case $100), and their account is credited with a "Bonus Bet" of the same amount. But a "Bonus Bet" is not worth its cash equivalent even when placed on an even-odds winning bet.

137.    According to DraftKings itself, "Bonus Bets," have no cash value, are non-transferrable, have an expiration date, and cannot be withdrawn from the account. Thus, in order to turn a "Bonus Bet" into U.S. dollars that can be deposited back into a bank account, a user must use the "Bonus Bet" to place an additional wager within the specified time limit *and win*.

138.    Furthermore, even when a customer wins a bet with the "Bonus Bet", they do not receive the stake back—which is what DraftKings purportedly gave them for free. If a customer uses a $100 "Bonus Bet" on a winning wager with 50/50 odds, they are paid out $91 ($100 winnings, minus 9% vig, without a return of the $100 stake). Of course, there is no guarantee that a user will win the "Bonus Bet". If a "Bonus Bet" loses, the user will be paid out nothing.

139.    Finally, DraftKings misrepresented there was no risk because there is the risk of losing all the money originally wagered. If a user loses their "Bonus Bet," they have no further means of recouping the initial amount they wagered.

140.    The false promise of "Risk-Free" and "No Sweat" bets was strategically and misleadingly designed to overcome new users' skepticism of gambling and to grab market share in the freshly legal sports betting industry.

141.    DraftKings was aware of the effects of such promises on new users' thinking: "If it's no-risk, why not bet more?"

142.    DraftKings deliberately tricked gambling-naive customers in New York into falling for these promotions by not clearly communicating that those signing up for the "No Sweat" promotion were, in fact, at risk of losing their money. Customers relying on their commonsense understanding of the "No Sweat" offer on promotional materials—and not understanding the complex terms laid out several layers deep in fine print that contradict DraftKings' large-print promises—were surprised to discover upon losing their "No Sweat Bet" that, in order to get *some* of their money back, they needed to make an additional, successful wager. DraftKings intentionally supplemented this confusion by using the dollar symbol ($) in its promotional materials.

143.    As alleged above, DraftKings advertised these no-risk bets to New York users on numerous occasions, often targeted specifically to new customers or existing customers who had not placed a certain type of bet before.



*Figure 5: A March 2024 advertisement promoting a "No Sweat Bet" of up to $1,000 for new customers used by DraftKings in various digital advertising media including on Twitter.*



*Figure 7: Twitter post, dated April 19, 2022, promoting a "Risk-Free Bet".*

*(https://x.com/DKSportsbook/status/1516544714425708552)*

144.    Some of DraftKings' advertisements for no-risk promotions include very small print referencing other terms.

145.    Other times DraftKings' advertisements for no-risk promotions did not include any reference to the full terms of the promotion at all.

146.    DraftKings goes to great lengths to make it onerous to even comprehend that additional fine print terms apply. First, the link to the terms of the promotion are not even made available to a user until after the customer has already logged into the platform in response to an off-platform advertisement for the promotion and clicked through several steps to get to the point of placing the supposedly no-risk bet.

147.    Even then, DraftKings buries the most important term—that if you lose your

original bet you only get an expiring "Bonus Bet" back which is not treated like a normal bet in how it is paid out. Presently, the vital information—which contradicts the large print promises that the customer is not at risk if they lose—only appears behind a tiny hyperlinked information symbol and then, if the symbol is clicked, deep in very small text below several blocks of much larger text focusing on other aspects of the promotion.



*Figure 8: Screenshot taken November 11, 2024, of the DraftKings user interface for placing a "No Sweat" bet. No terms and conditions are displayed. Instead, they are obscured by an easy-to-miss hyperlink, seen here as the almost imperceptible "i" with a small green circle around it next to "NBA No Sweat SGP or SGPx"*

148.    A user need not—and Plaintiffs did not—ever see the full terms before opting in

to the promotion on the basis of DraftKings' advertising that led them to believe they could place a bet with no risk.

149.    For example, a user could opt into a "No Sweat" NBA same game parlay on DraftKings by flipping the green switch in the app shown above without ever clicking the tiny I symbol. Otherwise, they are never shown this disclosure of the promotion's full terms, which itself buries the lead:



 

years of age or older (18+ if in DC/KY/NH/WY) (19+ if in CA-ONT). Any customer who is found to be ineligible to play on DraftKings (i.e., by way of self-exclusion from gambling, restriction due to employment, or otherwise) may not participate in this Promotion and immediately forfeits any bonus rewards which have been awarded under this Promotion.

In addition to the eligibility requirements set forth above and in the DraftKings Terms of Use, to participate in the Promotion, customers must (1) be a registered DraftKings Sportsbook customer with an active account; (2) receive an offer to participate in this Promotion; and (3) opt-in by clicking on the appropriate link or button within the Promotional Period.

NO SWEAT BET REDEMPTION

Upon completion of the promotion requirements, eligible customers will be awarded one (1) No Sweat Bet (the "Token"). Token valid only on 11/27 NBA bets (the "Qualifying Bet"). Minimum odds per leg of -500 or longer. Cashed-out bets and voided bets will void this Promotion. Bets placed with bonus rewards (including but not limited to Bonus Bets, Odds Boosts/Surges, Profit Boosts, etc.) are not valid. Token expires at the conclusion of the final 11/27 NBA game. Qualifying Bet must be placed using cash from your cash balance or DK Dollars. Maximum reward limits apply and vary by customer cohort. Maximum reward limits will be clearly and conspicuously disclosed to the customer upon opting in.

No Sweat Bet Tokens are single-use, non-withdrawable, and have no cash value. Must meet Qualifying Bet criteria and select Token BEFORE placing Qualifying Bet. Token only applies to Qualifying Bet. Reward issued only if Qualifying Bet loses after applying Token. Reward issued as Bonus Bet(s) based on the amount of losing Qualifying Bet. No Sweat Bet may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

REWARD LIMITATIONS

Bonus Bets are single-use, non-transferable, non-withdrawable, and have no cash value. Bonus Bets are valid for seven (7) days (168 hours) from the time they are credited to customers' accounts. Customers can choose when to use Bonus Bets and must select the Bonus Bet in their betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and

betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and wins, only the profit of $10 will be credited to the customer's account. Bonus Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

GENERAL TERMS

Limit one (1) offer per customer. Customers must opt-in to this Promotion each time it is offered. Opting-in to this Promotion during a single day is only valid during that day and does not opt the customer into future periods. See DraftKings Sportsbook Terms of Use for information and limitations on wagering. Each customer will be notified when they have received an award by (1) a bell notification (this is a notification that displays as a bell icon on the home page of the DraftKings Sportsbook app and website that can be clicked on to view short confirmation copy and terms) and/or (2) an automatically triggered email if the customer successfully entered the promotion and completed the promotion requirements. Whether a customer has committed abuse of this Promotion, violated the Promotion Terms or DraftKings Terms of Use, will be determined by DraftKings in its sole discretion, for any reason or no reason at all. Should you wish to cancel your participation in this promotion at any time, please contact customer experience at sportsbook@draftkings.com. Upon cancellation, you may withdraw any remaining funds deposited in connection with this promotion subject to DraftKings Terms of Use. Any wager placed on DraftKings Sportsbook in connection with the promotion cannot be rescinded once it has been placed. However, any applicable bonus rewards in your account shall be void, subject to forfeiture, and may not be transferred or withdrawn. All promotions are subject to the DraftKings Terms of Use and Privacy Policy. By accepting any bonus rewards, registered customers agree to abide by the terms and conditions of this Promotion. Promotional offer is subject to regulatory approval. Void where prohibited by law. DraftKings account holders are responsible for any and all local, state, or federal taxes. DraftKings is not liable for computer or program malfunctions, nor for errors in bonus rewards. DraftKings reserves the right to exclude or remove certain customers from this Promotion, as well as the right to withhold bonus rewards if you have violated or attempted to violate the Promotion Terms or DraftKings Terms of Use, including but not limited to sharing account credentials with other individuals, placing wagers on behalf of other individuals, circumventing DraftKings age and location verification procedures, and abusing the DraftKings Platform, the Services, or any bonuses, the refer-a-friend program, or



*Figure 9: The full terms of use for the promotion pictured in Figure 7. If a user navigates to these terms through the obscured hyperlink, they are met with an impractically small font size.*

150.    Regulators are increasingly catching on to the misleading language DraftKings and other sportsbooks use in advertising "risk-free" bets. Several illustrative examples are discussed below.

