## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Clara De Leon, Eric W. Mirsberger Jr., Joseph Mitchell, and Edward Mendez, individually and on behalf of all others similarly situated, | Case No. 1:25-cv-00644 |
| *Plaintiff*, | |
| v. | **AMENDED CLASS ACTION COMPLAINT** |
| DraftKings, Inc.; Crown NY Gaming LLC, | JURY TRIAL DEMANDED |
| *Defendants*. | |

Plaintiffs Clara De Leon, Eric W. Mirsberger Jr., Joseph Mitchell, and Edward Mendez ("Plaintiffs"), individually and on behalf of all others similarly situated, brings this class action against Defendants DraftKings, Inc., and its subsidiary Crown NY Gaming LLC, (collectively "DraftKings" or "Defendants"). Plaintiffs make the following allegations based on personal knowledge as to their own acts, and upon information and belief and the investigation of counsel as to all other matters.

## <u>INTRODUCTION</u>

1.      Online sports gambling was legalized in New York in January 2022. Since then, over $56 billion has been wagered by New Yorkers. Among the dominant players in New York's sports betting landscape is the operator DraftKings. For the fiscal year ending March 2025, DraftKings reported that it handled over $6 billion bets.[1]

2.      About 96% of sports betting customers lose money, which is a natural deterrent

---

[1] https://gaming.ny.gov/system/files/documents/2025/01/monthly-mobile-sports-wagering-report-draftkings.pdf

to continuing as a customer of DraftKings.[2] Thus, unlike with other industries, where a customer, once acquired, will reliably provide repeat business, most of DraftKings's customers will be incentivized to stop using the platform, all things being equal. Those who irrationally keep betting despite the losses—often because of a gambling addiction—will eventually "crap out," meaning that DraftKings will lose the customer. Thus, DraftKings's business model requires it to find ways to keep customers betting even as they lose money, and to recruit new bettors to its platform. DraftKings manages to keep the customers flowing through carefully designed promotions and user interfaces that make it easy to start gambling and hard to stop.

3.     Plaintiffs bring this action because DraftKings has crossed the line in its efforts to recruit fresh blood, deceiving New Yorkers and misleading them into betting more money and more frequently and resulting in their losing large amounts of money.

4.     DraftKings advertises an all-upside gambling experience, falsely promising new users that they will get free money which they can wager without any risk. In reality, DraftKings has created an all-upside opportunity only for itself: the fine-print terms of its promotions require new users to deposit and gamble almost exclusively with their own money, which they almost always lose. DraftKings also engages in other manipulative tactics, which are intentionally designed to inculcate gambling addiction and extract as much money as possible from users who are identified as particularly vulnerable.

5.     These unethical and fraudulent practices by DraftKings are the present face of competition in the obscenely profitable, and formerly illegal, industry.

6.     DraftKings's business model has long involved pushing the boundaries of the

---

[2] Wayne J. Taylor, et al., *Online Gambling Policy Effects on Tax Revenue and Irresponsible Gambling*, SMU Cox School of Business Research Paper No. 24-7, Jun. 10, 2024, https://dx.doi.org/10.2139/ssrn.4856684 (last visited Dec. 15, 2024).

law, misleading consumers, and luring naïve gamblers into developing addictions.

7.    DraftKings uses false promises of the opportunity to win big with no risk to lure users into committing more money to the platform than they otherwise would have. DraftKings uses these tactics to identify and cultivate the people it wants on its platform: those who are susceptible to these sorts of advertisements and most likely to lose a lot of money sports betting. In other words, marks.

8.    DraftKings's activities in New York are a textbook example of its pattern of skirting and sometimes flat-out ignoring laws and regulations intended to protect consumers.

9.    DraftKings targeted its promotions at new customers who may have been cautious about risking their money but had the potential to become cash cows for the company, regularly placing losing bets on sporting events.

10.    Rather than put its own money on the line to give customers an all-upside taste of gambling, as its advertisements suggest, DraftKings is using misleading promotions to lure new users into believing that creating and funding an account on DraftKings is far more financially advantageous than it is.

11.    Only after new users sign up, make a deposit, and start losing bets does the true nature of their bargain with DraftKings become clear. At that point, DraftKings attempts to instill long-term gambling habits in new users by forcing them to make many bets to comply with the fine print—many more bets than they initially were led to believe would be required—while chasing the promises DraftKings made in its advertisement and new-user promotions.

12.    Most users do not recoup their money, let alone win the additional money they were promised by DraftKings's misleading advertisements.

13.    Indeed, despite DraftKings advertising the promise of customers winning big,

the company is really only interested in keeping customers gambling wildly and therefore eventually losing big. And as soon as a user reveals a propensity to consistently make better bets—meaning bets that take advantage of an arbitrage in DraftKings's odds-making—the company drastically limits the size and frequence of bets that user can make so that they can't cost the company too much money.

14.     In short, while DraftKings advertises an all-upside gambling experience to new users, it is actually offering one that is almost all down-side.

15.     One of DraftKings's deceptive practices is a promotion that promises users that they can place a bet at no risk to them ("Risk-Free Bet" or "No Sweat Bet").

16.     These purportedly no-risk bets, however, are not as advertised. The promotion requires that the customer deposit funds and place the bet with their own money.  If a customer loses their bet, they are not returned to their original position. Instead, their accounts are credited with an expiring "Bonus Bet" rather than the amount the user initially wagered in U.S. dollars.

17.     Receiving "Bonus Bets" when the original bet loses does not make the original bet "Risk-Free" as advertised.  "Bonus Bets" cannot be withdrawn for cash. Instead, they must be both wagered and won before they have any cash value.

18.     Furthermore, wagers made with Bonus Bets are not paid out like wagers made with U.S. dollars. A winning $100 bet made with U.S. dollars at even odds recovers the $100 stake plus the $100 winnings less the sportsbook's cut (known as the "vig" or "rake") of ~9%, which results in a payment of approximately $191. By contrast, a winning bet made with a $100 Bonus Bet converts only to $100 US dollars less vig, which results in a payment of approximately $91.

19.     Thus, the customer responding to the no-risk advertisement can get their money back only if they win their second bet, which is not risk free, and even then, with the vig subtracted.

20.     The Bonus Bet is thus worth significantly less than the initial bet, meaning that the money the Plaintiffs and other customers were induced to gamble was never in fact risk-free as advertised.

21.     DraftKings further engages in deceptive practices through its near-ubiquitous advertisements that offer to match a new user's deposit up to $1,000. This promotion, too, is misleading and inaccurate.

22.     In order to receive the promised matching amount, users have to deposit up to 5x the matching amount and then bet up to 25x the matching amount on long-shot bets that users have low odds of winning, all within a relatively short period of time. Even then, and even if they win, customers do not actually receive a cash match of their deposit as the promotion implies. Instead, they receive "DK Dollars" equal to their deposit amount. Like "Bonus Bets," "DK Dollars" are not redeemable for cash and must be wagered and won before they have any value.

23.     Consumers who try to satisfy the playthrough requirements often develop addictions that, as DraftKings intends, result in them gambling far beyond their means on DraftKings.

24.     DraftKings has invested heavily in large-scale marketing, including television and print advertisements, in-arena marketing, and extensive internet and social media advertising to publicize each of these materially deceptive promotions.

25.     These advertisements allowed DraftKings to sign up a multitude of new

5

customers, including Plaintiffs. But little did these new customers know that the representations and omissions upon which they relied were misleading and false.

26.     DraftKings's actions in promulgating these marketing representations and omissions violate New York consumer protection statutes as well as New York common law, as discussed in detail below.

27.      Reasonable consumers, including Plaintiffs, were misled to their detriment. They did not receive the advertised benefit of the promotions, and they placed larger bets and more bets than they would have but-for the misleading advertising.

28.     DraftKings intentionally designs its app and promotions to instill an impulse to gamble more and to overcome users' ability to resist this impulse.

29.     DraftKings also designs its so called "Responsible Gaming" tools so that they are not as effective as they reasonably could be in helping users stop gambling beyond their means. For example, it requires far more clicks for a user to find their total losses than to make a deposit or place a bet. And DraftKings knows, from its internal research and date, that its tools are unlikely to be effective in preventing gambling addicts from developing addictions and continuing to use its product.[3]

30.     DraftKings top executives know that a substantial portion of its revenue comes from gambling addicts but rather than cautioning users of the risks of developing a harmful gambling addiction, DraftKings proclaims on its website that it is "committed to educating and empowering" customers to gamble responsibly. The truth is DraftKings uses its "Responsible Gaming" tools to give customers and prospective customers a false sense of security around the risks associated with using its platform.

---

[3] Flora I. Matheson et al., *The use of self-management strategies for problem gambling: a scoping*, 19 BMC PUB. HEALTH 445, 7 https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-019-6755-8/

31.     DraftKings also deliberately targets players it should know are experiencing gambling addictions. Rather than cutting a user off when they begin showing signs of a gambling problem, DraftKings pairs them with "VIP Hosts" who milk them for every dollar they have, often by encouraging them to use more misleading promotions like those described herein.

32.     DraftKings trains its VIP Hosts to deploy a specific playbook of tactics including contacting their assigned users when they have not logged on to the platform in a few days or have just experienced a sizeable loss and luring them back with offers of promotions that require them to deposit more of their own money and place more bets.

33.     As expected, some of these targeted people developed debilitating gambling addictions as a result of DraftKings's carefully orchestrated schemes to draw them in with misrepresentations and then force them to engage in habit-forming behavior to meet the promotional terms as they chase after DraftKings's illusory promises.

34.     Plaintiffs seek injunctive relief, actual, statutory, and punitive damages to compensate themselves and the Class for the injury inflicted on them by DraftKings and to prevent DraftKings from continuing to deceive consumers.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which at least one member of the class is a citizen of a different state than Defendant. The number of members of each proposed class in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

36.     This Court has personal jurisdiction over Defendant because it regularly

7

conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

37.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant does business in this District and because, as several Plaintiffs placed bets in this district, a substantial part of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

38.    Plaintiff Clara De Leon is a resident of New York, living in Manhattan.

39.    Plaintiff De Leon first created an account on DraftKings while located in New York in 2018 after seeing advertisements for DraftKings promotions on television. Her DraftKings username is cmdeleon23.

40.    Around January 2023, Plaintiff De Leon made her first deposit on DraftKings. Shortly thereafter, she opted-in to a DraftKings no-risk bet promotion that she saw advertised in digital media as described in further detail below. Plaintiff De Leon was surprised to discover that she did not get her original stake back when she lost her purportedly no-risk bet and instead received an expiring "Bonus Bet."

41.    Plaintiff Eric W. Mirsberger Jr. is a resident of New York, living in Long Island City.

42.    Plaintiff Mirsberger first created an account on DraftKings in October 2023. His DraftKings username is Vanburenboys173.

43.    Within approximately one year of creating his account, Plaintiff Mirsberger had lost more than $45,000 on DraftKings.

44.    Around the time Plaintiff Mirsberger created his account, he opted-in to

promotions on the DraftKings app that purported to offer him the opportunity to place a bet at no-risk. Plaintiff Mirsberger was surprised and dismayed to discover that when he lost the bets that were purportedly no-risk, he was not credited back his original stake but only an expiring "Bonus Bet."

45.    Plaintiff Mirsberger also opted in to numerous deposit match promotions that he saw advertised in digital media, on the DraftKings platform and that were directly offered to him by DraftKings "VIP Hosts." Plaintiff Mirsberger was aggrieved when he discovered he did not receive the cash value of his deposit match as DraftKings had led him to believe he would and instead was required to gamble many times his initial deposit just to receive DraftKings credits that had to be further wagered to be converted to money.

46.    Plaintiff Joseph Mitchell is a resident of New York living in Amherst.

47.    Plaintiff Mitchell first created his DraftKings account within one day of its New York launch in January 2022. His DraftKings username is jmmitch13.

48.    Plaintiff Mitchell has signed up for countless deposit match, "Risk-Free," and "No Sweat" promotions since creating his account, including offers sent to him via text message and email exclusive to high-level players. As described in further detail below, Plaintiff Mitchell developed a gambling addiction as a direct result DraftKings's onslaught of promotions.

49.    To date, Plaintiff Mitchell has lost over $70,000 betting on DraftKings.

50.    Plaintiff Edward Mendez is a resident of New York living in the Bronx. Plaintiff Mendez created his DraftKings account as a New Jersey resident in 2022. Solely for the purpose of escaping DraftKings casino offerings, which are legal in New Jersey but illegal in New York, Plaintiff Mendez moved to New York, where he currently resides. Plaintiff

Mendez's DraftKings username is eddie-boii.

51.    As detailed further below, Plaintiff Mendez has been pushed to the brink of suicide after developing a crippling gambling addiction from DraftKings fostering and manipulation of his habit. To date, Plaintiff Mendez has lost almost $200,000 betting on DraftKings.

52.    Defendant DraftKings, Inc. is a Nevada gambling and entertainment corporation headquartered in Boston, Massachusetts. As of April 2023, DraftKings is a publicly traded company that trades on the Nasdaq Stock Exchange.

53.    Defendant Crown NY Gaming Inc. is a privately held company incorporated in Delaware with its principal place of business in Boston, Massachusetts. Crown NY Gaming Inc. is a subsidiary of DraftKings and is the licensed mobile sports wagering operator with the New York State Gaming Commission for DraftKings's sportsbook.

## FACTUAL ALLEGATIONS

### A.  Sports legalization in New York and DraftKings's sordid early history in the state

54.    In 2018, the Supreme Court ruled in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), that a federal law could not prohibit states from legalizing sports betting within their borders. State legislatures moved quickly and, as of January 2025, sports betting has been legalized in thirty-eight states and Washington, DC.

55.    As a result, the market for sports betting has exploded. The total US revenue of sportsbooks exploded from $430 million in 2018 to $10.92 billion in 2023.[4]

---

[4] Mike Reynolds, *American Gaming Association: Legal sports betting hits record revenue in 2023*, S&P GLOBAL, Feb. 21, 2024, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/american -gaming-association-legal-sports-betting-hits-record-revenue-in-2023-80522087 (last visited Nov. 27, 2024).

56.     Sports betting was legalized in New York in January 2022. In the first year of legal sports betting in the state, New York residents wagered $16.2 billion. Of this $16.2 billion, $4.5 billion in bets were placed DraftKings, making it the second largest sportsbook in the state.[5]

57.     This rapid expansion of the sports betting industry has fueled a race to recruit new consumers. Sportsbook operators have bombarded the state with advertisements and promotions to capture valuable market share.

58.     Long before online sports betting was legalized in New York, DraftKings began offering "daily fantasy sports" contests to New York consumers, including sometimes to those who were under the age of eighteen.

59.     In practice, "daily fantasy sports" is sports betting by another name. In these contests, users bet on the performance of athletes in sporting events, but in doing so they "compete" against each other rather than the sportsbook, which keeps a portion of the pot.

60.     Daily fantasy sports are immensely popular with adolescents, which gives DraftKings an important advantage in terms of brand recognition and a head start in turning young people into reliable sports betters on its platform.[6]

61.     In the years before the recent wave of sports betting legalization, regulators across the country raised alarms around DraftKings's daily fantasy sports offering, its advertising, and its lax enforcement of age restrictions.

62.     DraftKings uses its daily fantasy sports offering to give potential future users of

---

[5] Mike Mazzeo, *NY Sports Betting Market has Record-Setting First Year*, LEGAL SPORTS REPORT, Jan. 9, 2023, https://www.legalsportsreport.com/97261/2022-ny-sports-betting-revenue-record-setting-first-year/ (last visited Jan. 14, 2024)

[6] Michael Sekich, *Drawing the Line of Scrimmage: Global Perspective of Daily Fantasy Sports in the Advertising Space*, 12 PENN. ST. J.L. & INT. AFF. 178, 202 (2023).

DraftKings's sportsbook a taste of gamified sports betting through daily fantasy sports contests that are not materially different from sports betting in terms of their potential to form addictions.

63.     DraftKings is aware that underage users, many under eighteen, explore its platform and sometimes enter fantasy sports contests.

64.     Today in New York and elsewhere, DraftKings continues to skirt and violate the law with misleading advertising targeting vulnerable young people.

**B. DraftKings operates a digital sportsbook in New York and reaps massive profits by misleading gambling naïve consumers and addicting people to its products**

65.     DraftKings partners with Del Lago Resort and Casino to operate in New York. DraftKings does some brick-and-mortar business at Del Lago Resort and Casino, but the vast majority of DraftKings's business in New York comes through its digital sportsbook.