151.    In Ohio gambling regulators have said such "free" or "risk-free" inducements are "false, misleading and explicitly against" state law. Matthew Schuler, executive director of Ohio's Casino Control Commission, recently said: "If something is claiming to be free or risk-free, then it has to absolutely not require the patron to incur any loss or risk their own money." Disclosing the risks within the terms and conditions isn't good enough, he added. "We are not

supportive of trying to put the truth in small print."[19]

152.    DraftKings was sent a notice of violation by the Ohio Casino Control

Commission which included a penalty of $150,000 for the use of "Risk-Free Bet" language.

Previously, DraftKings had received a notice of violation from the same commission for

advertising to individuals under the age of twenty-one.

153.    The Massachusetts Gaming Commission prohibits sportsbooks from running

promotions advertised as "free" or "risk-free" if a bettor needs to risk their own money as part

of the promotion. *See* 205 Mass. Code Regs. § 256.04. Colorado has imposed a similar

prohibition. *See* 1 Colo. Code Regs. § 207-2:9.4

154.    Even the NBA took a stance on the "risk-free" language, banning it on platforms

operated by the NBA or its franchises in February of 2023.[20]

155.    Most importantly, in 2022, the New York Attorney General's office

admonished: "Since online sports gambling became legal in New York last month, New

Yorkers have been bombarded with misleading ads on social media and streaming sites that

claim 'risk-free' bets and '$1,000 welcome offers,' which sound like free money, but often

come with strings attached without consumers' awareness."[21]

156.    Many of the sportsbooks, including DraftKings, started to quietly move away

---

[19] Danny Funt, *Sportsbooks call them risk-free bets. Just don't read the fine print.*, WASHINGTON POST, Dec. 26, 2022, https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/ (last visited Nov. 17, 2024).

[20] Bill King, *Concerned about betting's inherent dangers, NBA to ban 'risk free' advertising*, SPORTS BUSINESS JOURNAL, Feb. 6, 2023 https://www.sportsbusinessjournal.com/Journal/Issues/2023/02/06/Upfront/betting.aspx (last accessed Nov. 21, 2024).

[21] *CONSUMER ALERT: Attorney General James Warns New Yorkers of Deceptive Online Sports Betting Companies Ahead of Super Bowl*, NEW YORK ATTORNEY GENERAL, Feb. 10, 2022, https://ag.ny.gov/press-release/2022/consumer-alert-attorney-general-james-warns-new-yorkers-deceptive-online-sports#:~:text=Since%20online%20sports%20gambling%20became,strings%20attached%20-without%20consumers'%20awareness (last visited Nov. 17, 2024).

from explicit "risk-free" language in late 2022. In that year, DraftKings pivoted to labeling these offers "No Sweat" bets. These promotions are materially no different, and just as misleading, as their "Risk-Free" predecessors, particularly considering that consumers in New York still associate these offers, however labeled, with the "Risk-Free" promotion campaigns that were incessantly advertised on countless NFL, NBA, NHL, and MLB games. Nevertheless, DraftKings has continued to imply that betting on its platform in New York can be no-risk as recently as December 2024.



*Figure 10: A "No Sweat" NBA offer on the DraftKings Sportsbook app from December 4, 2024.*

157.    According to a Washington Post article, industry participants admitted publicly that advertising offers as no-risk was "unclear."

158.    Nevertheless, DraftKings continued to make these offers because it expected and intended consumers to be misled by its "Risk-Free" and "No Sweat" promotions.

159.     At no time in DraftKings' marketing or during DraftKings' sign-up process were Plaintiff and the Class Members warned of the true financial risks of using DraftKings' services to place a bet, including the immediate and acute risk of losing the entire amount in that initial bet, the risk that losses would never be reimbursed by Defendants, and the longer term financial and psychological risks of developing a gambling addiction.

160.     As described above, Defendants' marketing (including during the user sign-up process) misrepresented and omitted several key facts about the "No Sweat" bet promotions.

161.     Because a "Bonus Bet" cannot be deposited in the customer's bank account as cash and must be gambled quickly to have any value at all, there is nothing free of risk about the original transaction.

162.     However, customers like Plaintiffs who were misled into thinking that they could bet without risk and then lost their bet ended up losing all or a substantial portion of their initial stake.

163.     Had the Plaintiffs and Class Members understood the true risk inherent in making these "risk-free bets," they would have acted differently and not lost as much money.

**E.  DraftKings' "Deposit Match" promotions**

164.     No-risk bet offers are not the only deceptive promotions that DraftKings employs. For several years, DraftKings has also been offering a bonus of up to $1,000 for new customers who opened accounts and deposited money.

165.     Since at least 2022, DraftKings has advertised their promises of a "$1,000 Sign Up Bonus" to countless New Yorkers watching televised MLB, NFL, NBA, and NHL games, and have made themselves regulars on the Twitter, Instagram, Facebook, and TikTok feeds of their millions of followers.

166.     DraftKings also advertised sign-up bonuses on billboards and public

transportation in New York.

167.    The unfair and deceptive terms of this promotion, which they offer to this day, make it inordinately unlikely for a user to obtain the advertised $1,000. Omitted from the promising headline is the reality that DraftKings will only match 20% of a user's deposit and will require a user to play through (and risk) 25x the amount of bonus money rewarded.

168.    In plain terms—which the fine print regarding this promotion deliberately obscures and the large-print advertisements for this promotion completely misrepresent—in order for a user to get a $1,000 bonus, they actually need to deposit five times that amount ($5,000), and then, within 90 days, *risk $25,000 on DraftKings sports bets*.

169.    Additionally, in order to satisfy the playthrough requirement, DraftKings requires that these bets be placed at minimum odds of -300 (meaning a bettor must risk $300 to win $100). This means bettors must place a series of highly-risky bets to satisfy the playthrough requirements.

170.    None of the foregoing is adequately disclosed to the customer.

171.    A user is statistically likely, even using the most conservative betting approach, to lose money trying to satisfy the playthrough requirement.

172.    But even if they make it through all those steps, the $1,000 bonus is not rewarded as withdrawable cash funds, but rather as "DK Dollars" that hold no cash value, are non-withdrawable, non-transferable, non-refundable, and can only be used for further gambling.