66.     To place bets through DraftKings's online sportsbook, users download DraftKings's mobile application from the Apple App Store or the Google Play Store onto their cellphones, verify that they are located within New York by allowing DraftKings's mobile application to access their phone's location, and then can place bets on live and upcoming sporting events.

67.     According to the New York State Gaming Commission's records, DraftKings is one of the two most popular sportsbooks in the state, with over $6.8 billion dollars wagered by New Yorkers on the platform in 2023.

68.     DraftKings reinvests a lot of its revenue in hooking more users on sports betting.

69.     DraftKings's sales and marketing expenses totaled $1.2 billion in 2023.[7]

---

[7] https://www.statista.com/statistics/1379464/sales-marketing-expenses-draftkings-worldwide/#:~:text=In%202023%2C%20the%20fantasy%20sports,based%20company%20spent%20in%202020

DraftKings ran TV, radio, social media, email, billboard, and print advertising. The ads showcased various promotions that DraftKings was running, typically targeting new users and promising bonuses and no-risk bets for signing up and making a deposit.

70.     As DraftKings has repeatedly said in its annual 10–K reports, "Achieving growth in our community of users may require us to increasingly engage in sophisticated and costly sales and marketing efforts."

71.     DraftKings's target audience for these marketing efforts is new users and casual gamblers—those who are most likely to lose money and who might turn into high-value addictive gamblers losing thousands of dollars a month to DraftKings.

72.     In fact, DraftKings, will often limit or even outright ban "sharps," gamblers who are sophisticated and make too many winning bets, while naïve losing consumers are targeted with more deceiving promotions to encourage their gambling more money with more frequency.

73.     DraftKings could set standardized bet limits for all its users, but instead it dynamically limits the maximum allowable bet for each individual user in order to maximize the amount naïve and addictive gamblers lose to the company while minimizing the company's exposure to more successful bettors. The practice of dynamically limiting amounts to prevent bettors from winning too much is just one more fact that DraftKings does not disclose in its advertising.

74.     Professional gamblers know that DraftKings is looking to exclude them in favor of problem gamblers and they therefore attempt to mimic the behavior of gambling addicts in their app use. For example, professional gamblers report trying to take advantage of DraftKings's customer data analysis practices by logging into their accounts repeatedly late at

night, to appear like they are interrupting their sleep to compulsively check their bets or by opting into and then out of deposit limits to appear like they are unable to control themselves from depositing more and more.[8]

75.    Plaintiffs Mirsberger, Mitchell, and Mendez engaged in these sorts of activities, which led DraftKings to identify them as users to target with promotions and offers geared towards increasing the spend of gambling addicts.

76.    DraftKings's CEO has admitted that the company is only interested in serving bettors who are likely to lose money on its platform: "This is an entertainment activity. People who are doing this for profit are not the people we want."[9]

77.    DraftKings is not, however, following a traditional "entertainment" industry business model of trying to "entertain" as many customers as possible.

78.    Instead, DraftKings is seeking to exclude customers who are successful at betting while trapping those who are not. The latter customers, many of whom end up losing more than they can afford, are the source of most of DraftKings's revenues.

79.    Addicted gamblers represent the most important demographic for DraftKings and, under its present business model, are a key driver of its profitability.

80.    On information and belief, more than 80% of DraftKings's revenue comes from just 5% of its users, most of whom are addicted gamblers or at high risk of becoming addicted gamblers.

81.    DraftKings mines its user data to identify the most potentially-lucrative users—

---

[8] Isaac Rose-Berman, *Why Professional Gamblers Act like Addicts,* HOW GAMBLING WORKS (Sept. 10, 2024), https://howgamblingworks.substack.com/p/why-professional-gamblers-act-like (last visited April 7, 2025).
[9] David Hill, *Is the $11 Billion Online Sportsbook Bubble About to Burst?*, ROLLING STONE, Nov. 17, 2024, https://www.rollingstone.com/culture/culture-sports/sports-betting-law-draftkings-fanduel-1235158334/ (last visited Dec. 10, 2024).

those with developing gambling addictions—and then intentionally targets them with personalized outreach to increase the amount and frequency of their wagering on DraftKings.

82.      DraftKings could easily use this data to identify users who are gambling compulsively and cut them off. Indeed, Robins has stated that "we have models that we build that help us understand and flag risky behavior."[10] However those models are either ignored or intentionally designed to miss clear signs of gambling addiction in the user data that DraftKings has ready access to. DraftKings's demonstrated ability to identify and limit the gambling of "sharps" belies any suggestion that it could not reasonably do more to identify users like Plaintiffs Mirsberger, Mitchell, Mendez and others who are gambling compulsively on their platform.

83.      In fact, DraftKings intentionally does not collect certain data—that some of its competitors do collect—to allow the company to deny that it knows it is taking every dollar its customers have. For example, DraftKings has a policy of not conducting income verification checks for its users who are frequent, high-volume gamblers even though doing so is common in the casino industry.

84.      DraftKings's development of and adherence to income verification policies and source of funds verification policies is significantly worse than that of other online sports betting proprietors.

85.      DraftKings has prioritized taking users' money, regardless of where that money comes from or how much of it they have to lose, over implementing industry-standard practices to ensure users are betting their own money and within their means.

86.      As further described below, DraftKings designs its promotional offers to lure in

---

[10] *DraftKings Wants People to Gamble Responsibly, CEO Says*, BLOOMBERG TELEVISION, Sept. 6, 2024, https://www.youtube.com/watch?v=tq011JIlEzU (last accessed May 1, 2025).

and identify those users most likely to become consistent gamblers.

87.     These promotional offers include a deposit match up to $1,000 and "Risk-Free" (also termed "No Sweat") bets. But rather than coming through on the large-print offers made to new users in advertisements for these promotions, DraftKings contradicts the large-print offers by inserting difficult to read, legally-opaque fine print terms hidden behind hyperlinks that are only available when a user is about to opt-in to the promotions and, thereafter, by enforcing complicated rules that DraftKings knows will be overlooked and misunderstood.

88.     Not only do these false promises lure consumers into opening and funding accounts on DraftKings, but they also lure many users including the Plaintiffs into wagering larger amounts and more frequently than they otherwise would.

89.     This was DraftKings's goal all along. DraftKings knows that the money it invests to sign up a customer often pays for itself many times over. According to McKinsey partner Dan Singer, "When a market opens up, you've got to get out there and start acquiring, because being the first book that someone downloads gives you roughly twice as much action as being the second or the third."[11]

90.     DraftKings wants these promotions to be as habit-forming as possible—which is why they require users to place many bets to satisfy them and to engage in dangerous behavior like loss-chasing—because retaining addicted customers is much more profitable for DraftKings than constantly having to recruit new customers who bet infrequently.[12]

91.     Originally, DraftKings and other sportsbooks used to make good on the promises

---

[11] Danny Funt, *Sportsbooks Are Sweating Their Billion Dollar Marketing Bet*, WASHINGTON POST, Sept. 27, 2022, https://www.washingtonpost.com/sports/2022/09/27/caesars-fanduel-draftkings-commercials/ (last visited Nov. 15, 2024).
[12] *Online Sportsbook: A Shift In Player Retention?*, GAMING AMERICA, Mar. 17, 2023 https://gamingamerica.com/magazine/7296/online-sportsbook-a-shift-in-player-retention (last visited Nov. 15, 2024).

they made to new users of cash deposit matches and no-risk bets—where you get cash back if you lose. However, to do so, they hemorrhaged profit as they entered new markets.

92.     As the Washington Post has reported, "the days of companies giving away straightforward deposit matches worth thousands of dollars are largely over. Instead, sportsbooks are deploying increasingly complicated deals that advertise a big dollar figure but are far less generous [than advertised] upon closer examination."[13]

93.     Today, while DraftKings still makes the same bold promises in their ads, it now gives users "Bonus Bets" and "DK Dollars" that cannot be cashed out and must be used on the platform in accordance with complicated and unintuitive terms.

94.     In an online gambling marketplace saturated by sign-up promotions targeting vulnerable individuals with big "free" or "risk-free" dollar figures—some of which are truly risk-free and some of which, like those offered by DraftKings, are not—consumer confusion reigns. DraftKings exploits that confusion.

### C. DraftKings intentionally targets susceptible users and grooms them to become addictive gamblers

95.     Gambling products are not typical consumer products. Both the current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and the World Health Organization treat addiction to gambling in the same diagnostic category as addiction to heroin, cocaine, and tobacco.

96.     Gambling addiction causes more than just pecuniary loss. Like any physiological addiction, it can interfere with one's professional, family, and internal well-being and substantially increases the risk of suicide. However, many people do not understand that

---

[13] *Supra* note 11.

gambling can be "addictive and harmful in many of the same ways as drugs are."[14]

97.    As online sportsbooks exploded in 2021, the National Council on Problem Gambling reported overall increases of 43% in calls and 84% in online chats in just one year.[15]

98.    States that have legalized sports betting have seen dramatic increases in calls to gambling addiction helplines. In Connecticut, for example, helpline calls jumped 91% in the first year after legalization. In the first year after Virginia legalized sports gambling, calls climbed 387%.

99.    Gambling addiction is particularly prevalent in young men, not coincidentally a key demographic for DraftKings.

100.    According to Keith Whyte, executive director of the National Council on Problem Gambling, "We believe that the risks for gambling addiction overall have grown 30 percent from 2018 to 2021, with the risk concentrated among young males 18 to 24 who are sports bettors."[16]

101.    And the earlier kids get exposed to gambling through online games and other avenues, studies suggest, the more severe their gambling problems are likely to be later on.[17]

102.    According to a spokesperson for Gamblers Anonymous, there has been "a dramatic increase in the number of young men developing compulsive gambling issues and

---

[14] Gambling Disorder, YALE MED., https://www.yalemedicine.org/conditions/gamblingdisorder (last visited May 1, 2025) (if link ends in landing page, navigate by clicking "Mental Health" and then "Gambling Disorder").
[15] *National Problem Gambling Helpline Modernization Project*, NATIONAL COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/problem-gambling/helpline-modernization/#:~:text=In%202021%2C%20calls%20to%20the%20National%20Problem%20Gambling,we%20expect%20these%20numbers%20to%20continue%20to%20grow (last visited Nov. 21, 2024).
[16] Meghan Gunn, *These are the Real Dangers of the Sports Betting Boom for Young Men*, NEWSWEEK MAGAZINE, Mar. 22, 2023 https://www.newsweek.com/2023/04/07/sports-betting-boom-linked- rising-gambling-addiction-anxiety-suicide-1789055.html (last visited Nov. 15, 2024)
[17] Ardeshir S. Rahman, et al., *The relationship between age of gambling onset and adolescent problematic gambling severity*, JOURNAL OF PSYCHIATRIC RESEARCH, Vol. 46, No. 5, 2012.

showing up to meetings since online sports gambling became legal."[18]

103.    Unsurprisingly, DraftKings's target demographic overlaps heavily with the group most at risk of gambling addiction. As of 2021, 90% of DraftKings's users nationwide were male and more than half were in their teens, twenties, or early thirties.

104.    DraftKings touts that its "[s]ophisticated data science drives marketing decisions," which "delivers the right message, to the right user at the right time," to maximize return on investment.[19]

105.    DraftKings targeted marketing often reaches young people, particularly young men, who are not yet old enough to legally gamble.

106.    As one Illinois high-school sophomore told his school newspaper, which published a lengthy investigation of the rise of sports betting among classmates, "[after betting was legalized in Illinois] I saw more posts about it and stuff like that on social media, which made me want to [bet] more just because I saw it more," he said. "Before, I hadn't really seen that sort of thing on social media."[20]

107.    DraftKings's posts on TikTok have received 45.5 million "likes." On information and belief, a substantial portion of these "likes" are from individuals under the age of twenty-one years old who are being intentionally targeted with DraftKings's marketing.

108.    DraftKings also places physical advertising where it knows it will be seen by many underage users. For example, Ohio regulators recently fined the company $250,000 for

---

[18] Maxwell Strachan, *The Rise of Mobile Gambling is Leaving People Ruined and Unable to Quit*, VICE, Sept. 6, 2022, https://www.vice.com/en/article/ake7gk/therise-of-mobile-gambling-is-leaving-people-ruined-and-unable-to-quit (last visited Dec. 2, 2024).
[19] https://www.slidebook.io/company/draftkings/presentation/4482ce71d778bb9781863ed375bebca1-/slide-/4482ce71d7-78bb9781863ed375bebca1_24/ (last visited Nov. 21, 2024).
[20] Alexis Rogers, *"You can just lie, most people do": The rise of underage sports betting,* THE EVANSTONIAN, Apr. 20, 2023, https://www.evanstonian.net/sports/2023/04/20/you-can-just-lie-most-people-do-the-rise-of-underage-sports-betting/ (last visited Nov. 22, 2024).

advertising outside a college football stadium and targeting customers who are under legal betting age.[21]

109.    DraftKings routinely runs promotions encouraging gambling on collegiate sporting events.



*Figure 1: A post from DraftKings on X (formerly Twitter) publishing betting odds for the College Football National Championship; dated November 5th, 2024. (https://x.com/DKSportsbook/status/1853961644109382110)*

110.    Not only does DraftKings intentionally target its marketing to boys and young men, DraftKings also designs its product and its promotions so that once they download the DraftKings app, they quickly form gambling habits, often before they reach legal gambling age.

---

[21] Sean McDonnel, *Ohio: Barstool, DraftKings agree to $750K in fines for targeting underage people, advertising 'free' bets*, CDC GAMING, Feb. 15, 2023, https://cdcgaming.com/brief/ohio-barstool-draftkings-agree-to-750k-in-fines-for-targeting-underage-people-advertising-free-bets/ (last visited Nov. 21, 2024).

111.    One example of this, described more fully below, is the way that DraftKings's deposit match promotions work. First, to satisfy the hidden terms of the promotion a user must wager 25x the amount of the bonus, necessitating a long series of bets. Second, if the user completes enough bets, they receive the bonus in "DK Dollars," meaning they then have to place even more wagers in hopes of finally receiving the cash deposit match they were promised.

112.    Digital mediums, like computers and cell phones that host DraftKings, increases the likelihood of habit-forming behavior through portability and connectivity, which provide greater ease-of-use, ready availability, rapid gratification, and a tendency to enable "context-independent" cues that trigger habit response.[22]

113.    Furthermore, habits are most often formed as the result of goal-directed behavior, which DraftKings enables by requiring users to chase arduous playthrough requirements.

114.    Goals drive people to form habits by encouraging repeat actions, even when they are actively aware of not wanting to develop an undesirable habit. Because most people are unaware of the habit-cuing influencing their behavior, they often attribute the formation of an undesirable habit to the pull of temptations or suppressed desires.

115.    DraftKings designs its promotions—which have among the highest playthrough requirements in the industry—to maximize the likelihood that users will develop habits while completing them.

116.    DraftKings collects copious amounts of data on its players' behavior and is capable of identifying players who are developing or have developed gambling addictions.

---

[22] Bas Verplanken, *The Psychology of Habit: Theory, Mechanisms, Change, and Contexts*, Springer Nature Switzerland AG, 2018, https://link.springer.com/book/10.1007/978-3-319-97529-0

117.    DraftKings does not use this data to prevent users from gambling beyond their means or engaging in destructive behavior.

118.    Instead, DraftKings uses its data on users' betting and activity patterns to deploy its promotions, push notifications, emails, and other means of reaching a user to ensure that even when a user has just experienced a large loss or is trying to take a break from the platform, they get a message that will ensure they are back placing bets as soon as possible.

119.    Despite DraftKings stating that they encourage its customers to use "helpful tools" like "cool-off periods" when they are struggling with problem gambling, it actually uses its digital and VIP Host outreach to strategically stymie users' efforts to take a break from gambling, especially when the users are gambling addicts who are losing significant sums of money on DraftKings.

120.    For example, DraftKings targets push notifications to users who bet frequently but have not recently logged on to the platform in order to lure them back, even though DraftKings knows this undermines compulsive gamblers' efforts to resist gambling.

121.    Additionally, DraftKings frequently offers users a deposit match promotion after they have experienced a large loss or have been absent from the platform for several days.

122.    DraftKings does this because it knows that doing so makes a user more likely to continue gambling, engage in loss-chasing, and to gamble larger amounts despite having an adverse experience from a loss.

123.    Furthermore, DraftKings leverages its data to identify certain users who exhibit the propensity to gamble lots of money very quickly and assigns them "VIP Hosts": DraftKings employees who are trained and incentivized to get users to gamble more money.

124.    DraftKings's VIP Hosts are trained to make DraftKings users feel like they are

their friends and like they are getting personalized attention and support.