173.    DraftKings' advertising of the Bonus is also unfair and deceptive because an eligible consumer who often is a new participant in New York sports betting, would be unlikely to understand the cost and risk involved in qualifying for the $1,000 Bonus. In fact, if the Plaintiffs had understood the cost or the odds of winning the Bonus, they would not have acted

36

upon the promotion.

174.    DraftKings advertised the "$1,000 Bonus" as a reward for signing up for its

Sportsbook platform in these terms:



*Figure 11: DraftKings post on Twitter, dated February 15, 2022, using fan-favorite NBA player*

*Paul Pierce to promote false promises of a "Deposit Bonus up to $1,000".*

*(https://x.com/DKSportsbook/status/1493660970870312967)*



*Figure 12: Screenshot from an advertisement typical of those broadcasted by DraftKings on television and digital media in New York during the Class Period.*



*Figure 13: A Twitter post, dated April 20, 2022, featuring rapper Lil Wayne and promising customers that they can simply "Download the [DraftKings] app today and get a deposit bonus up to $1,000". (https://x.com/DKSportsbook/status/1516830656721993729)*

175.     Plaintiff Mirsberger saw advertisements for DraftKings' sign-up bonus promotion shortly before he funded his accounts on DraftKings.

176.     Plaintiff Mirsberger was misled by the advertising for the promotion and, as a

result, he deposited more money than he would have with DraftKings had he been informed of the actual terms of the promotion.

177.    As with the no-risk promotion advertisements, the terms of this promotion are not fully disclosed in the advertisements and, to the extent that they are communicated, they appear in an illegibly small font-size—an order of magnitude smaller than the misleading text advertising the promotion—and are confusingly worded.

178.    Plaintiff Mirsberger and many other users signed up for DraftKings and funded their account anticipating that their deposit would be "matched" in full up to $1,000.

179.    Plaintiff Mirsberger and most users never became aware that there were additional terms, much less saw the full terms of the promotion or learned that their funds would not be matched in U.S. Dollars, not be matched on a 1:1 basis, and would only be matched at a rate of one DK Dollar for every $25 USD wagered.

180.    Notwithstanding the large text of DraftKings' advertisements, a new customer of DraftKings was never going to simply receive "up to $1,000" in exchange for signing up for the sportsbook platform and depositing $1,000, as the ads implied. In order for a new customer to obtain the "$1,000 Bonus," he or she would have to satisfy three very onerous requirements, explained only in the unreadably small font size above:

    a.    They would have to deposit $5,000 up front;

    b.    They would have to bet $25,000 within 90 days;

    c.    Their $25,000 in bets would have to be placed on wagers with odds of "-300 or longer."

181.    Plaintiff Mirsberger and other users could not reasonably have been expected to understand from the face of DraftKings' advertisements that, in order to receive a $1,000

bonus, he or she needed to immediately deposit $5,000, because the bonus amount is calculated as 20% of the consumer's first deposit.

182.    Plaintiff Mirsberger and other users could not reasonably have been expected to understand from the face of DraftKings' advertisements that the $1,000 bonus would not be provided at the time of their initial deposit, but that instead he or she would earn the bonus only $1 at a time for every $25 wagered. Thus, to receive the $1,000 bonus, the new customer would have to risk $25,000 within 90 days on bets that DraftKings' odds-makers consider to have a less-than-75% likelihood of winning (–300 odds or longer).

183.    Plaintiff Mirsberger did not understand and could not reasonably have been expected to understand based on DraftKings' advertisements that, in order to place bets for at least $25,000 over 90 days to qualify for the Bonus, he would have had to wager an average of more than $276 gambling on sports every day for three months.

184.    Plaintiff Mirsberger also did not understand that, even if he met the $5,000 initial deposit and $25,000 of gambling in 90 days requirements, the Bonus would not be awarded in funds that could be withdrawn, but only as a non-withdrawable credit ("DK Dollars") to be used for further gambling.

185.    Plaintiff Mirsberger and Class Members also could not reasonably be expected to understand that they would be required to make bets with a high level of risk to satisfy the play-through requirements. They could not have been expected to understand that, contrary to the express terms of the advertisements for the "Bonus Match" promotion, not all bets they made on DraftKings Sportsbook would count toward the $1,000 bonus. In fact, any bets that DraftKings' oddsmakers believe have a greater than ~75% chance of winning would not count toward the required total bets of $25,000 within 90 days.

186.     Gambling regulators, like the New York Attorney General, have sounded warning bells about the misleadingness and illegality of deposit match promotions just like the ones DraftKings used on Plaintiff Mirsberger.

187.     DraftKings knew, or should have known, that its advertisement and promotion was deceptive to its target customers, who were customers new to sports betting and who were extremely unlikely to understand the details of the promotion, even if it were in readable English on the company's platform or in a font size that a reasonable consumer could be expected to read.

188.     DraftKings knowingly and intentionally designed this promotion to maximize the number of consumers that would sign up for its sports gambling platform, the number of bets that would be placed through the platform, and the amount of money that would be placed on bets through its platforms.

189.     DraftKings also offers and advertises other deposit match promotions available to users who have existing accounts with varying total amounts and playthrough requirements, which are equally misleading in that the terms regarding the percentage match, playthrough requirements, and reward are inadequately disclosed and are inconsistent with the large-print promises DraftKings makes when offering users the promotion.

190.     After Plaintiff Mirsberger signed up and began using DraftKings heavily he was often offered deposit match promotions directly by the VIP Hosts assigned to him.

191.     Sometimes if Plaintiff Mirsberger did not respond to an offer his VIP Host sent him for a deposit match promotion, they would text him again, emphasizing the need to act quickly to accept the promotion by making a deposit.

192.     Often these texts would be sent after Plaintiff Mirsberger had managed to pull

himself away from the platform where he was losing so much money.

193.    For example, Plaintiff Mirsberger took a break from DraftKings in May 2024 after experiencing significant losses. Then, at the beginning of September 2024, a DraftKings VIP host texted him with a deceptive "100% deposit match" offer, which predictably led Plaintiff Mirsberger to resume gambling.



*Figure 14: Text messages sent to Plaintiff Mirsberger by his DraftKings VIP Host "Rocco" offering him a deposit match promotion without disclosing the terms of any playthrough requirements.*

### F. DraftKings designed its interface to prevent users from learning of the additional terms and understanding that promises in its advertisements were false

194.    Consumer psychology research has identified several factors that decrease

people's likeliness to read the fine print of consumer contracts.[22] First, researchers point out that when contract forms are intentionally made not user-friendly, consumers are less likely to engage with them.

195.     For example, researchers at New York University note that "Font sizes are often very small and the clauses within sentences can be very long which can make it physically difficult and taxing for consumers to read."[23]

196.     The terms of a "Risk-Free Bet" and "Sign Up Bonus" are often over one thousand words long with small font sizes and lengthy sentences that make it excessively taxing for users to follow.

197.     The NYU researchers' paper goes on to mention that "Even if consumers were able to dissect the legalese in which contracts are written, the process of doing so would be exceedingly difficult especially since relevant passages are often buried in other language."

198.     DraftKings only reveals the truth of its unfavorable promotions after multiple paragraphs describing age and location requirements for betting on their platform. Even if a user is able to hunt down language that describes the promotion's reality, it is written in a way that makes it unlikely that a layperson—who is eager to get gambling—will understand.