125.    DraftKings's job description for VIP Hosts states that they will: "Create strong, authentic, and trusted player relationships. Exceed engagement and service level performance targets. Assist in reactivation efforts to re-engage inactive users. Effectively distribute an allotted promotional budget. Compile player feedback to support improvements to the platform and identify commercial opportunities. Execute against all VIP policies and guidelines, including responsible gaming policies."[23]

126.    VIP Hosts are supervised by "Player Development Managers," whose job description includes, "[d]riv[ing] key VIP sales metrics, contributing to customer engagement, market share, and net revenue while maintaining and enhancing relations with existing customers," and "[w]ork[ing] closely with Analytics teams to monitor reinvestment programs including promotions and other reward incentives by routinely checking reports and actual transactions."[24]

127.    VIP Hosts are trained to cultivate trust in the users they service and to use their access to users' data to give them outreach and attention that feels personalized and fortuitous.

128.    VIP Hosts also make users feel that they can come to them with concerns they have about the platform or their betting and they will provide advice and assistance, including in the form of free credits and other promotions to help users feel like they have a chance to win back losses.

129.    In reality, VIP Hosts are only pretending to be users' friends. Instead VIP Hosts are following a standardized playbook that is carefully designed to overcome users' attempts to

---

[23] DraftKings VIP Host job posting from July 2024, https://perma.cc/2PLH-S3HM (last accessed May 15, 2025).
[24] DraftKings Player Development Manager job posting from May 2025, https://perma.cc/5ESU-8HS7 (last accessed May 15, 2025).

limit or cease gambling and to entice them to return to DraftKings's platform often and gamble more.

130.    DraftKings is aware that users often feel a kinship with their VIP hosts and tell them when they are struggling with gambling addiction.

131.    Despite this, DraftKings's VIP Hosts are disincentivized from assisting problem gamblers and are not given adequate training or resources to respond correctly when a user is exhibiting signs of a gambling problem.

132.    Rather than receiving this sort of training and being incentivized to use it, VIP Hosts are given a single mission from DraftKings: keep the users frequently gambling and gambling big. VIP Hosts are evaluated and compensated based on performance metrics that reward increased gambling activity by their assigned customers.

133.    VIP Hosts often ignore obvious signs of gambling addiction.

134.    Even when a user explicitly states that they are gambling too much or beyond their means, VIP Hosts are trained to continue encouraging them to gamble on DraftKings.

135.    VIP Hosts are trained to follow a gambler's activity on the platform and to follow up with them at strategic moments when they might otherwise take a break from gambling or stop gambling all together.

136.    In fact, VIP Hosts are instructed to intensify contact with customers showing signs of attempting to limit their gambling activities.

137.    Among the tactics that VIP Hosts are trained to use is offering users deposit match promotions after they have experienced a large loss or have been absent from the platform for several days.

138.    DraftKings has its VIP Hosts do this because these promotions are themselves

designed to encourage users to gamble more and to develop and entrench gambling habits.

139.    In short, DraftKings uses its data and trains its hosts to induce rather than prevent problem gambling.

**D. DraftKings's "Risk-Free Bet" and "No-Sweat Bet" promotions**

140.    DraftKings offers a variety of promotions to new users that falsely state they can try out the platform without any risk of losing money. The dollar amount that can be placed "Risk-Free" or "No Sweat" varies but can be as much as $1,000.

141.    These tantalizing offers have been effective at persuading new users to open betting accounts they may not otherwise have opened and to wager amounts they may not otherwise have risked. That is what happened to the Plaintiffs.

142.    After DraftKings's lured Plaintiffs and others into placing bets based on the promise that they would be risk-free, Plaintiffs discovered that the money they wagered had in fact been lost.

143.    Since at least 2022, DraftKings has advertised no-risk gambling promotions to countless people watching professional and collegiate sports on television.

144.    For those not watching televised sports, DraftKings ads for no-risk promotions were inescapable on New York highways and public transportation.

145.    DraftKings has also advertised risk-free betting on Twitter, Instagram, Facebook, and TikTok feeds of millions of potential users through direct advertising and paid partnerships with influencers.



*Figure 2: Post on Twitter (now X) from user @SoManyWays2Joey (host of a popular NHL podcast on a network partnered with DraftKings) advertising a "Risk-Free Bet" up to $1,000; dated July 14, 2022. (https://x.com/SoManyWays2Joey/status/1547647893254746116)*

146.    Finally, DraftKings often directly emails its users including Plaintiffs encouraging them to log in and place no-risk bets.

147.    The bets placed pursuant to these promotions involve substantially more risk than DraftKings's promotional materials lead customers to believe. When a customer loses their initial bet, they are not in the same position as they were before placing the wager.

148.    DraftKings's advertising misleadingly implied the contrary and concealed several key features of the no risk promotion that would have allowed customers to determine that opting into the promotions did, in fact, involve risk of losing their money.

149.    First, DraftKings misrepresented that a user could place a bet at no risk to themselves when there was necessarily risk, because a consumer cannot simply cash out a refund if they lose, but instead must place another bet (the so-called "Bonus Bet") that they receive in the event they lost their original wager.

150.    Second, and more deceptively, DraftKings misleadingly implied that a user

could be restored to their original position if their original bet lost because they would receive a "Bonus Bets."

151.    When a user places a bet as part of a no-risk promotion, they are wagering their own money and their account is debited the amount of the bet in U.S. dollars (in this case $100). If they lose, that money is not credited back to their account (as it would be if the bet were actually without risk), instead they are given a "Bonus Bet" of the same amount. But what DraftKings consistently fails to disclose is that a "Bonus Bet" is not worth its cash equivalent.

152.    "Bonus Bets," have no cash value, are non-transferrable, have an expiration date, and cannot be withdrawn from the account.

153.    In order to turn a "Bonus Bet" into U.S. dollars that can make them whole for their prior loss, a user must use the "Bonus Bet" to place an additional wager within a specified time limit *and win*.

154.    Furthermore, even when a customer places and wins a "Bonus Bet," they do not receive the stake back—which is what DraftKings purportedly gave them to make up for their loss. For example, if a customer uses a $100 "Bonus Bet" on a winning wager with 50/50 odds, they are paid out $91 ($100 winnings, minus 9% vig, without a return of the $100 stake).

155.    And of course, there is no guarantee that a user will win the "Bonus Bet." If a "Bonus Bet" loses, the user will be paid out nothing.

156.    DraftKings thus misrepresented there was no risk because there is the risk of losing all the money originally wagered. If a user loses their "Bonus Bet," they have no further means of recouping the initial amount they wagered.

157.    The false promise of "Risk-Free" and "No Sweat" bets was strategically and misleadingly designed to overcome new users' skepticism of gambling, identify users who

27

could be converted into high-value addicted gamblers, and to grab market share in the New York sports betting industry.

DraftKings was aware of the effects of such promises on new users'—including Plaintiffs'—thinking: "If it's no-risk, why not bet more?"

158.    DraftKings deliberately tricked gambling-naive customers in New York into falling for these promotions by not clearly communicating that those signing up for the "No Sweat" promotion were, in fact, at risk of losing their money. Customers relying on their commonsense understanding of the "No Sweat" offer on promotional materials—and not understanding the complex terms laid out several layers deep in fine print that contradict DraftKings's large-print promises—were surprised to discover upon losing their "No Sweat Bet" that, in order to get *some* of their money back, they needed to make an additional, successful wager. DraftKings intentionally supplemented this confusion by using the dollar symbol ($) in its promotional materials, misleadingly indicating that customers could bet a specific dollar amount without risk of losing that amount of money.

159.    As alleged above, DraftKings advertised these no-risk bets to New York users on numerous occasions, often targeted specifically to new customers or existing customers who had not placed a certain type of bet before.



*Figure 3: A March 2024 advertisement promoting a "No Sweat Bet" of up to $1,000 for new customers used by DraftKings in various digital advertising media including on Twitter.*



*Figure 4: Advertisement for "Risk-Free Bet" appearing on DraftKings affiliate marketing*

*websites in March 2025.*



*Figure 5: Twitter post, dated April 19, 2022, promoting a "Risk-Free Bet".*

*(https://x.com/DKSportsbook/status/1516544714425708552)*

160.    Some of DraftKings's advertisements for no-risk promotions include very small print referencing other terms.

161.    Other times DraftKings's advertisements for no-risk promotions did not include any reference to the full terms of the promotion at all.

162.    DraftKings goes to great lengths to make it onerous to even comprehend that additional fine print terms apply. First, the link to the terms of the promotion are not even made available to a user until after the customer has already logged into the platform in response to an off-platform advertisement for the promotion and clicked through several steps to get to the

point of placing the supposedly no-risk bet.

163.    Even then, DraftKings buries the most important term—that if you lose your original bet you only get an expiring "Bonus Bet" back which is not treated like a normal bet in how it is paid out. Presently, this vital information—which contradicts the large print promises that the customer is not at risk if they lose—only appears behind a tiny hyperlinked information symbol and then, if the symbol is clicked, deep in very small text below several blocks of much larger text focusing on other aspects of the promotion.



*Figure 6: Screenshot taken November 11, 2024, of the DraftKings app for placing a "No Sweat" bet. No terms and conditions are displayed. Instead, they are obscured by an easy-to-miss hyperlink, seen here as the almost imperceptible "i" with a small green circle around it*

*next to "NBA No Sweat SGP or SGPx"*

164.    A user need not—and Plaintiffs did not—ever see the full terms before opting in to the promotion on the basis of DraftKings's advertising that led them to believe they could place a bet with no risk.

165.    For example, a user could opt into a "No Sweat" NBA same game parlay on DraftKings by flipping the green switch in the app shown above without ever clicking the tiny I symbol. Otherwise, they are never shown this disclosure of the promotion's full terms, which themselves bury the lead:



11:13 🌙

years of age or older (18+ if in DC/KY/NH/WY) (19+ if in CA-ONT). Any customer who is found to be ineligible to play on DraftKings (i.e., by way of self-exclusion from gambling, restriction due to employment, or otherwise) may not participate in this Promotion and immediately forfeits any bonus rewards which have been awarded under this Promotion.

In addition to the eligibility requirements set forth above and in the DraftKings Terms of Use, to participate in the Promotion, customers must (1) be a registered DraftKings Sportsbook customer with an active account; (2) receive an offer to participate in this Promotion; and (3) opt-in by clicking on the appropriate link or button within the Promotional Period.

NO SWEAT BET REDEMPTION

Upon completion of the promotion requirements, eligible customers will be awarded one (1) No Sweat Bet (the "Token"). Token valid only on 11/27 NBA bets (the "Qualifying Bet"). Minimum odds per leg of -500 or longer. Cashed-out bets and voided bets will void this Promotion. Bets placed with bonus rewards (including but not limited to Bonus Bets, Odds Boosts/Surges, Profit Boosts, etc.) are not valid. Token expires at the conclusion of the final 11/27 NBA game. Qualifying Bet must be placed using cash from your cash balance or DK Dollars. Maximum reward limits apply and vary by customer cohort. Maximum reward limits will be clearly and conspicuously disclosed to the customer upon opting in.

No Sweat Bet Tokens are single-use, non-withdrawable, and have no cash value. Must meet Qualifying Bet criteria and select Token BEFORE placing Qualifying Bet. Token only applies to Qualifying Bet. Reward issued only if Qualifying Bet loses after applying Token. Reward issued as Bonus Bet(s) based on the amount of losing Qualifying Bet. No Sweat Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

REWARD LIMITATIONS

Bonus Bets are single-use, non-transferable, non-withdrawable, and have no cash value. Bonus Bets are valid for seven (7) days (168 hours) from the time they are credited to customers' accounts. Customers can choose when to use Bonus Bets and must select the Bonus Bet in their betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and

---

11:13 🌙

betslip before placing a wager. Failure to use a Bonus Bet before expiration will void the reward. Payouts from Bonus Bet wagers will be transferred to the customer's cash balance and do not include the Bonus Bet stake. Ex: If a $10 bonus bet is placed at +100 odds and wins, only the profit of $10 will be credited to the customer's account. Bonus Bets may not be combined with other bonus rewards and may not be eligible for use on all promotions and/or betting markets.

GENERAL TERMS

Limit one (1) offer per customer. Customers must opt-in to this Promotion each time it is offered. Opting-in to this Promotion during a single day is only valid during that day and does not opt the customer into future periods. See DraftKings Sportsbook Terms of Use for information and limitations on wagering. Each customer will be notified when they have received an award by (1) a bell notification (this is a notification that displays as a bell icon on the home page of the DraftKings Sportsbook app and website that can be clicked on to view short confirmation copy and terms) and/or (2) an automatically triggered email if the customer successfully entered the promotion and completed the promotion requirements. Whether a customer has committed abuse of this Promotion, violated the Promotion Terms or DraftKings Terms of Use, will be determined by DraftKings in its sole discretion, for any reason or no reason at all. Should you wish to cancel your participation in this promotion at any time, please contact customer experience at sportsbook@draftkings.com. Upon cancellation, you may withdraw any remaining funds deposited in connection with this promotion subject to DraftKings Terms of Use. Any wager placed on DraftKings Sportsbook in connection with the promotion cannot be rescinded once it has been placed. However, any applicable bonus rewards in your account shall be void, subject to forfeiture, and may not be transferred or withdrawn. All promotions are subject to the DraftKings Terms of Use and Privacy Policy. By accepting any bonus rewards, registered customers agree to abide by the terms and conditions of this Promotion. Promotional offer is subject to regulatory approval. Void where prohibited by law. DraftKings account holders are responsible for any and all local, state, or federal taxes. DraftKings is not liable for computer or program malfunctions, nor for errors in bonus rewards. DraftKings reserves the right to exclude or remove certain customers from this Promotion, as well as the right to withhold bonus rewards if you have violated or attempted to violate the Promotion Terms or DraftKings Terms of Use, including but not limited to sharing account credentials with other individuals, placing wagers on behalf of other individuals, circumventing DraftKings age and location verification procedures, and abusing the DraftKings Platform, the Services, or any bonuses, the refer-a-friend program, or



*Figure 7: The full terms of use for the promotion pictured in Figure 6. If a user navigates to these terms through the obscured hyperlink, they are met with an impractically small font size.*

166.    Regulators are increasingly catching on to the misleading language DraftKings and other sportsbooks use in advertising "risk-free" bets. Several illustrative examples are discussed below.

167.    In Ohio gambling regulators have said such "free" or "risk-free" inducements are "false, misleading and explicitly against" state law. Matthew Schuler, executive director of Ohio's Casino Control Commission, recently said: "If something is claiming to be free or risk-free, then it has to absolutely not require the patron to incur any loss or risk their own money." Disclosing the risks within the terms and conditions is not good enough, he added. "We are not

supportive of trying to put the truth in small print."[25]

168.    DraftKings was sent a notice of violation by the Ohio Casino Control Commission which included a penalty of $150,000 for the use of "Risk-Free Bet" language. Previously, DraftKings had received a notice of violation from the same commission for advertising to individuals under the age of twenty-one.

169.    The Massachusetts Gaming Commission prohibits sportsbooks from running promotions advertised as "free" or "risk-free" if a bettor needs to risk their own money as part of the promotion. *See* 205 Mass. Code Regs. § 256.04. Colorado has imposed a similar prohibition. *See* 1 Colo. Code Regs. § 207-2:9.4

170.    Even the NBA took a stance on the "risk-free" language, banning it on platforms operated by the NBA or its franchises in February of 2023.[26]

171.    Most importantly, in 2022, the New York Attorney General's office admonished: "Since online sports gambling became legal in New York last month, New Yorkers have been bombarded with misleading ads on social media and streaming sites that claim 'risk-free' bets and '$1,000 welcome offers,' which sound like free money, but often come with strings attached without consumers' awareness."[27]

172.    Many of the sportsbooks, including DraftKings, started to quietly move away

---

[25] Danny Funt, *Sportsbooks call them risk-free bets. Just don't read the fine print.*, WASHINGTON POST, Dec. 26, 2022, https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/ (last visited Nov. 17, 2024).
[26] Bill King, *Concerned about betting's inherent dangers, NBA to ban 'risk free' advertising*, SPORTS BUSINESS JOURNAL, Feb. 6, 2023 https://www.sportsbusinessjournal.com/Journal/Issues/2023/02/06/Upfront/betting.aspx (last accessed Nov. 21, 2024).
[27] *CONSUMER ALERT: Attorney General James Warns New Yorkers of Deceptive Online Sports Betting Companies Ahead of Super Bowl*, NEW YORK ATTORNEY GENERAL, Feb. 10, 2022, https://ag.ny.gov/press-release/2022/consumer-alert-attorney-general-james-warns-new-yorkers-deceptive-online-sports#:~:text=Since%20online%20sports%20gambling%20became,strings%20attached%20without%20consumers'%20awareness (last visited Nov. 17, 2024).

from explicit "risk-free" language in late 2022. In that year, DraftKings pivoted to labeling these offers "No Sweat" bets, though they are sometimes still marketed as "Risk-Free" as Figure 4, a promotion seen by Plaintiffs a few months ago, shows. "No Sweat" promotions are materially no different, and just as misleading, as their "Risk-Free" counterparts, particularly considering that consumers in New York still associate these offers, however labeled, with the "Risk-Free" promotion campaigns that were incessantly advertised on countless NFL, NBA, NHL, and MLB games, and continue to be advertised with DraftKings's imprimatur. DraftKings has continued to imply that betting on its platform in New York can be no-risk as recently as December 2024.