199.     Furthermore, according to the NYU researchers, "consumers will also often have

---

[22] Meirav Furth-Matzkin & Roseanna Sommers, , *Fool Me Once, Shame On Me: How Consumers And Lawyers Perceive The Fine Print In Deception Cases*, HARVARD JOHN M. OLIN CENTER FOR LAW, ECONOMICS, AND BUSINESS - FELLOWS' DISCUSSION PAPER SERIES, June 2018, https://www.law.harvard.edu/programs/olin_center/felows_papers/pdf/Furth_82.pdf (last visited Dec. 10, 2024); Florencia Marotta-Wurgler, , *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts"*, U. CHI. L. REV., Feb. 6, 2011, https://lawreview.uchicago.edu/sites/default/files/78-1-Increased%20Disclosure%20in%20Software%20Contracts-Marotta-Wurgler.pdf (last visited Dec. 10, 2024).
[23] Debra Pogrund Stark & Jessica M. Choplin, *A License to Deceive: Enforcing Contractual Myths Despite Consumer Psychological Realities*, NYU JOURNAL OF L. AND BUS., Feb. 9, 2009, https://papers.ssrn.com/~sol3/papers.cfm?abstract_id=1340166 (last visited Dec. 10, 2024).

difficulty imagining problems that might arise. That is, scenarios under which things can go wrong never enter their minds."

200.    After exposure to DraftKings promising headlines, consumers are unlikely to predict that redeeming these promotions will entail such onerous requirements and fruitless rewards.

201.    The authors also write that "even if some consumers manage to foresee the possibility of potential negative consequences, they will often be overly optimistic in assessing the probability of those negative consequences once they have invested even a small amount of time, effort, or other resources pursuing a goal."

202.    By the time a user is presented with the full terms of a promotion, they have grown excited about DraftKings' alluring promises and have put time and effort into navigating to the platform's compelling offer.

203.    Moreover, research shows that social norms often discourage reading the fine print of a contract. Consumers believe that DraftKings, a company operating in a heavily regulated industry, can be trusted for the promises it's making in its advertisements. Consumers do not think, therefore, that they need to carefully read pages of fine print to protect themselves.

204.    Finally, DraftKings' contract is one of adhesion with terms that are non-negotiable, "[a]nother major reason why people might not read the contracts that they sign... [is that t]he consumers' choice is to accept the offered agreement or go elsewhere." DraftKings customers understand that reading the fine print will not lend itself to mediating a more favorable deal.

205.    DraftKings exploits these factors and misleads consumers about material aspects of its promotions, secure in the knowledge that few consumers will notice if the fine print

contradicts what they believed they had signed up for.

### G. DraftKings ignored the clear signs of Plaintiff Mirsberger's gambling addiction and instead of cutting him off or connecting him with resources, used VIP Hosts to feed him promotions and encourage him to continue gambling

206.     Plaintiff Mirsberger began using DraftKings in October of 2023. By the end of 2023 he had developed a serious gambling addiction and already lost over $17,000 on the platform.

207.     Based on Plaintiff Mirsberger's behavior on the platform, DraftKings' algorithms identified Plaintiff Mirsberger as the type of user that might be most profitable to the company and began offering him more and more promotions requiring more and more playthroughs to satisfy.

208.     Among these promotions were "No-Sweat Bet" promotions, which Plaintiff Mirsberger was surprised and dismayed to discover were not actually risk free and, as described above, required him to place more wagers if he lost the initial "no-sweat" bet just to have a chance to win back some of the money he lost. These promotions were also intentionally designed to inculcate dangerous gambling habits in Plaintiff Mirsberger.

209.     One of these dangerous gambling habits that the "No-Sweat Bet" promotions develop is chasing losses, wherein a gambler tries to win back money that they've lost in one bet by placing further bets. Prior to being enticed into using the "No-Sweat" promotions, Plaintiff Mirsberger did not chase his losses, but after opting into it, discovering his initial bet was not actually free of risk and that all it gave him was an opportunity to gamble more to recoup his money, Plaintiff Mirsberger began chasing his losses on DraftKings more and more.

210.     Eventually, because Plaintiff Mirsberger was betting more and more money on DraftKings, he began to hear from a DraftKings employee who introduced himself as "Ian" and

stated he was Plaintiff Mirsberger's "VIP Host."

211.    Ian, and then Michael and Rocco—the DraftKings VIP Hosts who replaced him—routinely called and texted Plaintiff Mirsberger offering him promotions designed to get him to gamble more and more.

212.    These communications from the VIP Hosts included neither information or steps to self-exclude or take a break from gambling on DraftKings nor a problem gambling hotline number.

213.    To take advantage of DraftKings' deceptive promotions and at the urging of his VIP Hosts, Plaintiff Mirsberger was making deposits of thousands of dollars a day and suffering losses of as much as $10,000 a day.

214.    Whenever Plaintiff Mirsberger suffered a significant loss or managed to take a break from DraftKings' platform, his VIP Host would offer him a promotion to try and win back the money he lost, but requiring him to make a new deposit to do so.

215.    DraftKings has sophisticated data on its customers that it uses to time its contacts and offers with them to induce them to continue gambling or to gamble more at the very moment they would otherwise have taken a break.

216.    Despite DraftKings stating that they encourage its customers to use "helpful tools" like "cool-off periods" when they are struggling with problem gambling, it actually uses its digital and VIP Host outreach to strategically stymie users' efforts to take a break from gambling, especially when the users are gambling addicts who are losing significant sums of money on DraftKings.

217.    DraftKings only cuts users off when they raise a complaint or have already lost so much money that their deposits are decreasing.

218.    From October 2023 through the end of December, Plaintiff Mirsberger wagered almost seven times his annual income of around $28,000.

219.    Over the course of 2024, at the urging of his VIP Hosts and despite attempting to take several breaks from the platform, Plaintiff Mirsberger's gambling only increased and he wagered almost fifteen times his annual income of around $35,000.

220.    In less than two years, Plaintiff Mirsberger lost over $45,000 on DraftKings, which amounted to essentially all the money he earned during the period he was using DraftKings.

221.    DraftKings did not follow industry standards or its own internal policies and procedures for verifying the income and source of funds for users like Plaintiff Mirsberger placing large bets on its platform.

222.    In the alternative, DraftKings intentionally does not collect information regarding its users' sources of funds and income so that it can take more money from its users than they can afford to lose.

223.    To the extent DraftKings does ask users about their income, it does so with yes or no questions like, "are you depositing expendable income that you can afford to possibly lose?" that DraftKings expects users with gambling problems will lie in response to.

224.    DraftKings knew or should have known that Plaintiff Mirsberger was gambling far beyond his means.

225.    Had DraftKings followed its own policies and verified Plaintiff Mirsberger's income and source of funds, Defendant would have had no choice but to cut him off.

226.    Even without verifying Plaintiff Mirsberger's income as it should have done, DraftKings was on notice that Plaintiff Mirsberger was putting every penny he had into the

platform as a result of his gambling addiction.

227.    Plaintiff Mirsberger frequently told his VIP Hosts that he was unable to afford daily necessities like food, transportation, and medicine as a result of his gambling on DraftKings.

228.    For example, in September of 2024, Plaintiff Mirsberger informed his VIP Host that he "just lost my last $1,750" trying to take advantage of a $500 deposit match bonus and was unable to pay his bills for the month.



*Figure 15: Text message Plaintiff Mirsberger sent to his DraftKings VIP Host on September 23, 2024.*

229.    After Plaintiff Mirsberger sent this message and others like it, DraftKings did not take any action to verify his income, limit his betting or deposits, or even to connect him with resources for his gambling addiction.