173.    According to a Washington Post article, industry participants admitted publicly that advertising offers as no-risk was "unclear."

174.    Nevertheless, DraftKings continued to make these offers because it expected and intended consumers to be misled by its "Risk-Free" and "No Sweat" promotions.

175.    Around January 2023, Plaintiff De Leon saw advertisements for "No-Sweat Bet" promotions on television commercials and on offers highlighted inside the DraftKings app. She placed a bet, believing if she lost, she would get her money back. She lost the bet and did not recover her money.

176.    Plaintiff Mirsberger received emails, push notifications to his phone, and text messages about no-risk bets in November 2023, shortly after creating an account with DraftKings. He placed a bet pursuant to a no-risk promotion, believing he would get his money back if he lost. When he lost the bet, he did not recover his money.

177.    Plaintiff Mitchell first learned of "No Sweat" offers from a DraftKings push notification he received on his phone in early 2023. Having seen and heard prior "Risk Free"

advertisement, Plaintiff Mitchell understood this offer to mean that he could place a bet without risk of losing money. Based on this understanding, he placed a "No Sweat" bet and lost money as a result of doing so.

178.    Plaintiff Mendez first learned of DraftKings's "Risk-Free" and deposit match promotions from advertisements on his car radio and from billboards in late 2021, he too placed a bet pursuant to the promotion believing he would get his money back if he lost.

179.    All the advertisements these Plaintiffs saw were materially similar to those above in advertising the chance to gamble without risk on DraftKings without disclosing in readable print the terms of the offer that would have allowed Plaintiffs to realize that placing a bet pursuant to the promotion would not be no-risk.

180.    At no time in DraftKings's marketing, during DraftKings's sign-up process, or during the no-risk promotion opt-in process were Plaintiffs and the Class Members warned of the true financial risks of using DraftKings to place a "Risk-Free" or "No Sweat" bet, including the immediate and acute risk of losing the entire amount in that initial bet, the risk that losses would never be reimbursed by Defendants, and the financial and psychological risks of developing a gambling addiction.

181.    As described above, Defendants' marketing (including during the user sign-up process) misrepresented and omitted several key facts about the "No Sweat" bet promotions.

182.    Because a "Bonus Bet" cannot be deposited in the customer's bank account as cash and must be gambled quickly to have any value at all, there is nothing free of risk about the original transaction.

183.    However, customers like Plaintiffs who were misled into thinking that they could bet without risk and then lost their bet ended up losing all or a substantial portion of their

37

initial stake.

184.    Had the Plaintiffs and Class Members understood the true risk inherent in

making these "risk-free bets," they would not have placed those bets and not have lost as much

money.

**E.   DraftKings's "Deposit Match" promotions**

185.    No-risk bet offers are not the only deceptive promotions that DraftKings

employs. For several years, DraftKings has also been offering a bonus of up to $1,000 for new

customers who opened accounts and deposited money.

186.    Since at least 2022, DraftKings has advertised their promises of a "$1,000 Sign

Up Bonus" to countless New Yorkers watching televised MLB, NFL, NBA, and NHL games,

and have made themselves regulars on the Twitter, Instagram, Facebook, and TikTok feeds of

their millions of followers.

187.    DraftKings also advertised sign-up bonuses on billboards and public

transportation in New York.

188.    Through at least the summer of 2023, the top banner on DraftKings's website

read:



*Figure 8: Screen Capture from DraftKings's Website on June 21, 2023*

(https://web.archive.org/web/20230621141013/https://sportsbook.draftkings.com/featured)

189.    Likewise, any user who downloaded the DraftKings app around the time

Plaintiff Mirsberger did was met with the following offer:



*Figure 9: Screen Capture of first page user saw in 2023 upon opening DraftKings's app.*

190.     Plaintiffs Mitchell, Mirsberger and Mendez each saw this advertising and relied on it when they created accounts and made deposits towards to the deposit match promotion. They would not have created accounts on DraftKings and lost money had they not relied on the misleading statements in these advertisements.

191.     DraftKings also ran TV advertisements for this promotion that began with a woman's voice saying, "with DraftKings Sportsbook you get out what you put in, like a 100% deposit match up to $1,000." The unfair and deceptive terms of this promotion, which they offer to this day, make it inordinately unlikely for a user to obtain the advertised $1,000. Omitted from the promising headline is the reality that DraftKings will only match 20% of a user's deposit and will require a user to play through (and risk) 25x the amount of bonus money rewarded.

192.     In plain terms—which the fine print regarding this promotion deliberately

39

obscures and the large-print advertisements for this promotion completely omit—in order for a user to get a $1,000 bonus, they actually need to deposit five times that amount ($5,000), and then, within 90 days, *risk $25,000 on DraftKings sports bets*.

193.    This playthrough requirement is designed to induce users to form a dangerous habit of gambling on DraftKings. It worked on Plaintiffs Mirsberger, Mitchell, Mendez, and on many others.

194.    Additionally, in order to satisfy the playthrough requirement, DraftKings requires that these bets be placed at minimum odds of -300 (meaning a bettor must risk $300 to win $100). This means bettors must place a series of highly-risky bets to satisfy the playthrough requirements.

195.    None of the foregoing is adequately disclosed to the customer.

196.    A user is statistically likely, even using the most conservative betting approach, to lose money trying to satisfy the playthrough requirement.

197.    But even if they make it through all those steps, the $1,000 bonus is not rewarded as withdrawable cash funds, but rather as "DK Dollars" that hold no cash value, are non-withdrawable, non-transferable, non-refundable, and can only be used for further gambling.

198.    DraftKings's advertising of the Bonus is also unfair and deceptive because an eligible consumer who often is a new participant in New York sports betting, would be unlikely to understand the cost and risk involved in qualifying for the $1,000 Bonus. In fact, if the Plaintiffs had been adequately informed of the risk or the odds associated with the promotion, they would not have acted upon it.

199.    DraftKings advertised the "$1,000 Bonus" as a reward for signing up for its Sportsbook platform in a variety of media as well as within the app itself as shown above.



*Figure 10: DraftKings post on Twitter, dated February 15, 2022, using fan-favorite NBA player*

*Paul Pierce to promote false promises of a "Deposit Bonus up to $1,000".*

*(https://x.com/DKSportsbook/status/1493660970870312967)*



*Figure 11: Screenshot from an advertisement typical of those broadcasted by DraftKings on television and digital media in New York during the Class Period.*

200.    Plaintiffs saw advertisements like these for DraftKings's sign-up bonus promotion shortly before they funded their accounts on DraftKings. They also each saw the offer within the app or on DraftKings's website when they first went to create an account. None of these advertisements for the promotion included the terms discussed above in readable print.

201.    The Plaintiffs relied on the promise in those advertisements when they made deposits on DraftKings.

202.    Plaintiffs Mirsberger, Mitchell, and Mendez were misled by the advertising for the promotion and, as a result, deposited more money than they would have with DraftKings had they been informed of the actual terms of the promotion.

203.    As with the no-risk promotion advertisements, the terms of this promotion are not fully disclosed in the advertisements and, to the extent that they are communicated, they

appear in an illegibly small font-size—an order of magnitude smaller than the misleading text advertising the promotion—and are confusingly worded.

204.    Plaintiffs and many other users signed up for DraftKings and funded their account anticipating that their deposit would be "matched" in full up to $1,000.

205.    Plaintiffs and most users never became aware that there were additional terms, much less saw the full terms of the promotion or learned that their funds would not be matched in U.S. Dollars, not be matched on a 1:1 basis, and would only be matched at a rate of one DK Dollar for every $25 USD wagered until after they had made their deposits and opted into the promotion.

206.    Notwithstanding the large text of DraftKings's advertisements, the Plaintiffs were never going to simply receive "$1,000" in exchange for signing up for the sportsbook platform and depositing $1,000, as the ads implied. In order for a new customer to obtain the "$1,000 Bonus," he or she would have to satisfy three very onerous requirements, explained only in the unreadably small font size above:

     a.   They would have to deposit $5,000 up front;

     b.   They would have to bet $25,000 within 90 days on wagers with odds of "-300 or longer;

     c.   They would then have to place wagers using their "DK Dollars" and win enough of those to accrue a cash value of $1,000 in their account.

207.    Plaintiffs and other users could not reasonably have been expected to understand from the face of DraftKings's advertisements that, in order to receive a $1,000 bonus, he or she needed to immediately deposit $5,000, because the bonus amount is calculated as 20% of the consumer's first deposit.

208.    Plaintiffs and other users could not reasonably have been expected to understand from the face of DraftKings's advertisements that the $1,000 bonus would not be provided at the time of their initial deposit, but that instead he or she would earn the bonus only $1 at a time for every $25 wagered. Thus, to receive the $1,000 bonus, the new customer would have to risk $25,000 within 90 days on bets that DraftKings's odds-makers consider to have a less-than-75% likelihood of winning (–300 odds or longer).

209.    Plaintiffs did not understand and could not reasonably have been expected to understand based on DraftKings's advertisements that, in order to place bets for at least $25,000 over 90 days to qualify for the Bonus, he would have had to wager an average of more than $276 gambling on sports every day for three months.

210.    Plaintiffs also did not understand that, despite the advertisements using dollar signs and thus conveying that the bonus funds would be in the form of US Dollars, the bonus would actually be awarded, if at all, only as a non-withdrawable credit ("DK Dollars") to be used for further gambling.

211.    Plaintiffs and Class Members also could not reasonably be expected to understand that they would be required to make bets with a high level of risk to satisfy the play-through requirements. They could not have been expected to understand that, contrary to the express terms of the advertisements for the "Bonus Match" promotion, not all bets they made on DraftKings Sportsbook would count toward the $1,000 bonus. In fact, any bets that DraftKings's oddsmakers believe have a greater than ~75% chance of winning would not count toward the required total bets of $25,000 within 90 days.

212.    Gambling regulators, like the New York Attorney General, have sounded warning bells about the misleadingness and illegality of deposit match promotions just like the

ones DraftKings used on Plaintiffs.

213.    DraftKings knew, or should have known, that its advertisements for this promotion were deceptive to its target customers, who were customers mostly new to sports betting and who were extremely unlikely to understand the details of the promotion, even if it were conveyed clearly and in a font size that a reasonable consumer could be expected to read on the company's advertisements and platform.

214.    DraftKings knowingly and intentionally designed this promotion to maximize the number of consumers that would sign up for its sports gambling platform, the number of bets that would be placed through the platform, and the amount of money that would be placed on bets through its platforms.

F.    **DraftKings designed its interface to addict users and prevent them from understanding the terms of its promotions or the risk of developing addiction to its products.**

215.    DraftKings's gambling products are designed to methodically, but unpredictably, trigger dopamine-triggering rewards with dopamine gaps. The lack of predictability is key because, paradoxically, intermittent variable rewards create stronger associations (conditioned changes in the neural pathway) than fixed rewards. This phenomenon is well understood in behavioral science, and products that use this technique are known to be highly habit forming and ultimately addictive.

216.    There are multiple types of dopamine neurons that are connected with distinct networks in the brain and have distinct roles in motivational control. Apart from the dopamine reward loop triggered by positive feedback, other dopamine neurons are impacted by salient but non-rewarding stimuli and even painful-aversive stimuli.[28] DraftKings's app and promotional

---

[28] J.P.H. Verharen, Yichen Zhu, and Stephan Lammel, *Aversion hot spots in the dopamine system* 64 Neurobiology 46-52 (March 5, 2020) https://doi.org/10.1016/j.conb.2020.02.002 (last visited May 7, 2025).

practices capitalize on this by giving users a dopamine-payoff involving both highly positive and aversive stimuli associated not just with winning and losing bets but also with being offered and completing or failing to complete promotions.

217.    DraftKings has also designed its app to increase the pace of this dopamine-payoff by offering numerous in-game bets that settle quickly. Gone are the days when sports betting simply involved gambling on the outcome of a game coming up on a Sunday. Now users can wager on the outcome of individual plays and can string these bets together into multi-leg bets every day, all day. This gamification of gambling is intentionally designed to lead to addiction and increase users' spend and time in the app.[29]

218.    DraftKings analyses its user data to plan the nature and timing of app notifications and other outreach to the user, often including large promises and promotional offers in a way that is designed to encourage them to gamble more and more on the platform, including by chasing "VIP tiers" and completing promotions.

219.    DraftKings knows that encouraging users to gamble in this way creates a substantial risk of them developing a gambling addiction.

220.    DraftKings's product is also designed to create and maintain a user's "flow-state": a hyper-focused, hypnotic state, where the user is immersed in the interface and acts reflexively in placing of bets and making deposits. DraftKings does this, in part, by serving rapid fire updates for ongoing bets—with scores and odds constantly refreshing faster than on television to keep users watching the app—and serving users precisely timed pop-ups, often in bright colors with emojis, alerting them of new bets they can place within the sporting event

---

[29] Allison Parshall, *How 'Dark Patterns' in Sports Betting Apps Keep Users Gambling*, SCIENTIFIC AMERICAN, Jan. 23, 2025, https://www.scientificamerican.com/article/how-sports-betting-apps-use-psychology-to-keep-users-gambling/ (last visited May 8, 2025).

they are already watching or within a new sporting event as soon as the one they are watching has concluded.

221.    DraftKings also is intentionally designed to make it very easy to place a bet and make a deposit with a single click, a design decision that "make[s] it nearly impossible to stop" gambling for someone "already struggle[ing] to control the impulse to keep placing bets."[30]

222.    DraftKings also designs and targets its promotions to get and keep users betting as much as possible.

DraftKings offers many different types of deposit match promotions available to users who have existing accounts with varying total amounts and playthrough requirements. These promotions are equally misleading in that the terms regarding the percentage match, playthrough requirements, and reward are inadequately disclosed and are inconsistent with the large-print promises DraftKings makes when offering to match a user's deposit.

223.    DraftKings knows that many of its users who are gambling compulsively will not understand these promotions but will jump at the promise of free money with which to gamble.

224.    Consumer psychology research has identified several factors that decrease people's likeliness to read the fine print of consumer contracts.[31] First, researchers point out that

---

[30] Luke Whelan, *How Smartphones Fuel Gambling Addiction*, UNIVERSITY OF WASHINGTON MEDICINE, May 20, 2024, https://rightasrain.uwmedicine.org/mind/mental-health/sports-betting-smartphone-screen-addiction (last visited May 8, 2025).
[31] Meirav Furth-Matzkin & Roseanna Sommers, , *Fool Me Once, Shame On Me: How Consumers And Lawyers Perceive The Fine Print In Deception Cases*, HARVARD JOHN M. OLIN CENTER FOR LAW, ECONOMICS, AND BUSINESS - FELLOWS' DISCUSSION PAPER SERIES, June 2018, https://www.law.harvard.edu/programs/olin_center/felows_papers/pdf/Furth_82.pdf (last visited Dec. 10, 2024); Florencia Marotta-Wurgler, , *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's "Principles of the Law of Software Contracts"*, U. CHI. L. REV., Feb. 6, 2011, https://lawreview.uchicago.edu/sites/default/files/78-1-Increased%20Disclosure%20in%20Software%20Contracts-Marotta-Wurgler.pdf (last visited Dec. 10, 2024).

when contract forms are intentionally made not user-friendly with small font and long sentences, consumers are less likely to engage with them.[32]

225.    The terms of DraftKings promotions, including its "Risk-Free Bet" and "Sign Up Bonus," are often over one thousand words long with small font sizes and lengthy sentences that make it excessively taxing for users to follow.

226.    DraftKings only reveals the truth of its unfavorable promotions after multiple paragraphs describing age and location requirements for betting on their platform. Even if a user is able to hunt down language that describes the promotion's substantive details, it is written in a way that makes it unlikely that a layperson—who is eager to get gambling—will understand.