230.    Instead DraftKings offered Plaintiff Mirsberger more addictive promotions and the illusory chance to recover some of his losses.

231.    For example, two months after Plaintiff Mirsberger informed DraftKings that he had gambled himself broke his VIP Host sent him a text about a new deposit promotion that required him to place more bets in order to cash out the money he was being offered.



*Figure 16: Text message Plaintiff Mirsberger received from his DraftKings VIP Host on November 26, 2024.*

232.    Only after Plaintiff Mirsberger contacted his DraftKings VIP Host and informed him that he was not doing "so good" and had "lost my final $3,400" did his account get flagged and forwarded to DraftKings' "Player Protection Team" for review.

233.    By that point, Plaintiff Mirsberger had been reduced to setting up a GoFundMe to pay his bills.

234.    DraftKings waited until Plaintiff Mirsberger had no more money to deposit before it took any action to connect him with resources for his gambling addiction or cut off his use of the platform.

235.    DraftKings' development of and adherence to income verification policies and source of funds verification policies is significantly worse than that of other online sports betting proprietors.

236.    DraftKings has prioritized taking users' money, regardless of where that money comes from or how much of it they have to lose, over implementing industry-standard practices to ensure users are betting their own money and within their means.

## CLASS ALLEGATIONS

237.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the following class and subclasses for which certification will be sought, defined as follows:

238.    **No-Risk Promotion Class:** Any person who opted into a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their bet.

   a.    **New York Subclass:** Any person who wagered in the state of New York and utilized a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their first bet within the applicable statute of limitations period.

239.    **Deposit Match Bonus Promotion Class:** Any person who opened an account and deposited money in response to a DraftKings "Deposit Match" promotion.

   a.    **New York Subclass:** Any person who opened an account and deposited money while in the state of New York in response to a DraftKings "Deposit Match" promotion.

240.    **DraftKings VIP Host Targeted Class:** Any person who was enticed by DraftKings' VIP Hosts to gamble beyond their means.

   a.    **New York Subclass:** Any person who opened an account and was enticed by DraftKings' VIP Hosts to gamble beyond their means while located in the state of New York.

241.    Excluded from these Classes are (a) Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; (b) class counsel and their employees; and (c) the judicial officers and Court staff assigned to this case

and their immediate family members.

242.    The Class Period for each promotion class is tolled to the earliest date of DraftKings' distribution of each of the relevant promotions under the continuing violation doctrine. DraftKings has engaged in an ongoing scheme to mislead consumers regarding the true terms of its promotions. As described more fully above, Plaintiffs have been misled and injured by the cumulative effect of DraftKings' misleading advertisements since gambling was legalized in New York.

243.    Alternatively, the Class Period extends from the relevant statutory limitations period for each cause of action through the date of judgment in this case and includes any continuing violations that DraftKings engages in while this litigation is pending.

244.    This case is properly brought as a class action for the following reasons:

   a.    **Ascertainability:** The Class Members can be readily identified through Defendants' records which will include a record of all those users who signed up for various promotions and must also track customer's state of residence. The members will be identified by filtering DraftKings' records for users who entered into each of the identified promotions and lost money.

   b.    **Numerosity:** The Class is so numerous that joinder of all members in this action is impracticable. The exact number and identity of all Class Members is unknown by Plaintiff at this time. However, Plaintiffs believes there are tens of thousands and potentially even hundreds of thousands of Class Members. The number and identity of Class Members can be determined through discovery of Defendant.

   c.    **Commonality and Predominance:** Plaintiffs and Class Members were all injured by the same unlawful conduct. Therefore, this action involved common

questions of law and fact, which predominate over any questions affecting only individual Class Members, including, without limitation:

- Whether DraftKings misrepresented in its advertisements that the Plaintiffs and the other No-Risk Promotion Class Members would not be at risk of losing money when they made a deposit and placed a first bet;

- Whether DraftKings intentionally designed its advertisements for the no-risk bet in such a way as to mislead the Plaintiffs and the other No-Risk Promotion Class Members in order to induce them to sign up and wager;

- Whether DraftKings' representations and omissions about the no-risk promotions are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings misrepresented in its advertisements the Bonus it was offering to the Plaintiffs and the other Signup Bonus Promotion Class Members

- Whether DraftKings intentionally designed its advertisements for the signup bonus promotions in such a way as to mislead the Plaintiffs and the other Signup Bonus Promotion Class Members in order to induce them to sign up and wager;

- Whether DraftKings' representations and omissions about the Signup Bonus Promotion are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings adequately disclosed the facts and/or risks concerning the use of its sportsbook service;

- Whether DraftKings trains its VIP Hosts to ignore the signs of problem gambling;

- Whether DraftKings has a duty to take certain steps to identify when its users are gambling beyond their means

- Whether DraftKings has a duty to take action when it has reason to know that a user is gambling beyond their means;

- Whether DraftKings' actions violate New York statutory law regarding unfair business practices invoked herein;

- Whether DraftKings' actions violate the New York common law causes of action invoked herein; and

- The appropriate measure of damages to award Plaintiffs and the other Class Members.

d.  The appropriate injunctive relief to which Plaintiffs and the other Class Members are entitled.

e.  **Typicality:** Plaintiffs' claims are typical of those of the other Class Members' claims because Plaintiffs and each of the other Class Members were induced to transact on DraftKings by one or more of the identified promotions and/or by the actions of VIP Hosts. The promotions identified were widely distributed by DraftKings over a long period of time and the promotion that the Plaintiffs responded to does not materially differ from promotions that any other Class Member would have responded to. The misrepresentations at issue were substantially uniform in content, presentation, and impact upon Plaintiff and Class Members. Plaintiffs' injury has been caused by the same conduct of

DraftKings, which would provide the same basis for a claim for all Class Members.

f.  **Adequacy of Representation:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class Members whom they seek to represent. Plaintiffs intend to vigorously prosecute this action, and Class Members' interests will be fairly and adequately protected by Plaintiffs and their chosen counsel. Plaintiffs have retained counsel that is competent and experienced in complex class action and consumer protection and Plaintiffs' counsel will devote the time and financial resources necessary to vigorously prosecute this action. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

g.  **Superiority:** A class action is superior to individual adjudications because joinder of all Class Members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. Furthermore, the amount-in-controversy for each individual Class Member is likely relatively small, and if each Class Member were required to file an individual lawsuit, Defendant would necessarily gain a significant and unfair advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each Class Member. This is an appropriate forum in which to litigate these claims, as the New York state population and the Class

Members are concentrated in this forum. Finally, there are no particular difficulties presented by the management or trial of this action as a class action.

h. **Declaratory and Injunctive Relief**: DraftKings acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, such that final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**Violation of New York General Business Law § 349, (Asserted on behalf of No-Risk Promotion New York Sub-Class)**

245.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

246.    Plaintiffs De Leon and Mirsberger bring this claim against DraftKings under New York consumer protection law, individually and on behalf of the No-Risk Promotion New York Sub-Class.

247.    New York consumer protection law declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state" N.Y. Gen. Bus. Law § 349.

248.    The circumstances that relate to the transactions giving rise to this claim occurred primarily and substantially in New York because DraftKings caused to be disseminated throughout the state of New York through advertising, marketing, and other publications, statements that were deceptive and misleading, and which it intended would mislead consumers in New York.