227.    Additionally, DraftKings's contract is one of adhesion with terms that are non-negotiable. "Another major reason why people might not read the contracts that they sign… [is that t]he consumers' choice is to accept the offered agreement or go elsewhere."[33] DraftKings customers understand that reading the fine print will not lend itself to mediating a more favorable deal.

228.    Furthermore, according to the NYU researchers, "consumers will also often have difficulty imagining problems that might arise. That is, scenarios under which things can go wrong never enter their minds."

229.    After exposure to DraftKings promising headlines, consumers are unlikely to predict that redeeming these promotions will entail such onerous requirements, fruitless rewards, and the risk of developing an addiction.

---

[32] Debra Pogrund Stark & Jessica M. Choplin, *A License to Deceive: Enforcing Contractual Myths Despite Consumer Psychological Realities*, NYU JOURNAL OF L. AND BUS., Feb. 9, 2009, https://papers.ssrn.com/-sol3/papers.cfm?abstract_id=1340166 (last visited Dec. 10, 2024).
[33] *Id.*

230.    The authors also write that "even if some consumers manage to foresee the possibility of potential negative consequences, they will often be overly optimistic in assessing the probability of those negative consequences once they have invested even a small amount of time, effort, or other resources pursuing a goal."

231.    By the time a user is presented with the full terms of a promotion, they have created an account on DraftKings, grown excited about the alluring promises made in the promotions, and have put time and effort into navigating to the platform.

232.    Moreover, research shows that social norms often discourage reading the fine print of a contract. Consumers believe that DraftKings, the largest company in its industry, that markets itself as "the safest sports betting platform," and ubiquitously espouses a commitment to "responsible gambling," can be trusted for the promises it's making in its advertisements and to put in place common-sense designs that will keep them safe. Consumers do not think, therefore, that they need to carefully read pages of fine print to understand risks and protect themselves from danger.

233.    DraftKings exploits these factors and misleads consumers about material aspects of its promotions, secure in the knowledge that few consumers will notice if the fine print contradicts what they believed they had signed up for.

234.    DraftKings also exploits the fact that its lip service to "responsible gambling" misleads customers into thinking that as long as they act "responsibly" they are not at risk to develop a gambling addiction. DraftKings knows that gambling addiction is a mental health condition the risk of which is substantially increased by the intentional features embedded in DraftKings's products.

### G. DraftKings's dangerously designed app and promotions worked exactly as intended on Plaintiffs Mirsberger, Mendez, and Mitchell

235.    Plaintiff Mirsberger began using DraftKings in October of 2023. By the end of 2023 he had developed a serious gambling addiction and already lost over $17,000 on the platform.

236.    Based on Plaintiff Mirsberger's early behavior on the platform, DraftKings's algorithms identified Plaintiff Mirsberger as the type of user that might be most profitable to the company and began offering him more promotions requiring more and more playthroughs to satisfy.

237.    Among these promotions were "No-Sweat Bet" promotions, which as described above, required him to place more wagers if he lost the initial "no-sweat" bet just to have a chance to win back some of the money he lost. These promotions were intentionally designed to inculcate dangerous gambling habits in Plaintiff Mirsberger.

238.    One of these dangerous gambling habits that the "No-Sweat Bet" promotions develop is chasing losses, wherein a gambler tries to win back money that they have lost in one bet by placing further bets. Prior to being enticed into using the "No-Sweat" promotions, Plaintiff Mirsberger did not chase his losses, but after opting into it, discovering his initial bet was not actually free of risk and that all it gave him was an opportunity to gamble more to recoup his money, Plaintiff Mirsberger began chasing his losses on DraftKings more and more.

239.    Eventually, as described below, the addition of a VIP Host further catalyzed Plaintiff Mirsberger's addiction and financial ruin.

240.    Plaintiff Mitchell's use of DraftKings began at a reasonable level. Quickly, however, Plaintiff Mitchell became sucked in by various deposit match and no risk promotions and started to gamble far more money than he could afford to lose. Soon Plaintiff Mitchell

found himself gambling for hours at a time, chasing his losses, and signing up for every promising DraftKings promotion he saw, including numerous deposit match and no risk promotions.

241.    Plaintiff Mitchell noticed that, as he continued to use promotions, DraftKings would send him offers that involved higher and higher deposit requirements, amounts which he would have previously rejected out of hand but which he had become conditioned to accept. Similarly, Plaintiff Mitchell's DraftKings app began to default his wagers to a higher and higher amount of money given his prior betting history. On numerous occasions this feature steered Plaintiff Mitchell towards betting a far larger amount of money than he initially intended or would have selected if left to his own decision-making.

242.    Uneasy about continuing to gamble, Plaintiff Mitchell declined DraftKings's attempts to assign a VIP host to his account because he knew he would be unable to resist an influx of even more deposit match and site credit offers. Despite declining a VIP host for these reasons, Plaintiff Mitchell still found himself receiving swarms of emails and text messages from DraftKings with offers exclusive to high-roller players—offers he found himself unable to refuse.

243.    Plaintiff Mitchell began wagering thousands of dollars per week in order to keep up with the playthrough requirements of offers sent to his email and phone number. Even as Plaintiff Mitchell's losses far surpassed what he could afford, he could not resist taking advantage of the next no risk or deposit match offers sent to his inbox.

244.    Despite the fact that Plaintiff Mitchell was gambling with increasing frequency and thousands of dollars in a sitting, DraftKings never did a financial background check or source of funds verification on him.

245.    DraftKings never once intervened in Plaintiff Mitchell's gambling or confirmed that he was gambling responsibly or within his means.

246.    In all, Plaintiff Mitchell has lost upwards of $70,000 using DraftKings.

247.    Plaintiffs Mirsberger and Mendez were each harmed by DraftKings's VIP tier system, which is intentionally designed to create goal-driven patterns of compulsive gambling. Each Plaintiff made more deposits and placed more bets in an attempt to reach the next VIP tier.

248.    DraftKings's data showed that Plaintiffs Mirsberger, Mendez, and Mitchell were each betting compulsively on the platform, chasing their losses, and gambling for hours at a time. Instead of limiting their betting, connecting them with effective gambling addiction resources, or otherwise interceding in their compulsive use of its product, DraftKings used its intimate knowledge of Plaintiffs' gambling and deposit practices to entice them to continue betting in higher and higher amounts.

**249.    DraftKings saw the clear signs of Plaintiffs gambling addictions and instead of cutting them off or connecting them with resources, used VIP Hosts to feed Plaintiffs Mirsberger and Mendez promotions and encourage them to continue gambling**

250.    DraftKings does not just target addicted gamblers with electronic ads after identifying them. It also uses agents, VIP Hosts, to reach out in person and exercise influence over the gamblers and keep them from limiting their betting.

251.    After Plaintiff Mirsberger was betting more money on DraftKings, he began to hear from a DraftKings employee who introduced himself as "Ian" and stated he was Plaintiff Mirsberger's "VIP Host."

252.    Ian, and then Michael, and then Rocco—the DraftKings VIP Hosts who replaced him—routinely called and texted Plaintiff Mirsberger offering him promotions designed to keep

him gambling more and more.

253.    These communications from the VIP Hosts included neither information about the risks of compulsive gambling nor steps to self-exclude or take a break from gambling on DraftKings nor a problem gambling hotline number. And the VIP Hosts did not disclose that their purpose was to interfere with his attempts to control his gambling.

254.    At the urging of his VIP Hosts, Plaintiff Mirsberger was making deposits of thousands of dollars a day. On his worst day, Plaintiff Mirsberger lost $10,000 on DraftKings.

255.    Whenever Plaintiff Mirsberger suffered a significant loss or managed to take a break from DraftKings's platform, his VIP Host would offer him a promotion to try and win back the money he lost but requiring him to make a new deposit to do so, playing upon and reinforcing the drive to chase losses.

256.    Often if Plaintiff Mirsberger did not respond to these texts, his VIP Host would send a follow-up text, falsely claiming that the offer, which the VIP Host had control over, only lasted for a short period of time and needed to be acted on quickly.



*Figure 12: Text messages sent to Plaintiff Mirsberger by his DraftKings VIP Host "Rocco"*
*offering him a deposit match promotion without disclosing the terms of any playthrough*
*requirements.*

257.    From October 2023 through the end of December, Plaintiff Mirsberger wagered almost seven times his annual income of around $28,000.

258.    Over the course of 2024, at the urging of his VIP Hosts and despite attempting to take several breaks from the platform, Plaintiff Mirsberger's gambling only increased and he wagered almost fifteen times his annual income of around $35,000.

259.    In less than two years, Plaintiff Mirsberger lost over $45,000 on DraftKings, which amounted to essentially all the money he earned from his employment during the period

he was using DraftKings.

260.    DraftKings did not follow industry standards or its own internal policies and procedures for verifying the income and source of funds for users like Plaintiff Mirsberger placing large bets on its platform.

261.    In the alternative, DraftKings intentionally does not collect information regarding its users' sources of funds and income so that it can take more money from its users than they can afford to lose.

262.    To the extent DraftKings does ask users about their income, it does so with yes or no questions like, "are you depositing expendable income that you can afford to possibly lose?" These supposed checks were worded in ways that DraftKings knows problem gamblers will convince themselves to answer yes to, as opposed to seeking substantive information which DraftKings could use to make its own determinations.

263.    DraftKings knew or should have known that Plaintiff Mirsberger was gambling compulsively and far beyond his means.

264.    Had DraftKings followed its own policies and verified Plaintiff Mirsberger's income and source of funds, Defendant would have had no choice but to cut him off.

265.    Even without verifying Plaintiff Mirsberger's income as it should have done, DraftKings was on notice that Plaintiff Mirsberger was putting every penny he had into the platform as a result of his gambling addiction.

266.    Plaintiff Mirsberger frequently told his VIP Hosts that he was unable to afford daily necessities like food, transportation, and medicine as a result of his gambling on DraftKings.

267.    For example, in September of 2024, Plaintiff Mirsberger informed his VIP Host

that he "just lost my last $1,750" trying to take advantage of a $500 deposit match bonus and was unable to pay his bills for the month.



*Figure 13: Text message Plaintiff Mirsberger sent to his DraftKings VIP Host on September 23, 2024.*

268.    After Plaintiff Mirsberger sent this message and others like it, DraftKings did not take any action to verify his income, limit his betting or deposits, or even to connect him with resources for his gambling addiction.

269.    Instead DraftKings offered Plaintiff Mirsberger more addictive promotions and the illusory chance to recover some of his losses.

270.    For example, two months after Plaintiff Mirsberger informed DraftKings that he had gambled himself broke, his VIP Host sent him a text about a new deposit promotion that required him to place more bets in order to cash out the money he was being offered.



*Figure 14: Text message Plaintiff Mirsberger received from his DraftKings VIP Host on November 26, 2024.*

271.    Finally, after Plaintiff Mirsberger had no more money to gamble and expressed to his VIP Host that he was struggling with severe mental health issues, did his account get forwarded to DraftKings's "Player Protection Team" for review.

272.    By that point, Plaintiff Mirsberger had been reduced to setting up a GoFundMe to pay his bills.

273.    Plaintiff Mendez experienced even more devastating losses from DraftKings's calculated efforts to inculcate and manipulate his gambling addiction.

274.    Plaintiff Mendez first signed up for DraftKings as a New Jersey resident in 2022. Upon creating an account, Plaintiff Mendez submitted his bank statements, which showed that he was working in construction, making less than $30,000 per year, and did not have substantial savings.

275.    Plaintiff Mendez began betting on DraftKings after seeing advertisements for "Risk-Free" bets and deposit match offers. As intended by DraftKings, the playthrough requirements and promises of no-risk gambling led Plaintiff Mendez to quickly gamble far more money than he was comfortable losing. By the day, Plaintiff Mendez found the urge to try to win back money he had lost, and the urge to take advantage of promotions more and more irresistible. Not long after exhibiting addictive impulses, Plaintiff Mendez was assigned a VIP host.

276.    Quickly, Plaintiff Mendez was bombarded with high limit deposit match promotions and other exclusive offers from his VIP host.

277.    Signing up for nearly every offer sent his way, Plaintiff Mendez pushed himself

to satisfy playthrough requirements far beyond what was appropriate for his modest salary. With so many VIP promotions being sent his way, Plaintiff Mendez started to deposit every paycheck he earned into DraftKings.

278.    As Plaintiff Mendez's gambling addiction worsened, he began depositing funds to his account using a credit card and started to borrow tens of thousands of dollars from friends and loved ones, lying to them about the reason he needed the funds.

279.    On days of big losses, Plaintiff Mendez noticed that his VIP host would deposit credits to his account and send him even more enticing offers.

280.    On many occasions, Plaintiff Mendez asked his VIP host to raise his deposit limit, a request that was always granted with ease even though, upon account creation, Plaintiff Mendez submitted financial statements showing that he could not afford to be gambling at such a level.

281.    Despite raising his monthly deposit limit to levels that nearly tripled his annual income, DraftKings never asked for further proof of funds or income verification.

282.    When Plaintiff Mendez asked his VIP host to lower his deposit limit, he was told that he would have to do this himself, a problem he never faced when asking for a limit increase.

283.    Frequently, and especially after big losses or an infusion of new offers from his VIP host, Plaintiff Mendez could not bring himself to set the restriction. When Plaintiff Mendez did find the strength to set the temporary limits, his VIP host promised to send him a new array of site credit and deposit match promotions to be waiting for him once the restrictions were lifted.

284.    Within a year of placing his first bet, Plaintiff Mendez found himself spiraling

into a depressive state, powerless to stop gambling on DraftKings.

285.    Daily, Plaintiff Mendez would set his morning alarm for several hours before work so he could have time to wake up and use DraftKings online casino before starting his day. On mornings when his losses were in the tens of thousands, Plaintiff Mendez would skip work in favor of staying in bed to chase the money he had lost.

286.    On one occasion, Plaintiff Mendez's account became temporarily restricted, and he was unable to withdraw any funds out of the app. His gambling addiction, which DraftKings had knowingly and deliberately instilled, was so strong that he continued to deposit and wager tens of thousands of dollars despite knowing that he would be unable to withdraw any money if he won.

287.    Quickly hitting his monthly deposit limits, Plaintiff Mendez would visit retailers to make cash deposits and go to stores that sold DraftKings gift cards, routinely buying out a store's entire stock of DraftKings gift cards—funds that did not count towards his bank deposit maximums.

288.    By now, Plaintiff Mendez's entire life revolved around gambling. On many occasions, Plaintiff Mendez's DraftKings screentime would amount to over 20 hours *per day for several days in a row*. Bedridden and helpless to his addiction, Plaintiff Mendez would go days without eating, stopping for just a few brief hours of sleep before waking up early to texts from his VIP host enticing him to gamble another 20 hours of his life away.

289.    Eventually, Plaintiff Mendez was threatened with eviction from his house and was forced to move into a local shelter.

290.    Unsurprisingly, the relationships in Plaintiff Mendez's life suffered. Spending his weeks lying in bed, he drifted further apart from friends, family, and loved ones. Plaintiff

Mendez's relationship with his two children began to shatter as he could not help but prioritize gambling in bed over spending time his own children. As of May 2025, Plaintiff Mendez has not seen his daughter in almost three years. Plaintiff Mendez's relationship with his son is irreparably damaged by the addiction that DraftKings intentionally inflicted on him.

291.    With his home lost, family torn apart, and routine monthly deposits exceeding $50,000 (often double his annual salary), Plaintiff Mendez spiraled deeper into his addictive depression and considered suicide.

292.    Throughout this time, Plaintiff Mendez's VIP host monitored his screen time and location and continued to push promotions and site credits on him.

293.    Sometimes, when Plaintiff Mendez would ask his VIP host for site credits after a big loss, his host would respond with the promise that she would add funds to his account the following morning because, by her own admission, that was when Plaintiff Mendez's wager amounts and frequency were the highest. On one or more occasions, Plaintiff Mendez's VIP host would promise to send him large amounts of site credit but insisted on doing it in two infusions to avoid getting flagged for "problem gambling."

294.    At one point, Plaintiff Mendez was caught attempting to bypass his $60,000 monthly deposit limit by using a second DraftKings account in his girlfriend's name, a breach of DraftKings's terms of service that can result in banning both accounts. Plaintiff Mendez's VIP host texted him that, so long as he promised to maintain his current level of play, they would not ban him from the platform. Plaintiff Mendez agreed.

295.    On at least one occasion, in an attempt to get his addiction under control, Plaintiff Mendez lied to his VIP host and told her he was going out of town and would be unable to gamble for the next several days. After staying away for a day or two, Plaintiff

Mendez would open the DraftKings app and immediately receive a text from his host welcoming him back and offering him more promotions.