249.    DraftKings' misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers were exposed to

DraftKings' material misrepresentations.

250.    DraftKings' conduct was unfair and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the no-risk promotions.

251.    DraftKings' conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the no-risk promotions.

252.     DraftKings' conduct violated New York law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers could place bets without risking their own money when, in fact, this was not the case.

253.    DraftKings' conduct was additionally deceptive and because it violated the New York State Gaming Commissions' regulations regarding sports gambling advertising, which require sports gambling advertisements to comply with advertising guidelines issued by the National Council on Problem Gambling and specifically prohibits "deceptive or misleading statements or elements, including, without limitation, those concerning . . . the rules, terms or conditions of wagering." N.Y. Comp. Codes R. & Regs. tit. 9 §§ 5329.37, 5325.6 ("A false, deceptive or misleading statement or element includes, without limitation, one that reasonably would be expected to confuse or mislead patrons in order to induce them to engage in sports wagering.").

254.    DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

255.    DraftKings's misrepresentations were material because they were likely to

deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its no-risk offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiff and Class Members.

256.    DraftKings advertised its no-risk promotion with no intent to sell its services and with intent that the Plaintiffs and Class Members be misled by the misrepresentations and omissions in its no-risk promotions.

257.    DraftKings induced the Plaintiffs and Class Members to rely on its misrepresentations and omissions.

258.    Without the misrepresentation and omissions in DraftKings advertising, the Plaintiffs and No-Risk Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings' platform.

259.    As a direct and proximate result of DraftKings' deceptive practices, Plaintiffs and No-Risk Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive cash refunds for bets they placed and lost in reliance on DraftKings "Risk-Free" and "No Sweat" promotions.

260.    These acts caused substantial monetary injury to Plaintiffs and the members of the No-Risk Promotion Class that they could not reasonably avoid.

261.    DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the No-Risk Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with wanton and reckless indifference with respect to the rights of Plaintiffs and the No-

Risk Promotion Class.

262.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the New York Subclass and will continue to both damage Plaintiffs and the No-Risk Promotion Class and deceive the public unless enjoined by this Court.

263.    As a result of Defendant's recurring deceptive acts and practices, Plaintiff and other Class Members are entitled to monetary and compensatory damages, of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs. This includes statutory damages of $50 per violation, actual damages, and treble damages pursuant to GBL § 349(h).

### SECOND CAUSE OF ACTION
**Violation of N.Y. Gen. Bus. Law § 350, (Asserted on behalf of No-Risk Promotion New York Sub-Class)**

264.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

265.    Plaintiffs De Leon and Mirsberger bring this claim against DraftKings under New York consumer protection law, individually and on behalf of the No-Risk Promotion New York Sub-Class.

266.    N.Y. Gen. Bus. Law § 350 provides, in part that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." The statute further defines the term 'false advertising," to include any advertising "including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity" that "is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in

the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual." N.Y. Gen. Bus. Law § 350-a(1).

267.    Defendants' advertising is consumer oriented and contains a deceptive and materially misleading statement concerning the "risk free" nature of the bets.

268.    This advertising directly violates New York State Gambling Commission Regulations, which state that operators may not, among other things, "**(iii)** imply or promote sports wagering as free of risk in general or in connection with a particular promotion or sports wagering offer; **(iv)** describe sports wagering as 'free', 'cost free' or 'free of risk' if the patron needs to incur any loss or risk the patron's own money to use or withdraw winnings from the wager; **(v)** encourage patrons to 'chase' losses or re-invest winnings." N.Y. Comp. Codes R. & Regs. tit. 9 § 5329.37.

269.    Plaintiff and the No-Risk Promotion Class relied on the misleading advertising and have suffered injuries as a result of DraftKings' deceptive conduct.

270.    Defendant engaged in its unlawful conduct as alleged herein willfully, wantonly, and with reckless disregard for the truth.

271.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.

272.    Pursuant to N.Y. Gen. Bus. Law §350(e) Plaintiff and the Class seek monetary damages (including actual damages, or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to N.Y. GBL § 350-e(3), injunctive relief, restitution, and disgorgement of all monies obtained by means of DraftKings' unlawful conduct, interest, and attorney's fees and costs).

**THIRD CAUSE OF ACTION**

**Violation of New York General Business Law § 349 (Asserted on behalf of Deposit Match Promotion New York Sub-Class)**

273.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

274.    Plaintiff Eric Mirsberger brings this claim against DraftKings pursuant to New York consumer protection law, individually and on behalf of the Signup Bonus Promotion New York Sub-Class.

275.    DraftKings's conduct was misleading, and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the deposit match bonus promotions.

276.    DraftKings' conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the deposit match bonus promotions.

277.    DraftKings' deposit match offers are also unfair and deceptive because the Plaintiffs and the members of the Class were required to act differently than they could reasonably expect in order to obtain the promised bonus. Plaintiffs and the members of the Class were required to deposit and wager large sums of money in a manner designed by Defendant to induce repeated exposure to a known addictive product.

278.    DraftKings' conduct violated New York law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers would receive a cash-value match of their deposit when, in fact, this was not the case.

279.    DraftKings's advertisements and promotions created a likelihood of confusion

61

and misunderstanding among consumers.

280.    DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its signup bonus offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members.

281.    DraftKings advertised its promotion with no intent to sell its services as advertised and with intent that the Plaintiffs and Class Members be misled by the misrepresentations and omissions in its signup bonus promotions.

282.    DraftKings induced the Plaintiffs and Class Members to rely on its misrepresentations and omissions.

283.    Without the misrepresentations and omissions in DraftKings advertising, the Plaintiffs and Signup Bonus Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings' platform.

284.    As a direct and proximate result of DraftKings unfair and deceptive practices, Plaintiffs and Signup Bonus Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive a cash deposit match for the funds they deposited in their DraftKings accounts.

285.    These acts caused substantial injury to Plaintiffs and the members of the Signup Bonus Promotion Class that they could not reasonably avoid.

286.    DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the Signup Bonus Promotion Class. DraftKings's

actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with reckless indifference with respect to the rights of Plaintiffs and the Signup Bonus Promotion Class.

287.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the New York Subclass and will continue to both damage Plaintiffs and the Signup Bonus Promotion Class and deceive the public unless enjoined by this Court.

288.    As a result of Defendant's recurring deceptive acts and practices, Plaintiff and other Class Members are entitled to monetary and compensatory damages, of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs. This includes statutory damages of $50 per violation, actual damages, and treble damages pursuant to GBL § 349(h).

### FOURTH CAUSE OF ACTION
### Violation of N.Y. Gen. Bus. Law § 350, (Asserted on behalf of Deposit Match Promotion New York Sub-Class)

289.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

290.    Plaintiff Eric Mirsberger brings this claim against DraftKings pursuant to New York consumer protection law, individually and on behalf of the Signup Bonus Promotion New York Sub-Class.

291.    Defendant's advertising is consumer oriented and contains deceptive and materially misleading statements concerning its Deposit Match promotions.

292.    Plaintiff and the Class relied on the reasonably misleading statements and have suffered injuries as a result of DraftKings' deceptive conduct.

293.    Defendant engaged in its unlawful conduct as alleged herein willfully, wantonly,

and with reckless disregard for the truth.

294.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.