296.    On occasions when Plaintiff Mendez did visit another state and open the DraftKings app, he would receive immediate texts from his VIP host notifying him that DraftKings was available in that jurisdiction.

297.    In September 2022, Plaintiff Mendez filed a report with the New Jersey Division of Gaming Enforcement stating that he believed one of DraftKings's casino games to be rigged. In response to this claim, DraftKings told an investigator the Division that Plaintiff Mendez was an addicted gambler with concerning playing habits. Despite apparently knowing this, prior to him complaining about the outcomes of a game, they did nothing to limit his play or prevent him from losing thousands of dollars per day on their platform.

298.    During the Division's investigation, an employee of the Division told Plaintiff Mendez that to proceed with his complaint, he would need to permanently close his DraftKings account. Instead of taking this opportunity, Plaintiff Mendez's addiction was so strong that he refused, retracted his complaint, and insisted he wished to keep playing.

299.    After a communication between the Division investigator and DraftKings, Plaintiff Mendez's account was reinstated and he was allowed to continue gambling.

300.    Around this same time, Plaintiff Mendez lost over $100,000 on DraftKings in a single day, nearly 5 times what he earned at work in a calendar year. Dealing with this devastating loss the only way he knew how, Plaintiff Mendez texted his VIP host asking for an infusion of site credit. He was still not cut off from gambling on DraftKings or connected with any addiction resources.

301.    With thoughts of suicide clouding his mind, Plaintiff Mendez decided that the

only way to restrict his gambling was to move to New York state, where online casinos are illegal and DraftKings only offers sports wagers.

302.    Plaintiff Mendez moved to New York for the sole purpose of escaping the DraftKings casino, but DraftKings followed him there, assigned him a new VIP host (after his prior one was promoted for doing such good work). Plaintiff Mendez continues to lose thousands of dollars every month on the DraftKings sportsbook.

303.    DraftKings's in-app data shows that Plaintiff Mendez has lost over $185,000 and made deposits exceeding $545,000.

## CLASS ALLEGATIONS

304.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the following class and subclasses for which certification will be sought, defined as follows:

305.    **No-Risk Promotion Class:** Any person who opted into a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their bet.

    a.    **New York Subclass:** Any person who wagered in the state of New York and utilized a DraftKings promotion advertising a "Risk-Free" or "No Sweat" bet with Defendant and lost their first bet within the applicable statute of limitations period.

306.    **Signup Bonus Promotion Class:** Any person who deposited money in response to a DraftKings "Deposit Match" promotion.

    a.    **New York Subclass:** Any person who opened an account and deposited money while in the state of New York in response to a DraftKings "Deposit Match"

promotion.

307.    **VIP Host Targeted Class:** Any person who was enticed by DraftKings's VIP Hosts to gamble compulsively.

    a.    **New York Subclass:** Any person who opened an account and was enticed by DraftKings's VIP Hosts to gamble compulsively while located in the state of New York.

308.    **Product Liability Class:** Any person who compulsively gambled on DraftKings's sportsbook during the Class Period.

    a.    **New York Product Liability Class:** Any person who compulsively gambled on DraftKings's sportsbook during the Class Period while located in the state of New York.

309.    Excluded from these Classes are (a) Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; (b) class counsel and their employees; and (c) the judicial officers and Court staff assigned to this case and their immediate family members.

310.    The Class Period for each promotion class is tolled to the earliest date of DraftKings's distribution of each of the relevant promotions under the continuing violation doctrine. DraftKings has engaged in an ongoing scheme to mislead consumers regarding the true terms of its promotions. As described more fully above, Plaintiffs have been misled and injured by the cumulative effect of DraftKings's misleading advertisements since gambling was legalized in New York.

311.    Alternatively, the Class Period extends from the relevant statutory limitations period for each cause of action through the date of judgment in this case and includes any

continuing violations that DraftKings engages in while this litigation is pending.

312.    This case is properly brought as a class action for the following reasons:

a. **Ascertainability:** The Class Members can be readily identified through Defendants' records which will include a record of all those users who signed up for various promotions and must also track customer's state of residence. The members will be identified by filtering DraftKings's records for users who entered into each of the identified promotions and lost money.

b. **Numerosity:** The Class is so numerous that joinder of all members in this action is impracticable. The exact number and identity of all Class Members is unknown by Plaintiff at this time. However, Plaintiffs believes there are tens of thousands and potentially even hundreds of thousands of Class Members. The number and identity of Class Members can be determined through discovery of Defendant.

c. **Commonality and Predominance:** Plaintiffs and Class Members were all injured by the same unlawful conduct. Therefore, this action involved common questions of law and fact, which predominate over any questions affecting only individual Class Members, including, without limitation:

• Whether DraftKings misrepresented in its advertisements that the Plaintiffs and the other No-Risk Promotion Class Members would not be at risk of losing money when they made a deposit and placed a first bet;

• Whether DraftKings intentionally designed its advertisements for the no-risk bet in such a way as to mislead the Plaintiffs and the other No-Risk Promotion Class Members in order to induce them to sign up and

64

wager;

- Whether DraftKings's representations and omissions about the no-risk promotions are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings misrepresented in its advertisements the Bonus it was offering to the Plaintiffs and the other Signup Bonus Promotion Class Members

- Whether DraftKings intentionally designed its advertisements for the signup bonus promotions in such a way as to mislead the Plaintiffs and the other Signup Bonus Promotion Class Members in order to induce them to sign up and wager;

- Whether DraftKings's representations and omissions about the Signup Bonus Promotion are false, misleading, deceptive, or likely to deceive;

- Whether DraftKings adequately disclosed the facts and/or risks concerning the use of its sportsbook service;

- Whether DraftKings trains its VIP Hosts to ignore the signs of problem gambling;

- Whether DraftKings has a duty to take certain steps to identify when its users are gambling beyond their means

- Whether DraftKings has a duty to take action when it has reason to know that a user is gambling beyond their means;

- Whether DraftKings's actions violate New York statutory law regarding unfair business practices invoked herein;

- Whether DraftKings's actions violate the New York common law

causes of action invoked herein; and

- The appropriate measure of damages to award Plaintiffs and the other Class Members.

d. The appropriate injunctive relief to which Plaintiffs and the other Class Members are entitled.

e. **Typicality:** Plaintiffs' claims are typical of those of the other Class Members' claims because Plaintiffs and each of the other Class Members were induced to transact on DraftKings by one or more of the identified promotions and/or by the actions of VIP Hosts. The promotions identified were widely distributed by DraftKings over a long period of time and the promotion that the Plaintiffs responded to does not materially differ from promotions that any other Class Member would have responded to. The misrepresentations at issue were substantially uniform in content, presentation, and impact upon Plaintiff and Class Members. Plaintiffs' injury has been caused by the same conduct of DraftKings, which would provide the same basis for a claim for all Class Members.

f. **Adequacy of Representation:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class Members whom they seek to represent. Plaintiffs intend to vigorously prosecute this action, and Class Members' interests will be fairly and adequately protected by Plaintiffs and their chosen counsel. Plaintiffs have retained counsel that is competent and experienced in complex class action and consumer protection and Plaintiffs' counsel will devote the time and financial resources necessary to

66

vigorously prosecute this action. Neither Plaintiffs nor their counsel have any interests adverse to the Class.

g. **Superiority:** A class action is superior to individual adjudications because joinder of all Class Members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. Furthermore, the amount-in-controversy for each individual Class Member is likely relatively small, and if each Class Member were required to file an individual lawsuit, Defendant would necessarily gain a significant and unfair advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each Class Member. This is an appropriate forum in which to litigate these claims, as the New York state population and the Class Members are concentrated in this forum. Finally, there are no particular difficulties presented by the management or trial of this action as a class action.

h. **Declaratory and Injunctive Relief**: DraftKings acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, such that final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

## **TIMELINESS, ACCRUAL, AND TOLLING**

313.    The Class Period for each promotion class is tolled to the earliest date of DraftKings's distribution of each of the relevant promotions under the continuing violation

doctrine. DraftKings has engaged in an ongoing scheme to mislead consumers regarding the true terms of its promotions and risks of using its products.

314.    The Class Period for the Product Liability Class and VIP Host Targeted Class has been tolled by operation of the continuing violations doctrine, the discovery rule and by DraftKings's active concealment with respect to the defective design and dangerousness of its products.

315.    As described more fully above, Plaintiffs have been misled and injured by the cumulative effect of DraftKings's abusive practices, dangerous design, failure to warn, and misleading advertisements since gambling was legalized. DraftKings continues to violate its duties to design safe products and warn of foreseeable risks. These failures continued to harm Plaintiffs and the Class Members throughout the time they were using DraftKings's platform.

316.    Separately, through the exercise of reasonable diligence, Plaintiffs and Class Members did not and could not have discovered that DraftKings's products caused their injuries and/or the effects thereof because, at the time of these injuries and their effects, the cause was unknown to Plaintiffs and Class Members, and due to the technical natures of the design features and the effect they had on Plaintiffs and Class Members, they had no reason to suspect that DraftKings had committed the violations alleged herein, and they were unable to independently discovery that DraftKings's products caused their injuries until less than the applicable limitations period prior to the filing of this action.

317.    In addition, DraftKings's fraudulent concealment and/or other tortious conduct has tolled the running of any statute of limitations.

318.    DraftKings had primary knowledge of the material defects designed and implemented into its products and has at all times through the present maintained the

proprietary designs of its products' features as strictly confidential.

319.    DraftKings had a duty to disclose dangerous and defective features that cause foreseeable harm to users.

320.    DraftKings knowingly, affirmatively, and actively concealed from Plaintiffs and Class Members the risks associated with the defects of Defendants' products and that these products caused their injuries.

321.    Defendants committed tortious and/or fraudulent acts that continue to this day. As of the date of this Complaint, DraftKings still has not disclosed, and continue to conceal, that they designed and implemented dangerous features into its products. Despite knowing of the defects and their attendant safety risks, DraftKings continues to market its products while simultaneously omitting the disclosure of known and foreseeable harms to users.

322.    Alternatively, the Class Period is tolled to the earliest limitations in any previously filed class action complaints against DraftKings raising the claims at issue here, which, on information and belief is the statutory limitations period running back from December 8, 2023 as to the Deposit Match Promotion Class.

323.    Each Class Period extends from the relevant limitations period for each cause of action through the date of judgment in this case and includes any continuing violations that DraftKings engages in while this litigation is pending.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**Violation of New York General Business Law § 349, (Asserted on behalf of No-Risk Promotion New York Sub-Class)**

324.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

325.    Plaintiffs De Leon, Mirsberger, Mitchell, and Mendez bring this claim against

69

DraftKings under New York consumer protection law, individually and on behalf of the No-Risk Promotion New York Sub-Class.

326.    New York consumer protection law declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state" N.Y. Gen. Bus. Law § 349.

327.    The circumstances that relate to the transactions giving rise to this claim occurred primarily and substantially in New York because DraftKings caused to be disseminated throughout the state of New York through advertising, marketing, and other publications, statements that were deceptive and misleading, and which it intended would mislead consumers in New York.

328.    DraftKings's misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers were exposed to DraftKings's material misrepresentations.

329.    DraftKings's conduct was unfair and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the no-risk promotions.

330.    DraftKings's conduct was also unfair and deceptive in that DraftKings used and employed concealment, suppression, and omission of material facts as to the nature of the no-risk promotions.

331.    DraftKings's conduct violated New York law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers could place bets without risking their own money when, in fact, this was not the case.

332.    DraftKings's conduct was additionally deceptive and because it violated the New York State Gaming Commissions' regulations regarding sports gambling advertising, which require sports gambling advertisements to comply with advertising guidelines issued by the National Council on Problem Gambling and specifically prohibits "deceptive or misleading statements or elements, including, without limitation, those concerning . . . the rules, terms or conditions of wagering." N.Y. Comp. Codes R. & Regs. tit. 9 §§ 5329.37, 5325.6 ("A false, deceptive or misleading statement or element includes, without limitation, one that reasonably would be expected to confuse or mislead patrons in order to induce them to engage in sports wagering.").

333.    DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

334.    DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling—about the nature of its no-risk offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiff and Class Members.

335.    DraftKings advertised its no-risk promotion with no intent to sell its services and with intent that the Plaintiffs and Class Members be misled by the misrepresentations and omissions in its no-risk promotions.

336.    DraftKings induced the Plaintiffs and Class Members to rely on its misrepresentations and omissions.

337.    Without the misrepresentation and omissions in DraftKings advertising, the Plaintiffs and No-Risk Promotion Class Members would not have created accounts with

DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings's platform.

338.    As a direct and proximate result of DraftKings's deceptive practices, Plaintiffs and No-Risk Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive cash refunds for bets they placed and lost in reliance on DraftKings "Risk-Free" and "No Sweat" promotions.

339.    These acts caused substantial monetary injury to Plaintiffs and the members of the No-Risk Promotion Class that they could not reasonably avoid.

340.    DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the No-Risk Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with wanton and reckless indifference with respect to the rights of Plaintiffs and the No-Risk Promotion Class.

341.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the New York Subclass and will continue to both damage Plaintiffs and the No-Risk Promotion Class and deceive the public unless enjoined by this Court.

342.    As a result of Defendant's recurring deceptive acts and practices, Plaintiff and other Class Members are entitled to monetary and compensatory damages, of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs. This includes statutory damages of $50 per violation, actual damages, and treble damages pursuant to GBL § 349(h).

## SECOND CAUSE OF ACTION
### Violation of N.Y. Gen. Bus. Law § 350, (Asserted on behalf of No-Risk Promotion New York Sub-Class)

343.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set

forth herein.

344.    Plaintiffs De Leon, Mirsberger, Mitchell, and Mendez bring this claim against DraftKings under New York consumer protection law, individually and on behalf of the No-Risk Promotion New York Sub-Class.

345.    N.Y. Gen. Bus. Law § 350 provides, in part that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." The statute further defines the term 'false advertising," to include any advertising "including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity" that "is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual." N.Y. Gen. Bus. Law § 350-a(1).

346.    Defendants' advertising is consumer oriented and contains a deceptive and materially misleading statement concerning the "risk free" nature of the bets.

347.    This advertising directly violates New York State Gambling Commission Regulations, which state that operators may not, among other things, "**(iii)** imply or promote sports wagering as free of risk in general or in connection with a particular promotion or sports wagering offer; **(iv)** describe sports wagering as 'free', 'cost free' or 'free of risk' if the patron needs to incur any loss or risk the patron's own money to use or withdraw winnings from the wager; **(v)** encourage patrons to 'chase' losses or re-invest winnings." N.Y. Comp. Codes R. &

Regs. tit. 9 § 5329.37.

348.    Plaintiffs and the No-Risk Promotion Class relied on the misleading advertising and have suffered injuries as a result of DraftKings's deceptive conduct.

349.    Defendant engaged in its unlawful conduct as alleged herein willfully, wantonly, and with reckless disregard for the truth.

350.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.

351.    Pursuant to N.Y. Gen. Bus. Law §350(e) Plaintiffs and the Class seek monetary damages (including actual damages, or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to N.Y. GBL § 350-e(3), injunctive relief, restitution, and disgorgement of all monies obtained by means of DraftKings's unlawful conduct, interest, and attorney's fees and costs).

### THIRD CAUSE OF ACTION

**Violation of New York General Business Law § 349 (Asserted on behalf of Deposit Match Promotion New York Sub-Class)**

352.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

353.    Plaintiffs Mirsberger, Mitchell, and Mendez brings this claim against DraftKings pursuant to New York consumer protection law, individually and on behalf of the Signup Bonus Promotion New York Sub-Class.

354.    DraftKings's conduct was misleading, and deceptive in that DraftKings used and employed deception, fraud, false promises, and misrepresentations about the nature of the deposit match bonus promotions.

355.    DraftKings's conduct was also unfair and deceptive in that DraftKings used and

employed concealment, suppression, and omission of material facts as to the nature of the deposit match bonus promotions.

356.    DraftKings's deposit match offers are also unfair and deceptive because the Plaintiffs and the members of the Class were required to act differently than they could reasonably expect in order to obtain the promised bonus. Plaintiffs and the members of the Class were required to deposit and wager large sums of money in a manner designed by Defendant to induce repeated exposure to a known addictive product.

357.    DraftKings's conduct violated New York law because its advertisements represent that its promotion contains characteristics that it does not have. DraftKings represented that consumers would receive a cash-value match of their deposit when, in fact, this was not the case.

358.    DraftKings's advertisements and promotions created a likelihood of confusion and misunderstanding among consumers.