295.    Pursuant to N.Y. Gen. Bus. Law §350(e) Plaintiff and the Class seek monetary damages (including actual damages, or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to N.Y. GBL § 350-e(3), injunctive relief, restitution, and disgorgement of all monies obtained by means of DraftKings' unlawful conduct, interest, and attorney's fees and costs).

**FIFTH CAUSE OF ACTION**
**Negligence, (Asserted on behalf of DraftKings VIP Host Targeted Class)**

296.    Plaintiff repeats and realleges the other allegations in this Complaint as if fully set forth herein.

297.    Plaintiff Eric Mirsberger brings this claim individually and on behalf of the DraftKings VIP Host Targeted Class.

298.    DraftKings owes a duty of care to its users and other foreseeable victims of gambling addictions, which its product has the potential to create and exacerbate.

299.    Part of this duty includes the obligation to take action to help users it has reason to know are gambling beyond their means.

300.    Part of this duty includes an obligation to discover through reasonable diligence when its users are gambling beyond their means as a result of a gambling addiction.

301.    As a further component of this duty, DraftKings must verify the income and source of funds for users who are gambling a substantial amount on its platform.

302.    DraftKings has a policy of not equipping its VIP Hosts with the training and tools they need to satisfy these duties.

303.    DraftKings incentivizes its VIP Hosts to not identify or stop a user who is gambling beyond their means.

304.    Industry standards, including those promulgated by the National Council on Problem Gambling—whose guidelines the New York State Gaming Commission endorses—constitute a duty of care to users that DraftKings must observe.

305.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its income or source-of-funds verification practices.

306.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its training of customer facing staff to intervene on users who are exhibiting signs of problem gambling.

307.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its digital interventions on users who are exhibiting signs of problem gambling.

308.    DraftKings breaches its duty of care where it induces a user to place bets when it knows or should know that user is compulsively gambling beyond their means.

309.    DraftKings' breach of these duties as described throughout this Complaint resulted in significant damage to Plaintiff Mirsberger and members of the DraftKings VIP Host Targeted Class, both financial and emotional.

310.    Defendants breach their duty of care to Plaintiff Mirsberger and VIP Host Targeted Class Members by sending them a series of enticements including relentlessly pursuing him through VIP Hosts which Defendants know or should know will have the effect of creating, nurturing, expediting, and/or exacerbating compulsive gambling in those users

including Plaintiff Mirsberger.

311.    DraftKings' negligence was intentional, and done with a wanton and willful disregard of persons who foreseeably might be harmed by their acts, such as Plaintiff Mirsberger.

312.    In the alternative, DraftKings' negligence was reckless to the foreseeable risk to Plaintiff Mirsberger and VIP Host Targeted Class Members.

313.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligence, including compensatory and punitive damages, fees, and costs.

**SIXTH CAUSE OF ACTION**
**Violation of N.Y. Gen. Bus. Law §§ 349 & 350, (Asserted on behalf of DraftKings**
**VIP Host Targeted Class)**

314.    Plaintiff repeats and realleges the other allegations in this Complaint as if fully set forth herein.

315.    Plaintiff Eric Mirsberger brings this claim individually and on behalf of the DraftKings VIP Host Targeted Class New York Sub-Class.

316.    Defendants' VIP Hosts engage in consumer-oriented advertising when they contact individuals and encourage them to engage in further gambling on DraftKings.

317.    These communications constitute "direct advertisements" under the Racing, Pari-Mutuel Wagering and Breeding Law Ch. 47-A, Art. 13, Tit. 7, § 1363.

318.    Defendants' VIP Hosts advertising to Plaintiff Mirsberger and similarly situated Class Members is deceptive and false within the meaning of N.Y. Gen. Bus. Law § 350 because the VIP Hosts do not disclose the full terms of the promotions they are encouraging users like Plaintiff Mirsberger to opt-into and omit material terms of these promotions.

319.    Defendants' direct advertisements further violate N.Y. Gen. Bus. Law § 350 because they do not contain elements required by New York Gambling regulations including

"clearly and conspicuously" stating "a problem gambling number" and "a method or methods by which an individual may designate that the individual does not wish to receive any future direct advertisement." Ch. 47-A, Art. 13, tit. 7, § 1363 (3, 4).

320.    Additionally, Defendants' direct advertisements use misleading keywords that are intended to and in fact do "attract persons . . . who are or may be problem gamblers." N.Y. Comp. Codes R. & Regs. tit. 9 § 5329.37

321.    Defendant's material misrepresentations delivered by VIP Hosts were substantially uniform in content, presentation, and impact upon consumers at large.

322.    Pursuant to N.Y. Gen. Bus. Law §350(e) Plaintiff and the Class seek monetary damages (including actual damages, or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to N.Y. GBL § 350-e(3), injunctive relief, restitution, and disgorgement of all monies obtained by means of DraftKings' unlawful conduct, interest, and attorney's fees and costs) and statutory damages of $50 per violation, actual damages, and treble damages pursuant to GBL § 349(h).

## SEVENTH CAUSE OF ACTION
### Intentional Misrepresentation (Asserted on behalf of No-Risk Promotion Class)

323.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

324.    DraftKings has intentionally represented that it will ensure that customers will not be liable for losing initial bets. Although DraftKings advertised that consumers could place a "risk free" or "no sweat" bet these representations were false. Despite this representation, the promotions in fact carry a substantial risk of loss and when users lose their first bet, they receive credits with no cash value that may never allow them to recoup their initial losses. Therefore, Defendants misrepresented the promotional offers.

325.     These representations were material, in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform, and placing an initial bet in reliance on the promotion.

326.     Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the DraftKings service and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

327.     At all relevant times when Defendants made such representations, Defendants knew that the representations were misleading, or acted recklessly in making the representations, without regard for their truth or falsity.

328.     DraftKings knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether to wager on DraftKings.

329.     DraftKings intended its consumers to rely on these misrepresentations. It could have honestly represented the terms of its promotion: "if you lose, you'll get an expiring bonus bet that will not pay back the stake if it wins." But DraftKings knew that such an offer would not entice customers to bet more money or more frequently.

330.     Plaintiffs and Class Members did rely on these misrepresentations in placing bets on DraftKings' platform.

331.     Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

332.     As a state licensed sports betting platform, DraftKings knew or should have

known that its representations in marketing materials about its service being without risk are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

333.    Plaintiffs and Class Members acted in reliance upon Defendants' false and misleading statements by signing up for and using the DraftKings service to make initial bets.

334.    Neither Plaintiffs nor any reasonable consumer would have used DraftKings in the same way if they had known of the true operation and risks of DraftKings's service—risks the Defendants alone were aware of and misrepresented.

335.    As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs and members of the Classes were induced into using DraftKings's service and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result of an initial bet.

336.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

## EIGHTH CAUSE OF ACTION
### Intentional Misrepresentation (Asserted on behalf of Deposit Match Bonus Promotion Class)

337.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

338.    DraftKings has intentionally misrepresented that it will ensure that customers would receive a cash match of their initial deposit up to $1,000. These representations were false. Consumers actually received only a percentage of their deposit *only if* they wagered their initial deposit amount twenty-five times on long-odds bets. Even then, consumers only received

69

"DK Dollars", not redeemable for cash and not treated like normal bets. Therefore, Defendants misrepresented the promotional offers.

339.    These representations were material in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform and placing an initial bet in reliance on the promotion.

340.    Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the promotion and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

341.    At all relevant times when Defendants made such representations, Defendant knew that the representations were misleading, or acted recklessly in making the representations, without regard for their truth or falsity.