359.    DraftKings's misrepresentations were material because they were likely to deceive reasonable consumers—uninitiated in the new industry of online sports gambling— about the nature of its signup bonus offers inducing them into spending money and placing bets on its platform. These misrepresentations were substantially uniform in content, presentation, and impact upon Plaintiffs and Class Members.

360.    DraftKings advertised its promotion with no intent to sell its services as advertised and with intent that the Plaintiffs and Class Members be misled by the misrepresentations and omissions in its signup bonus promotions.

361.    DraftKings induced the Plaintiffs and Class Members to rely on its misrepresentations and omissions.

362.    Without the misrepresentations and omissions in DraftKings advertising, the Plaintiffs and Signup Bonus Promotion Class Members would not have created accounts with DraftKings and/or would not have deposited as much money into their DraftKings accounts and/or placed bets on DraftKings's platform.

363.    As a direct and proximate result of DraftKings's unfair and deceptive practices, Plaintiffs and Signup Bonus Promotion Class Members suffered injuries in the form of monetary losses when they failed to receive a cash deposit match for the funds they deposited in their DraftKings accounts.

364.    These acts caused substantial injury to Plaintiffs and the members of the Signup Bonus Promotion Class that they could not reasonably avoid.

365.    DraftKings knew or should have known that its misrepresentations and omissions would deceive Plaintiffs and the Signup Bonus Promotion Class. DraftKings's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with reckless indifference with respect to the rights of Plaintiffs and the Signup Bonus Promotion Class.

366.    DraftKings's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the New York Subclass and will continue to both damage Plaintiffs and the Signup Bonus Promotion Class and deceive the public unless enjoined by this Court.

367.    As a result of Defendant's recurring deceptive acts and practices, Plaintiff and other Class Members are entitled to monetary and compensatory damages, of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs. This includes statutory damages of $50 per violation, actual damages, and treble damages pursuant to GBL § 349(h).

**FOURTH CAUSE OF ACTION**

**Violation of N.Y. Gen. Bus. Law § 350, (Asserted on behalf of Deposit Match
Promotion New York Sub-Class)**

368.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

369.    Plaintiffs Mirsberger, Mitchell, and Mendez  bring this claim against DraftKings pursuant to New York consumer protection law, individually and on behalf of the Signup Bonus Promotion New York Sub-Class.

370.    Defendant's advertising is consumer oriented and contains deceptive and materially misleading statements concerning its Deposit Match promotions.

371.    Plaintiffs and the Class relied on the reasonably misleading statements and have suffered injuries as a result of DraftKings's deceptive conduct.

372.    Defendant engaged in its unlawful conduct as alleged herein willfully, wantonly, and with reckless disregard for the truth.

373.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.

374.    Pursuant to N.Y. Gen. Bus. Law §350(e) Plaintiffs and the Class seek monetary damages (including actual damages, or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to N.Y. GBL § 350-e(3), injunctive relief, restitution, and disgorgement of all monies obtained by means of DraftKings's unlawful conduct, interest, and attorney's fees and costs).

**FIFTH CAUSE OF ACTION**

**Negligence/Gross Negligence, (Asserted on behalf of VIP Host Targeted Class)**

375.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

376.    Plaintiffs Mirsberger and Mendez bring this claim individually and on behalf of the VIP Host Targeted Class.

377.    DraftKings owes a duty of care to its users and other foreseeable victims of gambling addictions, which its product has the potential to create and exacerbate.

378.    Part of this duty includes the obligation to take action to help users it has reason to know are gambling beyond their means.

379.    Part of this duty includes an obligation to discover through reasonable diligence when its users are gambling beyond their means as a result of a gambling addiction.

380.    As a further component of this duty, DraftKings must verify the income and source of funds for users who are gambling a substantial amount on its platform.

381.    DraftKings has a policy of not equipping its VIP Hosts with the training and tools they need to satisfy these duties.

382.    DraftKings incentivizes its VIP Hosts to not identify or stop a user who is gambling beyond their means.

383.    Industry standards, including those promulgated by the National Council on Problem Gambling—whose guidelines the New York State Gaming Commission endorses—constitute a duty of care to users that DraftKings must observe.

384.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its income or source-of-funds verification practices.

385.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its training of customer facing staff to intervene on users who are exhibiting signs of problem gambling.

386.    DraftKings does not meet industry standards, including those promulgated by the National Council on Problem Gambling, in its digital interventions on users who are exhibiting signs of problem gambling.

387.    DraftKings breaches its duty of care where it induces a user to place bets when it knows or should know that user is compulsively gambling beyond their means.

388.    DraftKings's breach of these duties as described throughout this Complaint resulted in significant damage to Plaintiff Mirsberger and members of the DraftKings VIP Host Targeted Class, both financial and emotional.

389.    Defendants breach their duty of care to Plaintiff Mirsberger and VIP Host Targeted Class Members by sending them a series of enticements including relentlessly pursuing him through VIP Hosts which Defendants know or should know will have the effect of creating, nurturing, expediting, and/or exacerbating compulsive gambling in those users including Plaintiff Mirsberger.

390.    DraftKings's negligence was intentional and done with a wanton and willful disregard of persons who foreseeably might be harmed by their acts, such as Plaintiffs Mirsberger and Mendez.

391.    In the alternative, DraftKings's negligence was reckless to the foreseeable risk to Plaintiffs and VIP Host Targeted Class Members.

392.    As a direct and proximate result of DraftKings's breaches of fiduciary duty, Plaintiffs and Class Members have suffered substantial damages including financial losses from excessive gambling facilitated by DraftKings's VIP Hosts; damage to personal and professional relationships; costs of medical and psychological treatment for gambling addiction; emotional distress, anxiety, and depression resulting from excessive gambling; and other consequential

damages resulting from gambling addiction.

393.    Plaintiffs seek all available remedies, damages, and awards as a result of

Defendants' negligence, including compensatory and punitive damages, fees, and costs.

## SIXTH CAUSE OF ACTION
### Violation of N.Y. Gen. Bus. Law §§ 349 & 350, (Asserted on behalf of VIP Host Targeted Class)

394.    Plaintiff repeats and realleges the other allegations in this Complaint as if fully

set forth herein.

395.    Plaintiffs Mirsberger and Mendez bring this claim individually and on behalf of

the VIP Host Targeted Class New York Sub-Class.

396.    Defendants' VIP Hosts engage in consumer-oriented advertising when they

contact individuals and encourage them to engage in further gambling on DraftKings.

397.    These communications constitute "direct advertisements" under the Racing,

Pari-Mutuel Wagering and Breeding Law Ch. 47-A, Art. 13, Tit. 7, § 1363.

398.    Defendants' VIP Hosts advertising to Plaintiff Mirsberger and similarly situated

Class Members is deceptive and false within the meaning of N.Y. Gen. Bus. Law § 350 because

the VIP Hosts do not disclose the full terms of the promotions they are encouraging users like

Plaintiff Mirsberger to opt-into and omit material terms of these promotions.

399.    Defendants' direct advertisements further violate N.Y. Gen. Bus. Law § 350

because they do not contain elements required by New York Gambling regulations including

"clearly and conspicuously" stating "a problem gambling number" and "a method or methods

by which an individual may designate that the individual does not wish to receive any future

direct advertisement." Ch. 47-A, Art. 13, tit. 7, § 1363 (3, 4).

400.    Additionally, Defendants' direct advertisements use misleading keywords that

are intended to and in fact do "attract persons . . . who are or may be problem gamblers." N.Y.

Comp. Codes R. & Regs. tit. 9 § 5329.37

401.    Defendant's material misrepresentations delivered by VIP Hosts were substantially uniform in content, presentation, and impact upon consumers at large.

402.    Pursuant to N.Y. Gen. Bus. Law §350(e) Plaintiff and the Class seek monetary damages (including actual damages, or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to N.Y. GBL § 350-e(3), injunctive relief, restitution, and disgorgement of all monies obtained by means of DraftKings's unlawful conduct, interest, and attorney's fees and costs) and statutory damages of $50 per violation, actual damages, and treble damages pursuant to GBL § 349(h).

**SEVENTH CAUSE OF ACTION**
**Breach of Fiduciary Duty (Asserted on behalf of the VIP Host Targeted Class)**

403.    Plaintiff repeats and realleges the other allegations in this Complaint as if fully set forth herein.

404.    Plaintiffs Mirsberger and Mendez bring this claim individually and on behalf of the VIP Host Targeted Class for breach of fiduciary duty arising from the special relationship of trust and confidence established between DraftKings's VIP Hosts and their assigned users.

405.    DraftKings, through its VIP Hosts, deliberately cultivated relationships of trust and confidence with Plaintiffs by, among other things:

    a.    Creating the impression that VIP Hosts were acting in Plaintiffs' best interests rather than solely for DraftKings's financial gain;

    b.    Fostering dependency by encouraging frequent communication and establishing patterns of regular contact; and

    c.    Exploiting the vulnerable psychological state of Plaintiffs who suffer from gambling addiction.

406.    Plaintiffs reasonably reposed trust and confidence in their VIP Hosts based on their conduct.

407.    As fiduciaries, DraftKings through its VIP Hosts owed Plaintiffs and Class Members duties of:

    a.  Loyalty and fidelity;

    b.  Full disclosure of material information;

    c.  Acting in Plaintiffs' and Class Members' best interests;

    d.  Refraining from self-dealing or conflicts of interest; and

    e.  Reasonable care in providing gambling-related advice and services.

408.    As alleged in further detail elsewhere, DraftKings assigned VIP Hosts to Plaintiffs and Class Members after detecting that had a propensity to gamble compulsively. DraftKings understood their susceptibilities based on their app usage and betting patterns, frequency of deposits, chasing of losses, communications with their VIP hosts, and other behavioral indicators readily available to DraftKings and recognized in the gambling industry as signs of problem gambling.

409.    DraftKings was aware of Plaintiffs' and Class Members vulnerability to gambling addiction and deliberately exploited this vulnerability through the special relationships of trust it cultivated between VIP Hosts and users. DraftKings assigned the hosts to interfere with Plaintiffs' and Class Members' attempts to protect themselves.

410.    DraftKings, through its VIP Hosts, breached its fiduciary duties to Plaintiffs by, among other things:

    a.  Exploiting Plaintiffs' addiction and relationship to VIP Hosts by encouraging continued and increased gambling during periods when Plaintiffs were

attempting to reduce or cease gambling activities;

b.   Prioritizing DraftKings's financial interests over Plaintiffs' well-being in direct
     contravention of the trust relationship established by the VIP Hosts;

c.   Failing to disclose the addictive propensities of DraftKings's product;

d.   Failing to disclose that DraftKings has detected addictive tendencies in
     Plaintiffs' gambling activity;

e.   Failing to Disclose that the VIP Hosts' primary objective was to maximize
     Plaintiffs' gambling, rather than to ameliorate Plaintiffs' losses or act in
     Plaintiffs' best interests;

f.   Concealing indicators of problem gambling from Plaintiffs while simultaneously
     using this information to develop targeted strategies to increase Plaintiffs'
     gambling activity;

g.   Offering personalized bonuses, free bets, and loss rebates specifically calculated
     to extend Plaintiffs' gambling sessions and increase total losses;

h.   Failing to implement reasonable safeguards or take reasonable steps to prevent
     harm to Plaintiffs despite knowing of their addiction; and

i.   Intentionally manipulating the personal relationship between VIP Hosts and
     Plaintiffs to exploit Plaintiffs' psychological vulnerabilities.

411.    DraftKings's breaches were willful, wanton, and malicious, undertaken with
conscious disregard for the rights and welfare of Plaintiffs.

412.    As a direct and proximate result of DraftKings's breaches of fiduciary duty,
Plaintiffs and Class Members have suffered substantial damages including financial losses from
excessive gambling facilitated by DraftKings's VIP Hosts; damage to personal and professional

relationships; costs of medical and psychological treatment for gambling addiction; emotional

distress, anxiety, and depression resulting from excessive gambling; and other consequential

damages resulting from gambling addiction.

413.    Plaintiffs seek all available remedies, damages, and awards as a result of

Defendants' negligence, including compensatory and punitive damages, fees, and costs.

**EIGHTH CAUSE OF ACTION**
**Intentional Misrepresentation (Asserted on behalf of No-Risk Promotion Class)**

414.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set

forth herein.

415.    DraftKings has intentionally represented that it will ensure that customers will

not be liable for losing initial bets. Although DraftKings advertised that consumers could place

a "risk free" or "no sweat" bet these representations were false. Despite this representation, the

promotions in fact carry a substantial risk of loss and when users lose their first bet, they

receive credits with no cash value that may never allow them to recoup their initial losses.

Therefore, Defendants misrepresented the promotional offers.

416.    These representations were material, in that a reasonable viewer would rely on

them when deciding to proceed with creating and funding an account on DraftKings's platform,

and placing an initial bet in reliance on the promotion.

417.    Defendants, in promoting and marketing DraftKings to consumers, had a duty of

care to reasonably disclose and inform customers of material dangers and risks of the

DraftKings service and to not mislead its customers and the public at large about its offerings,

particularly as a leading competitor in a highly regulated industry.

418.    At all relevant times when Defendants made such representations, Defendants

knew that the representations were misleading, or acted recklessly in making the

84

representations, without regard for their truth or falsity.

419.    DraftKings knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether to wager on DraftKings.

420.    DraftKings intended its consumers to rely on these misrepresentations. It could have honestly represented the terms of its promotion: "if you lose, you'll get an expiring bonus bet that will not pay back the stake if it wins." But DraftKings knew that such an offer would not entice customers to bet more money or more frequently.

421.    Plaintiffs and Class Members did rely on these misrepresentations in placing bets on DraftKings's platform.

422.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

423.    As a state licensed sports betting platform, DraftKings knew or should have known that its representations in marketing materials about its service being without risk are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was careless and negligent in not ascertaining the truth of its misrepresentations and their effect on consumers before making them.

424.    Plaintiffs and Class Members acted in reliance upon Defendants' false and misleading statements by signing up for and using the DraftKings service to make initial bets.

425.    Neither Plaintiffs nor any reasonable consumer would have used DraftKings in the same way if they had known of the true operation and risks of DraftKings's service—risks

the Defendants alone were aware of and misrepresented.

426.    As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs and members of the Classes were induced into using DraftKings's service and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result of an initial bet.

427.    Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations, including compensatory damages and costs.

## NINTH CAUSE OF ACTION
### Intentional Misrepresentation (Asserted on behalf of Signup Bonus Promotion Class)

428.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

429.    DraftKings has intentionally misrepresented that it will ensure that customers would receive a cash match of their initial deposit up to $1,000. These representations were false. Consumers actually received only a percentage of their deposit *only if* they wagered their initial deposit amount twenty-five times on long-odds bets. Even then, consumers only received "DK Dollars," not redeemable for cash and not treated like normal bets. Therefore, Defendants misrepresented the promotional offers.

430.    These representations were material in that a reasonable viewer would rely on them when deciding to proceed with creating and funding an account on DraftKings's platform and placing an initial bet in reliance on the promotion.

431.    Defendants, in promoting and marketing DraftKings to consumers, had a duty of care to reasonably disclose and inform customers of material dangers and risks of the promotion and to not mislead its customers and the public at large about its offerings, particularly as a leading competitor in a highly regulated industry.

432.    At all relevant times when Defendants made such representations, Defendant knew that the representations were misleading, or acted recklessly in making the representations, without regard for their truth or falsity.

433.    DraftKings knew and intended that Plaintiffs and members of the Classes would rely upon its misrepresentations when deciding whether to deposit and wager on DraftKings.

434.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law in a highly regulated industry.

435.    As a state licensed sports betting platform, DraftKings knew or should have known that its representations in marketing materials about deposit matches are inaccurate and misleading. DraftKings had no reasonable grounds for believing its misrepresentations were not false or misleading and was intentional or reckless in advertising those misrepresentations.

436.    Plaintiffs and members of the Classes acted in reliance upon Defendants' false and misleading statements by signing up for and using the DraftKings app to make initial bets.

437.    Neither Plaintiffs nor any reasonable consumer would have initially deposited as much money on DraftKings if they had known the true terms of the signup bonus promotion that DraftKings misrepresented.

438.    As a direct and proximate result of DraftKings's misrepresentations, Plaintiffs and members of the Classes were induced into wagering more money and more frequently than they otherwise would have and have been harmed and suffered actual damages in the amount of unrecouped losses incurred as a result.

439.    Plaintiffs seek all available remedies, damages, and awards as a result of

Defendants' negligent misrepresentations, including compensatory damages and costs.