342.    DraftKings knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether to deposit and wager on DraftKings.

343.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

344.    As a state licensed sports betting platform, DraftKings knew or should have known that its representations in marketing materials about deposit matches are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was intentional or reckless in advertising those misrepresentations.

345.    Plaintiffs and members of the Classes acted in reliance upon Defendants' false

and misleading statements by signing up for and using the DraftKings service to make initial

bets. prior to making them.

346.    Neither Plaintiffs nor any reasonable consumer would have initially deposited as

much money on DraftKings if they had known the true terms of the signup bonus promotion

that DraftKings misrepresented.

347.    As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs

and members of the Classes were induced into wagering more money and more frequently than

they otherwise would have and have been harmed and suffered actual damages in the amount of

unrecouped losses incurred as a result.

348.    Plaintiffs seek all available remedies, damages, and awards as a result of

Defendants' negligent misrepresentations, including compensatory damages and costs.

## NINTH CAUSE OF ACTION
### Fraudulent Inducement (Asserted on behalf of All Classes)

349.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set

forth herein.

350.    Plaintiffs bring this claim against Defendants individually and on behalf of all

Class Members.

351.    Defendants misrepresented multiple material facts about its promotional offers,

as described throughout this Complaint.

352.    Plaintiffs and Class Members relied on Defendants' misrepresentations and

omissions in creating accounts on DraftKings and in placing wagers on the platform in reliance

on the promotions.

353.    Plaintiffs and Class Members were justified in so relying, because they were

entitled to believe that DraftKings, a leader in a highly regulated industry, would not violate the

law by failing to make requisite disclosures to its consumers, or to misrepresent the nature of its advertised offers.

354.    At the time Defendants made these misrepresentations to consumers, it knew them to be false.

355.    At the time Defendants made these misrepresentations to consumers, it had no present intent to fulfil the terms of the promotional offers as advertised to consumers.

356.    As a result of Defendants' misrepresentations, Plaintiffs and Class Members sustained monetary damages amounting to the total losses each sustained in reliance on funding accounts and placing bets in response to the unlawful promotions discussed herein.

357.    Absent these misrepresentations, Plaintiffs and the Class Members would not have created accounts or placed bets on DraftKings's platform.

358.    Therefore, as a direct and proximate result of Defendant's intentional misrepresentations, Plaintiffs and Class Members have suffered economic losses and other general and specific damages, including, but not limited to, the amounts paid to Defendant for placing bets in the first place, as well as losses associated with any subsequent bets placed in an effort to recover their original funds.

**TENTH CAUSE OF ACTION**
**Unjust Enrichment (Asserted on behalf of All Classes)**

359.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

360.    Plaintiffs bring this claim against DraftKings individually and on behalf of all Class Members.

361.    As alleged herein, Defendant has intentionally and/or recklessly made misleading misrepresentations to Plaintiffs and Class Members to induce them to create

accounts and place bets on its platform.

362.    As further alleged herein, DraftKings created and implemented a scheme to increase its share of the legal gambling market through a pervasive pattern of deceptive and unfair conduct including with deceptive advertising and the deliberate targeting of minors and underage users.

363.    DraftKings was unjustly enriched as a result of its wrongful conduct, including through the false and misleading advertisements regarding (i) that certain bets on DraftKings could be placed at no-risk to the user and (ii) that DraftKings would give users an amount equal in U.S. dollar value to their deposit.

364.    DraftKings was also unjustly enriched as a result of its wrongful conduct of targeting underage users with its advertising and intentionally allowing them to use its platform without adequate age verification.

365.    Plaintiffs and the Class Members have reasonably relied on these misleading representations and have not received the benefits promised by Defendant.

366.    Plaintiffs and the Class Members therefore have been induced by DraftKings' misleading and deceptive representations about the promotional offers and its deceptive and unfair targeting of minors and have paid more money to DraftKings to place bets than they otherwise would and/or should have paid.

367.    Plaintiffs and the Class Members have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiffs and the Class Members.

368.    The money DraftKings received was obtained under circumstances that were at the expense of Plaintiffs and the members of the Class Members. In other words, Plaintiffs and the Class Members did not receive the full value of the benefit conferred upon DraftKings.

369.    Therefore, it is inequitable and unjust for DraftKings to retain the profit, benefit, or compensation conferred upon it without paying Plaintiffs and the Class Members back for the difference of the full value of the benefits compared to the value actually received.

370.    As a direct and proximate result of DraftKings' unjust enrichment, Plaintiffs and Class Members are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by DraftKings from its deceptive misleading, and unlawful conduct as alleged herein.

371.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

### ELEVENTH CAUSE OF ACTION
**Declaratory Judgment, 28 U.S.C. § 2201 (Asserted on behalf of all classes)**

372.    Plaintiffs reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

373.    Plaintiffs bring this claim individually and on behalf of all other Class Members.

374.    DraftKings is contractually bound to comply with the Apple App Store and Google Play Store requirements for smartphone applications and their developers.

375.    In relevant part, Apple's Developer License Agreement, which DraftKings agreed to in order to list its app on the Apple App Store, prohibits DraftKings from engaging "in any unlawful, unfair, misleading, fraudulent, improper, or dishonest acts or business practices relating to" its app.

376.    Apple's Developer License Agreement also incorporates Apple's App Review Guidelines which further warns developers that "marketing your app in a misleading way, such as by promoting content or services that it does not actually offer . . . or promoting a false price, whether within or outside of the App Store, is grounds for removal of your app from the App

Store," and that "If your app engages in misleading marketing practices, scams, or fraud in relation to the entitlement, your app will be removed from the App Store."

377.    Similarly, DraftKings is bound by the terms of the Google Play Developer Distribution Agreement and the incorporated Google Play Store Developer Guidelines, which prohibit "apps that directly or indirectly engage in, or benefit from promotion practices (such as ads) that are deceptive or harmful to users."

378.    These terms are intended to protect and benefit the users of applications that are listed on the Apple App Store.

379.    Plaintiffs and Class Members are among the intended beneficiaries of these contractual requirements and are directly harmed by DraftKings' failure to comply with them.

380.    Due to the conduct alleged above, DraftKings is in breach of its contractual obligations under the Apple Developer License Agreement and the Google Play Developer Distribution Agreement to honestly advertise its promotions to its users who download its mobile app through Apple and Google's app stores.

381.    Plaintiffs seek a declaratory judgment that DraftKings is in breach of these contractual obligations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demand a jury trial on all claims so triable and judgment as follows:

A.    Certifying the proposed Classes, appointing Plaintiffs De Leon and Mirsberger as representatives of the No-Risk Promotion Class, and Plaintiff Mirsberger as representative of the Signup Bonus Promotion Class, and the DraftKings VIP Host Targeted Class and appointing counsel for Plaintiffs as Class Counsel;

B. Declaring that Defendants are financially responsible for notifying the Class Members of the pendency of this suit;

C. Declaring that Defendant's policies and practices as described herein constitute a violation of the New York General Business Law;

D. Enjoining Defendant from the wrongful conduct as described herein;

E. Awarding actual and/or compensatory, multiple, punitive, and statutory damages in an amount according to proof;

F. Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

G. Awarding pre- and post-judgment interest to the extent the law allows; and

H. Awarding such further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: January 22, 2025                    Respectfully submitted,

                                           */s/ Anand Swaminathan*