## TENTH CAUSE OF ACTION
### Fraudulent Inducement (Asserted on behalf of All Classes)

440.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

441.    Plaintiffs bring this claim against Defendants individually and on behalf of all Class Members.

442.    Defendants misrepresented multiple material facts about its promotional offers, as described throughout this Complaint.

443.    Plaintiffs and Class Members relied on Defendants' misrepresentations and omissions in creating accounts on DraftKings and in placing wagers on the platform in reliance on the promotions.

444.    Plaintiffs and Class Members were justified in so relying, because they were entitled to believe that DraftKings, a leader in a highly regulated industry, would not violate the law by failing to make requisite disclosures to its consumers, or to misrepresent the nature of its advertised offers.

445.    At the time Defendants made these misrepresentations to consumers, it knew them to be false.

446.    At the time Defendants made these misrepresentations to consumers, it had no present intent to fulfil the terms of the promotional offers as advertised to consumers.

447.    As a result of Defendants' misrepresentations, Plaintiffs and Class Members sustained monetary damages amounting to the total losses each sustained in reliance on funding accounts and placing bets in response to the unlawful promotions discussed herein.

448.    Absent these misrepresentations, Plaintiffs and the Class Members would not

have created accounts or placed bets on DraftKings's platform.

449.    Therefore, as a direct and proximate result of Defendant's intentional misrepresentations, Plaintiffs and Class Members have suffered economic losses and other general and specific damages, including, but not limited to, the amounts paid to Defendant for placing bets in the first place, as well as losses associated with any subsequent bets placed in an effort to recover their original funds.

## ELEVENTH CAUSE OF ACTION
### Unjust Enrichment (Asserted on behalf of each Class)

450.    Plaintiffs repeat and reallege the other allegations in this Complaint as if fully set forth herein.

451.    Plaintiffs bring this claim against DraftKings individually and on behalf of all Class Members.

452.    As alleged herein, Defendant has intentionally and/or recklessly made misleading misrepresentations to Plaintiffs and Class Members to induce them to create accounts and place bets on its platform.

453.    As further alleged herein, DraftKings created and implemented a scheme to increase its share of the legal gambling market through a pervasive pattern of deceptive and unfair conduct including with deceptive advertising and the deliberate targeting of minors and underage users.

454.    DraftKings was unjustly enriched as a result of its wrongful conduct, including through the false and misleading advertisements regarding (i) that certain bets on DraftKings could be placed at no-risk to the user and (ii) that DraftKings would give users an amount equal in U.S. dollar value to their deposit.

455.    DraftKings was also unjustly enriched as a result of its wrongful conduct of

targeting users it knew were gambling beyond their means and struggling with gambling addictions.

456.    Plaintiffs and the Class Members have reasonably relied on these misleading representations and have not received the benefits promised by Defendant.

457.    Plaintiffs and the Class Members therefore have been induced by DraftKings's misleading and deceptive representations about the promotional offers and its deceptive and unfair targeting of minors and have paid more money to DraftKings to place bets than they otherwise would and/or should have paid.

458.    Plaintiffs and the Class Members have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiffs and the Class Members.

459.    The money DraftKings received was obtained under circumstances that were at the expense of Plaintiffs and the members of the Class Members. In other words, Plaintiffs and the Class Members did not receive the full value of the benefit conferred upon DraftKings.

460.    Therefore, it is inequitable and unjust for DraftKings to retain the profit, benefit, or compensation conferred upon it without paying Plaintiffs and the Class Members back for the difference of the full value of the benefits compared to the value actually received.

461.    As a direct and proximate result of DraftKings's unjust enrichment, Plaintiffs and Class Members are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by DraftKings from its deceptive misleading, and unlawful conduct as alleged herein.

462.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## TWELFTH CAUSE OF ACTION
**Strict Liability – Design Defect (Asserted on behalf of Product Liability Class)**

90

463.    Plaintiffs Mirsberger, Mitchell, and Mendez reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

464.    Plaintiffs Mirsberger, Mitchell, and Mendez bring this claim individually and on behalf of all other Product Liability Class Members.

465.    DraftKings app and promotions offered on it constitute a single product that as designed is unreasonably dangerous.

466.    In the alternative, the promotions and features described in this Complaint constitute individual products, which have been designed in ways that are unreasonably dangerous.

467.    DraftKings designed its app including its promotions to addict users and especially those users who were susceptible to developing a gambling addiction

468.    DraftKings defectively designed its application and promotions to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harms.

469.    DraftKings failed to test the safety of its promotions and other features and when it did perform testing, those tests revealed significant risks of its products addictiveness that DraftKings failed to take cost-effective, reasonably feasible steps to remedy.

470.    DraftKings products, including the promotions described herein and its app fail to meet ordinary consumers expectations regarding the propensity of its product to cause addiction when used in an intended or reasonably foreseeable manner. Indeed, DraftKings designs and times promotions to maximize their addictive power and hides that fact from its consumers. Plaintiffs and other users do not expect that DraftKings app is designed to hack their dopamine system so that they progressively gamble more regardless of financial resources

or the effect on their mental health.

471.    DraftKings products are likewise defectively designed because they create an inherent risk of danger of addiction, compulsive use, and serious financial, professional, personal, and emotional consequences in its users. This inherent risk is not a necessary component of online sports gambling and could be mitigated by reasonable design changes including, without limitation, those described in this complaint.

472.    The risks inherent in the design of DraftKings app and promotions significantly outweigh any benefit of such design.

473.    DraftKings could have made cost-effective, reasonably feasible alternative designs including without limitation the following, none of which has been implemented to-date:

      a.  Robust age verification across products;

      b.  Analyzing user data to identify users compulsively gambling and cut them off and/or otherwise intervene;

      c.  Preventing loss chasing;

      d.  Requiring multiple steps to deposit and place a bet, to facilitate users exercising self-control;

      e.  Tempering suggestions of additional bets after a user places one;

      f.  Designing promotions to avoid encouraging and inculcating loss-chasing habits;

      g.  Tempering deposit match promotions or at least eliminating playthrough requirements above 1x, the sole purpose of which is to encourage habit-formation;

      h.  Clearly disclosing the terms and risks of promotions including the addictive

propensity of participating in the intensive gambling required by the terms;

i.   Not marketing gambling as without risk;

j.   Maximum daily and weekly deposit limits that can only be changed through proper financial condition and source-of-funds verification;

k.   Preventing users who set deposit limits from changing them immediately or without verification that the limits are not being removed as a result of a compulsion to gamble;

l.   Easier and more user-friendly access to responsible gaming tools like self-exclusion (including ensuring that links to state self-exclusion programs work);

m.  Session notifications including, but not limited to, amount wagered, amount lost, and time spent on the app;

n.   Advising users of their entire lifetime losses at appropriate junctures;

o.   Preventing users from depositing money into the DraftKings app using funds borrowed on credit, including preventing users from making deposits using a credit card;

p.   Improving training for customer-facing staff and revising policies that allow or encourage these staff to target specific individuals in attempts to entice users to place bets;

q.   Allowing users to opt-into self-exclusion within the DraftKings app itself for a period of longer than 4 weeks; and

r.   Setting a standard minimum amount for bets and deposits, rather than dynamically setting a suggested default based on a user's individual profile, which leads to anchoring users to deposit a higher amount than they otherwise

would have.

474.    Alternative designs were available that would reduce users' addictive and compulsive engagement with DraftKings's products, and which would have served effectively the legitimate purposes of DraftKings's products while reducing the gravity and severity of danger posed by those products' defects;

475.    Plaintiffs used Defendants' respective products as intended or in reasonably foreseeable ways.

476.    The physical, emotional, and economic injuries of Plaintiffs and Class Members were reasonably foreseeable to DraftKings when it developed, designed, advertised, marketed, promoted, and distributed its products.

477.    DraftKings's products were defective and unreasonably dangerous when they were deployed by DraftKings. The defects continued to exist through the products' distribution to and use by Plaintiffs and Class Members, who used the products without any substantial change in the products' condition.

478.    As a direct and proximate result of DraftKings products' defective design, Plaintiffs and Class Members suffered serious injuries including both economic injuries and non-economic pain and suffering injuries not all of which can be wholly remedied by monetary relief.

479.    Some Plaintiffs and Class Members continue to use DraftKings's products. When Plaintiffs use DraftKings's products, they will not be independently able to verify whether the products continue to pose an unreasonable risk.

480.    As described above, DraftKings's conduct was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an

entire want of care and a conscious and depraved indifference to the consequences of its

conduct, including to the health, safety, and welfare of its customers, and warrants an award of

punitive damages in an amount sufficient to punish DraftKings and deter others from like

conduct.

481.    Plaintiffs demand judgment against each Defendant for injunctive relief and for

compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees,

and all such other relief as the Court deems proper.

**THIRTEENTH CAUSE OF ACTION**
**Strict Liability – Failure to Warn (Asserted on behalf of Product Liability Class)**

482.    Plaintiffs Mirsberger, Mitchell, and Mendez reassert, reallege, and incorporate

by reference all other paragraphs in the complaint.

483.    Plaintiffs Mirsberger, Mitchell, and Mendez bring this claim individually and on

behalf of all other Product Liability Class Members.

484.    DraftKings knew or should have known of the unreasonably dangerous

properties of its app and promotions including their potential to inculcate gambling addictions

and compulsive gambling habits in users and the harms associated with these conditions.

485.    DraftKings's app and promotions are dangerous to an extent beyond that

contemplated by the ordinary user, who would not reasonably be expected to understand that

they encourage and inculcate addictive engagement and compulsive use when used in a manner

reasonably foreseeable to DraftKings.

486.    DraftKings's app and promotions are defective and unreasonably dangerous

because, among other reasons described throughout this Complaint, DraftKings failed to

exercise reasonable care to inform users that:

      a.    The promotions cause addiction and compulsive gambling, which are associated

95

with concomitant physical and mental injuries;

b. The promotions inculcate habits like loss-chasing, escalating bets, and extended gambling sessions;

c. Use of the app causes addiction and compulsive gambling, which are associated with concomitant physical and mental injuries;

d. Contrary to their advertising, there are numerous risks of gambling on DraftKings; and

e. DraftKings analyses user data and deploys promotions in ways that increase a user's risk of addiction to its products.

487.    Had Plaintiffs and Class Members received proper or adequate warnings or instructions as to the risks of using DraftKings products, they would have heeded the warning and not have become addicted to gambling, lost as much money, and suffered the foreseeable consequences of doing so.

488.    DraftKings's failures to adequately warn Plaintiffs and Class Members about the risks of its defective products was a direct and proximate cause and a substantial factor in the injuries sustained by Plaintiffs and Class Members.

489.    Some Plaintiffs and Class Members continue to use DraftKings's products. When Plaintiffs use DraftKings's products, they will not be independently able to verify whether the products continue to pose an unreasonable risk.

490.    As described above, DraftKings's conduct was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of

punitive damages in an amount sufficient to punish DraftKings and deter others from like conduct.

491.    Plaintiffs demand judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTEENTH CAUSE OF ACTION**
**Negligence – Design Defect (Asserted on behalf of Product Liability Class)**

492.    Plaintiffs Mirsberger, Mitchell, and Mendez reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

493.    Plaintiffs Mirsberger, Mitchell, and Mendez bring this claim individually and on behalf of all other Product Liability Class Members.

494.    DraftKings knew or could reasonably foresee that its products were designed in a way that made them dangerous and likely to cause harm to a substantial portion of users.

495.    The risks associated with DraftKings products was knowable to DraftKings in light of DraftKings's own internal data and knowledge regarding its products and promotions at the time of their design, marketing, and deployment.

496.    DraftKings knew, or by the exercise of reasonable care, should have known that ordinary consumers such as Plaintiffs and Class Members would not have realized the potential risks and dangers of its products including the risk of developing and exacerbating gambling addictions and the cascade of negative consequences that flow from such addictions including profound financial, mental, and emotional distress.

497.    DraftKings owed a duty to all reasonably foreseeable users of its products to design products that were reasonably safe.

498.    DraftKings owed a heightened duty to those users who, as a result of

97

DraftKings's deliberate actions in designing promotions meant to inculcate compulsive behavior and overcome inhibitions, had a diminished capacity for self-control including young people it intentionally drew to its platform.

499.    DraftKings owed a heightened duty to those users who, through its internal data and analysis, it knew or should have known were suffering from gambling addictions.

500.    DraftKings knew that individuals with gambling addictions, including Plaintiffs and Class Members, would use its products.

501.    DraftKings breached these duties in designing its products by negligently designing them with features and algorithms as described above that are particularly addictive and likely to addict users who would not appreciate the risks posed by the products.

502.    DraftKings breached these duties by designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

503.    DraftKings breached these duties by failing to use reasonable care to use cost-effective, reasonably feasible alternative designs, including changes to the addictive features described above, and other safety measures, to minimize the harms described herein. Alternative designs that would reduce the addictive features of DraftKings's products were available, would have served effectively the same purpose as DraftKings's defectively designed products, and would have reduced the gravity and severity of danger DraftKings's products posed to Plaintiffs and Class Members.

504.    A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

505.    DraftKings's negligent design of its products was a direct and proximate cause

and a substantial factor in the injuries sustained by Plaintiffs and Class Members.

506.    As described above, DraftKings's conduct was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish DraftKings and deter others from like conduct.

507.    Plaintiffs demand judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION
### Negligence – Failure to Warn (Asserted on behalf of Product Liability Class)

508.    Plaintiffs Mirsberger, Mitchell, and Mendez reassert, reallege, and incorporate by reference all other paragraphs in the complaint.

509.    Plaintiffs Mirsberger, Mitchell, and Mendez bring this claim individually and on behalf of all other Product Liability Class Members.

510.    DraftKings knew or could reasonably foresee that its products were designed in a way that made them dangerous and likely to cause harm to a substantial portion of users.

511.    The risks associated with DraftKings products was knowable to DraftKings in light of DraftKings's own internal data and knowledge regarding its products and promotions at the time of their design, marketing, and deployment.

512.    DraftKings knew, or by the exercise of reasonable care, should have known that ordinary consumers such as Plaintiffs and Class Members would not have realized the potential risks and dangers of its products including the risk of developing and exacerbating gambling

addictions and the cascade of negative consequences that flow from such addictions including profound financial, mental, and emotional distress.

513.    Had Plaintiffs and Class Members received proper or adequate warnings or instructions as to the risks of using DraftKings products, they would have heeded the warning and not have become addicted to gambling, lost as much money, and suffered the foreseeable consequences of doing so.

514.    DraftKings owed a duty to all reasonably foreseeable users to provide adequate warnings about the risk of using its products that were known to it, or that it should have known through the exercise of reasonable care.

515.    DraftKings owed a heighted duty of care to users it knew were particularly susceptible to develop gambling addictions through the use of its products.

516.    DraftKings breached its duty by failing to use reasonable care in providing adequate warnings to Plaintiffs and Class Members, as set forth above.

517.    A reasonable company under the same or similar circumstances as each Defendant would have provided adequate warnings to consumers as described herein.

518.    DraftKings could have provided adequate warnings to prevent the harms and injuries to Plaintiffs and Class Members described herein.

519.    As a direct and proximate result of DraftKings's breach of its duty to provide adequate warnings, Plaintiffs and Class Members were harmed and sustained the injuries set forth herein.

520.    As described above, DraftKings's conduct was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its

conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish DraftKings and deter others from like conduct.

521.    Plaintiffs demand judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demand a jury trial on all claims so triable and judgment as follows:

A. Certifying the proposed Classes, appointing Plaintiffs De Leon, Mirsberger, Mitchell, and Mendez as representatives of the No-Risk Promotion Class, and Plaintiffs Mirsberger, Mitchell, and Mendez as representatives of the Signup Bonus Promotion Class, and the Product Liability Class, and appointing Plaintiffs Mirsberger and Mendez as representatives of the VIP Host Targeted Class and appointing counsel for Plaintiffs as Class Counsel;

B. Declaring that Defendants are financially responsible for notifying the Class Members of the pendency of this suit;

C. Declaring that Defendant's policies and practices as described herein constitute a violation of the New York General Business Law;

D. Enjoining Defendant from the wrongful conduct as described herein;

E. Awarding actual and/or compensatory, multiple, punitive, and statutory damages in an amount according to proof;

F. Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys'

fees;

G.   Awarding pre- and post-judgment interest to the extent the law allows; and

H.   Awarding such further relief as this Court may deem just and proper.

### **DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands trial by jury on all issues in this Class Action Complaint that

are so triable.

Dated: May 16, 2025                                  Respectfully submitted,

                                                     _/s/ Mike Kanovitz_____