UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
CLARA DE LEON and ERIC W. MIRSBERGER,    :
JR., individually and on behalf of all   :
others similarly situated,               :
                                         :      25cv644 (DLC)
                    Plaintiffs,          :
                                         :      OPINION AND
              -v-                        :         ORDER
                                         :
DRAFTKINGS, INC., et al.,                :
                                         :
                    Defendants.          :
                                         :
---------------------------------------- X

APPEARANCES:

For plaintiffs:

Aaron Michael Tucek
Alexandra Wolfson
Isaac Green
Jon Loevy
Michael Kanovitz
Anand Swaminathan
Loevy & Loevy
311 North Aberdeen Street
3rd Floor
Chicago, IL 60607

For defendants:

Richard R. Patch
Christopher J Wiener
Clifford Yin
Sarah Elizabeth Peterson
Coblentz Patch Duffy & Bass
One Montgomery Street
Ste 3000
San Francisco, CA 94104

Alan Schoenfeld
Andrew S. Dulberg
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center

250 Greenwich Street
New York, NY 10007

DENISE COTE, District Judge:

Four individual plaintiffs who engaged in online sports gambling have filed a putative class action against DraftKings, Inc. and Crown NY Gaming Inc.[1] (together, "DraftKings"), alleging that they were damaged by the defendants' misrepresentations and deceptive practices. Three of the plaintiffs became addicted to online gambling and have suffered both financial and emotional harm from using the defendants' app to gamble on sports. For the following reasons, the defendants' motion to dismiss is granted.

## Background

The following allegations are contained in the Amended Class Action Complaint ("FAC") and are accepted as true for purposes of this motion. Documents integral to the complaint are also described below.

New York State legalized online sports gambling in January of 2022. Crown NY Gaming is the licensed mobile sports wagering operator with the New York State Gaming Commission for the

---

[1]  The FAC's caption errs in identifying the defendant as Crown NY Gaming LLC.

DraftKings' sportsbook.  It is a subsidiary of DraftKings, Inc., which is a publicly traded gambling and entertainment company.

To place bets through DraftKings' online sportsbook, users download its mobile application onto their cellphones, verify that they are located within New York by granting access to their geolocation data, and then place bets.  The FAC asserts that three promotional activities violated the plaintiffs' rights.  They are advertisements of "No Sweat" bets and a $1,000 deposit bonus, and the use of VIP Hosts to urge users of the app to continue gambling even when they have lost sizeable sums of money.

## I.  "No Sweat" Bets for New Customers

DraftKings advertises and offers promotions to new users. The FAC asserts that advertisements of the "No Sweat" promotion imply that users may place bets of up to $1,000 without the risk of losing that money.[2]  According to the FAC, DraftKings' advertisements are misleading because a consumer who loses a bet cannot simply cash out a refund but must place a "Bonus Bet" in the refund amount.  That "Bonus Bet" has no cash value, is non-transferrable, and has an expiration date.  Only by placing a

---

[2]  The FAC also refers to a "Risk Free" promotion but does not plausibly assert that that promotion is actionable in this lawsuit.  The plaintiffs have abandoned claims based on the promotion.

"Bonus Bet" and winning that wager can a player win cash.  Even then the amount of cash the player receives from winning is not their stake but instead depends on the odds associated with that "Bonus Bet."

The FAC displays a March 2024 advertisement promoting a "No Sweat" Bet.  The ad highlights that it is available to new customers and for an amount up to $1,000.  It states, "Get a bonus bet back in the amount of your original wager if your first bet doesn't hit."

The FAC also displays a screenshot of the app page through which a user may place a "No Sweat" bet.  The line reads "NBA No Sweat SGP or SGPx ⓘ ".  At the end of the line there is an activation button or toggle switch.  A user may toggle the switch and proceed to place a bet without reading the hyperlinked information.  The information or ⓘ symbol contains a hyperlink to the terms of the "No Sweat" bet.  The FAC includes a screen shot of those terms, which the FAC asserts are in "impractically small font size."  The FAC does not allege that the terms contain any inaccuracy.

II.  $1,000 Bonus for New Customers

A second allegedly misleading advertisement is for a $1,000 deposit bonus.  A television advertisement announced that new customers can receive "a 100% deposit match up to $1,000".  The

FAC asserts that this is misleading because DraftKings will only match 20% of a user's deposit.  To obtain the full benefit of the promotion, a user must deposit $5,000 and place bets with minimum odds of -300, risking at least $25,000, all within 90 days.  Moreover, the bonus is not rewarded as withdrawable cash but rather as "DK Dollars", which can only be used for further gambling.

The screen visible in the app in 2022 announced to users that "With your first deposit, Bet $1+ on [the event] and Get $100!"  It adds, "Plus, you will receive a 20% deposit bonus up to $1,000!  Bonus funds are earned as you play.  Please see 'Profile Page' to view bonus status.  Get started today!"  The screen then allowed users to select one of four displayed amounts, beginning with $25 and increasing to $600, or to enter another amount of their choosing.  After collecting payment information, the screen described the terms of the offer in more detail.  It states, <u>inter alia</u>, that

> A user's first deposit (min. $5) qualifies the user to
> receive up to $1,000 in bonus funds in the form of site
> credits that can only be used on DraftKings.  Bonus amount
> is equal to 20% of that deposit amount, not to exceed
> $1,000 (the user must deposit $5,000 to be eligible to
> receive the maximum bonus amount of $1,000).  Bonus funds
> will be awarded to the user according to the following
> play-through requirement: for every $25 played on
> DraftKings in DFS/Sportsbook/Casino, the user will receive
> $1 in bonus funds released into their player account(e.g.,
> a $5,000 deposit requires a user to play through a
> cumulative total of $25,000 in daily fantasy contests,

> sportsbook (-300 odds or longer), casino products, or any
> combination thereof to receive the maximum possible bonus
> amount of $1,000).  The play-through requirement must be
> met 90 days from the date of first deposit to receive
> maximum bonus.

The screen displayed in 2023 was not materially different.
It explained in pertinent part,

> The customer's Qualifying Deposit dictates the amount of DK
> Dollars available to be earned.  Bonus reward is equal of
> 20% of Qualifying Deposit amount . . . .  [T]he customer
> must deposit $5,000 to be eligible to receive the maximum
> bonus amount of $1,000 in DK Dollars.

### III.  VIP Hosts

The third practice challenged in the FAC is the use of VIP

Hosts to encourage users to continue placing bets on the app.

One plaintiff's VIP Host contacted him after he had suffered a

significant loss on the DraftKings platform and offered him a

100% deposit match of up to $500.  The promotion was contingent

on the plaintiff making a new deposit that same day.  After the

plaintiff informed his VIP Host that he was behind on bills, the

VIP Host sent him another text about a new deposit promotion.

Another plaintiff signed up for nearly every deposit match

and other offer sent by his VIP host.  On days of losses, the

plaintiff's VIP Host would deposit more credits and offers into

his account.  When the plaintiff set temporary limits on his

betting, the VIP Host promised to send him new promotions and

credits once the limits expired.

The FAC asserts that DraftKings uses such promotions without taking steps to verify either the income of or source of funds for users placing large bets.  DraftKings only asks yes/no questions such as "are you depositing expendable income that you can afford to possibly lose?"  When one of the plaintiffs lost over $100,000 in a single day, which was nearly five times what he earned at work in a year, DraftKings did not cut him off from gambling on its site or connect him with addiction resources.

The FAC is brought on behalf of a class by four named plaintiffs.  Clara De Leon is a resident of New York and created an account on DraftKings in 2018.  She made her first deposit around January 2023 and shortly thereafter opted in to a "No Sweat" bet promotion.  Eric W. Mirsberger is a New York resident who created an account in October 2023 and opted into numerous deposit match promotions that were offered to him by VIP hosts. Joseph Mitchell is a New York resident who opened an account in January 2022.  Mitchell first learned of "No Sweat" offers in early 2023 and has since signed up for the promotion.

Finally, Edward Mendez created his DraftKings account as a New Jersey resident in 2022.  At some point after opening his account, Mendez began betting on DraftKings after seeing deposit match offers and, at some point after that, was assigned a VIP host.  At an unspecified time after September 2022, Mendez moved

to New York in an attempt to restrict his gambling addiction. After his move, DraftKings assigned Mendez a new VIP host.

IV.  Procedural History

This putative class action was filed on January 22, 2025 by plaintiffs De Leon and Mirsberger.  DraftKings filed a motion to dismiss the complaint on April 8.  The plaintiffs were given an opportunity to amend the complaint.  The FAC was filed on May 16 and added Mitchell and Mendez as plaintiffs.  DraftKings renewed its motion to dismiss the FAC on June 20.  The motion became fully submitted on August 4.[3]

## Discussion

The FAC brings fifteen claims.  It brings two claims pursuant to New York General Business Law ("GBL") § 349 and two claims pursuant to GBL § 350.  The four claims are asserted on behalf of the "No Sweat" and Deposit Match Promotion classes. There are also intentional misrepresentation claims for the "No Sweat" and for the Deposit Match Promotion classes.  There are three claims addressed to the VIP Host Targeted class asserting gross negligence, a violation of GBL §§ 349 and 350, and a breach of fiduciary duty.  On behalf of all classes there are claims for unjust enrichment, and for strict liability and

---

[3]  The plaintiffs' August 6 motion to file a sur-reply is denied. The authority discussed in the motion has no bearing on the disposition of the plaintiffs' claims.

negligence products liability claims for a design defect and for a failure to warn.[4]

To defeat a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Doe v. Franklin Square Union Free School Dist., 100 F.4th 86, 94 (2d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting Iqbal, 556 U.S. at 678). In determining if a claim is sufficiently plausible to withstand dismissal, a court "must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." Doe, 100 F.4th at 94 (citation omitted).

In reviewing a motion to dismiss for failure to state a claim, the court "may consider documents that are attached to the complaint, incorporated in it by reference, integral to the complaint, or the proper subject of judicial notice." United States v. Strock, 982 F.3d 51, 63 (2d Cir. 2020) (citation

---

[4] The plaintiffs have abandoned a fraudulent inducement claim pleaded in the FAC.

omitted).  A document is "integral when the complaint relies heavily upon the document's terms and effect."  Id. (citation omitted).  The defendants have attached copies of the 2022 and 2023 versions of the terms and conditions of the $1,000 deposit bonus promotion to their motion to dismiss.[5]  The terms and conditions are integral to the FAC.  The FAC refers to and summarizes the terms, describing them as illegibly small, confusingly worded, and not conspicuously displayed to the plaintiffs.

Certain claims in the FAC are subject to a heightened pleading standard.  Under Rule 9(b), a plaintiff pleading a claim that sounds in fraud must "state with particularity the circumstances constituting [the] fraud."  Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd., 19 F.4th 145, 150 (2d Cir. 2021) (citation omitted).  A complaint subject to the pleading requirements of Rule 9(b) must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  In re IBM Arb. Agreement Litig., 76 F.4th 74, 87 (2d Cir. 2023) (citation omitted).  "A plaintiff may satisfy Rule 9(b) with allegations

---

[5]  The defendants have also attached the DraftKings app's terms of use that were effective in New Jersey in 2022 and in New York in 2023.

of circumstantial evidence if the circumstantial evidence alleged explains how and why the statement was misleading when made." Altimeo, 19 F.4th at 150-51 (citation omitted).

I.   GBL §§ 349 and 350: the Two Advertisements

The FAC asserts four claims pursuant to GBL §§ 349 and 350 linked to advertisements of the "No Sweat" bet and $1,000 Bonus promotions.  Each of these claims must be dismissed.  Although the defendants identify a number of deficiencies in connection with these claims, it is only necessary to discuss two.  First, the FAC does not identify the specific advertisement on which any of the plaintiffs alleges he or she relied, and second, it does not plausibly plead that the advertisements were misleading.[6]

Section 349 of the GBL prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce in the furnishing of any service in this state."  N.Y. Gen. Bus. Law § 349(a).  Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing

---

[6]  The FAC does not plead that Mendez has standing to bring these claims.  The GBL claims require that "the transaction in which the consumer is deceived occur in New York."  Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 122 (2d Cir. 2013) (citation omitted).  The FAC does not allege when plaintiff Mendez moved to New York from New Jersey and what bets he placed while in New York that can be attributed to the defendants' violations of law.  Plaintiffs concede that to the extent that Mendez's GBL claims rely on out-of-state conduct, he cannot prevail on them.

of any service in this state." N.Y. Gen. Bus. Law § 350. To
demonstrate a violation under either section, a plaintiff must
establish "that a defendant has engaged in (1) consumer-oriented
conduct that is (2) materially misleading and that (3) plaintiff
suffered injury as a result of the allegedly deceptive act or
practice." McCracken v. Verisma Sys., Inc., 91 F.4th 600, 607
(2d Cir. 2024) (citation omitted); see also Orlander v. Staples,
Inc., 802 F.3d 289, 300 (2d Cir. 2015).

    "While it is true that literally accurate statements can
still be misleading," the Court of Appeals "has repeatedly
observed that in determining whether a reasonable consumer would
have been misled by a particular advertisement, context is
crucial." Chufen Chen v. Dunkin' Brands, Inc., 954 F.3d 492,
501 (2d Cir. 2020) (citation omitted). "In the case of
omissions in particular . . . [the GBL] surely does not require
businesses to ascertain consumers' individual needs and
guarantee that each consumer has all relevant information
specific to its situation." Oswego Laborers' Loc. 214 Pension
Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26 (1995).
Under either provision of the GBL, "it is well settled that a
court may determine as a matter of law that an allegedly
deceptive advertisement would not have misled a reasonable
consumer." Chufen, 954 F.3d at 500 (citation omitted).

Finally, a defendant's actions are not cognizable under the GBL if the defendant discloses the very practices alleged to be deceptive.  See Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 125 (2d Cir. 2017).

The FAC does not identify the advertisement seen or heard by any of the named plaintiffs and on which it asserts they relied.  Instead, it asserts that "All of the advertisements these Plaintiffs saw were materially similar" to those described in the FAC.  This is insufficient to state a plausible claim based on the assertion that an advertisement violated the GBL because it was misleading.

As significantly, the FAC does not plausibly assert that the advertisements of the two promotions were misleading when considered in context.  Accurate and complete terms of each promotion were fully disclosed to users of the app and the FAC does not assert that those disclosures of the terms were misleading.  A claim pursuant to either § 349 or § 350 requires deception, and the FAC fails to plead that the advertisements of the promotions, which are obviously short-hand descriptions of the promotions, were misleading or deceptive.

The plaintiffs essentially complain that the terms of the promotions were not included in the advertising, that without that disclosure the advertising was misleading, and that the

small print disclosures of the terms of the promotions on the
app, even when accurate and accessible, do not defeat their
claims.  In making this argument, plaintiffs rely on Mantikas v.
Kellogg Co., 910 F.3d 633 (2d Cir. 2018).  Mantikas is
inapposite.  Mantikas held that a reasonable consumer would not
be expected to consult the nutrition label on the side of a
snack box to check information about product ingredients that is
presented in large bold font on the front of the box.  Id. at
637.  Here, the product is on an app.  The plaintiffs do not
assert that any information contained on the app was misleading.
The terms of the promotions are readily available on the app and
are presented to the user before and during the purchasing
process.  They are accessed through the very same pages that the
consumer uses to place the promoted bet.  A reasonable consumer
of an online platform would be expected to look at the terms of
promotion, which are readily accessible, before accessing the
promotion.

The allegation that the terms of the promotion were in
small font fares no better.  The plaintiffs refer to caselaw
describing font sizes in other contexts, such as on the
packaging of physical products.[7]  The FAC does not allege that

---

[7]  See Danone, US, LLC v. Chobani, LLC, 362 F. Supp. 3d 109, 123
(S.D.N.Y 2019) (yogurt product package); Delgado v. Ocwen Loan
Servicing, LLC, No. 13-CV-4427, 2014 WL 4773991, at *9 (E.D.N.Y.

the promotional terms were in unusually small font for a phone app or that the size of the font could not be expanded through operation of the phone and app.

Finally, the plaintiffs argue that the FAC "unambiguously" alleges that they did not see or understand the disclosures of the terms of the promotions. The FAC asserts that "Plaintiffs and most users never became aware that there were additional terms, much less saw the full terms of the promotion." Such a conclusory allegation is insufficient to save this pleading. To assert a claim for a violation of either GBL section, the pleading must allege deceptive conduct that was "likely to mislead a reasonable consumer acting reasonably under the circumstances." Orlander, 802 F.3d at 300 (citation omitted). The FAC does not allege that the terms of the promotions, as presented on the app, were misleading, hidden, or unavailable to app users in advance of a user joining the promotion. To repeat, the terms for the "No Sweat" bet were hyperlinked to the ⓘ symbol on the line on which the bet could be placed, and the full disclosure of the terms for the $1,000 Bonus was made on the very page of the app where the user made that selection. A

---

Sept. 24, 2014) (mail solicitation materials); Lonner v. Simon Prop. Grp., Inc., 866 N.Y.S.2d 239, 247 (App. Div. 2008) (prepaid gift cards).

reasonable consumer acting reasonably under the circumstances
would have read the terms, and the FAC fails to plead otherwise.

  II.    Intentional Misrepresentation: the Two Advertisements

    The intentional misrepresentation claims regarding the two
advertisements fail as well.  The pleading standard for these
claims, which sound in fraud, is governed by Rule 9(b).  In a
claim for fraudulent misrepresentation, a plaintiff must allege
"a misrepresentation or a material omission of fact which was
false and known to be false by defendant, made for the purpose
of inducing the other party to rely upon it, justifiable
reliance of the other party on the misrepresentation or material
omission, and injury."  Mandarin Trading Ltd. v. Wildenstein, 16
N.Y.3d 173, 178 (2011) (citation omitted).

    The FAC's failure to identify the specific language of the
advertisement on which it brings a claim for fraud is fatal.
Similarly, the FAC fails to plead that the terms of the
advertisements, when read in context, are misleading.  In
addition, there is a failure to plead scienter.  The FAC only
offers conclusory statements about DraftKings' intent.
Dismissal of the intentional misrepresentation claims is
therefore warranted.

III.  Unjust Enrichment

    The defendants move to dismiss the unjust enrichment claims
based on the two advertisements and the VIP Host program.  They
argue that these claims fail because they are entirely
duplicative of claims that are dismissed.  They are correct.

    Under New York law, a plaintiff bringing an unjust
enrichment claim must plead "(1) that the defendant benefitted;
(2) at the plaintiff's expense; and (3) that equity and good
conscience require restitution."  Myun-Uk Choi v. Tower Rsch.
Cap. LLC, 890 F.3d 60, 69 (2d Cir. 2018) (citation omitted).
"It is available only in unusual situations when, though the
defendant has not breached a contract nor committed a recognized
tort, circumstances create an equitable obligation."  Corsello
v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012).  Thus, an
unjust enrichment claim "is not available where it simply
duplicates, or replaces, a conventional contract or tort claim."
Id.  "Two claims are duplicative of one another if they arise
from the same facts and do not allege distinct
damages."  NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d
168, 175 (2d Cir. 2008) (citation omitted).

    The unjust enrichment claims are entirely duplicative of
the other claims included in the FAC.  The plaintiffs seek to
avoid their dismissal by asserting in opposition to this motion

17

that "wholly apart from its deceptive conduct, DraftKings was
enriched at their expense by taking advantage of their gambling
addictions". This argument fails. The allegedly deceptive
conduct identified in the FAC is critical to each of the FAC's
claims. There is no separate conduct identified by the claim
for unjust enrichment and no distinct damages are sought.

   IV. Products Liability

    The defendants next move to dismiss the products liability
claims, which are brought under theories of both strict
liability and negligence for both a design defect and a failure
to warn. Their motion is granted.

    "[A] defectively designed product is one which, at the time
it leaves the seller's hands, is in a condition not reasonably
contemplated by the ultimate consumer." McCarthy v. Olin Corp.,
119 F.3d 148, 155 (2d Cir. 1997) (citation omitted). To
establish a prima facie case for design defect under strict
liability, the plaintiff must show that the defendant "breached
its duty to market safe products when it marketed a product
designed so that it was not reasonably safe and that the
defective design was a substantial factor in causing plaintiffs
injury." Hoover v. New Holland N. Am., Inc., 23 N.Y.3d 41, 54
(2014) (citation omitted). The plaintiff must also show that
"it was feasible to design the product in a safer manner."

Pierre-Louis v. DeLonghi Am., Inc., 887 N.Y.S.2d 628, 631 (N.Y. App. Div. 2d Dept. 2009) (citation omitted).  To show negligence, "the plaintiff must also prove that the injury caused by the defect could have been reasonably foreseen by the manufacturer."  Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 86 (2d Cir. 2006).

"[F]ailure-to-warn claims grounded in strict liability and negligence are functionally equivalent."  In re New York City Asbestos Litig., 27 N.Y.3d 765, 787 (2016).  "[P]rinciples of reasonableness and public policy" are at the heart of such claims."  Id.

A plaintiff bringing a products liability claim must plead a physical injury resulting from use of the product.  The New York Court of Appeals has held that "[t]he requirement that a plaintiff sustain physical harm before being able to recover in tort is a fundamental principle of [New York's] tort system."  Caronia v. Philip Morris USA, Inc., 22 N.Y.3d 439, 446 (2013).  The policy "serves a number of important purposes: it defines the class of persons who actually possess a cause of action, provides a basis for the factfinder to determine whether a litigant actually possesses a claim, and protects court dockets from being clogged with frivolous and unfounded claims."  Id.  Accordingly, the cause of action "in strict products liability

19

cases accrues when the product causes physical injury." <u>Lindsey v. A.H. Robins Co.</u>, 458 N.Y.S.2d 602, 604 (N.Y. App. Div. 2d Dept. 1983), <u>aff'd</u>, 60 N.Y.2d 417 (1983).

In opposition to this motion, the plaintiffs essentially abandon their products liability claims insofar as they concern the advertisements for the two promotions.  They agree that products liability law does not apply to expressive conduct in either the app or the advertisements for the promotions available on the app.  They argue, however, that the overall design of the DraftKings platform is addictive and has caused severe financial loss and emotional distress to three of the plaintiffs.  They complain as well that the defendants failed to warn users of the substantial risk posed by the addictive nature of the app's features.  Those features include automated push notifications informed by user data, escalating default wagers based on a user's prior betting history, and the absence of income verification and deposit limits.  Three of the plaintiffs suffered from these product defects and the failure to warn about them.  Mirsberger wagered many times his annual income and VIP Hosts encouraged him to continue gambling.  Mitchell became

addicted and lost over $70,000.  Mendez became severely addicted and suicidal; he lost his home and family.[8]

As the defendants explain, the application of a products liability theory to DraftKings' online betting tool would be novel.  The product is an online betting service, which is not a physical product and therefore not generally covered by products liability law.  Even if products liability law could apply to certain types of online services, however, plaintiffs would still be required to plead that they were physically injured through the use of the DraftKings platform.  The FAC does not contain such allegations.

The plaintiffs do not contest that they must plead the existence of physical harm to bring a claim that DraftKings is liable under products liability law.  They contend, however, that the psychological and emotional suffering that they experienced constituted a mental illness and should relieve them of the obligation to otherwise plead physical harm.  With their mental illness came financial hardship, professional turmoil, and loss of their homes.  Plaintiffs do not provide any legal authority for the proposition that mental illness and distress, although real and severe, is an injury protected by products

---

[8]  As already noted, the FAC does not explain when Mendez moved from New Jersey to New York and whether he used the DraftKings app after relocating to New York.

liability or general tort law absent physical injury or property
damage.  Under New York tort law, a plaintiff may only recover
for emotional suffering absent physical injury in three narrow
circumstances, none of which are present here.  See SanMiguel v.
Grimaldi, -- N.Y.3d --, 2025 WL 2955744, at *2 (N.Y. Oct. 21,
2025).  Accordingly, the products liability claims must be
dismissed as well.

    V.   VIP Hosts

    The FAC pleads several claims challenging the legality of
the VIP Host program.  The products liability claims have
already been addressed.  The remaining claims are for violations
of the GBL, gross negligence, and breach of fiduciary duty.
None of these survive the motion to dismiss.

    A. GBL

    The elements of the claims brought under the GBL are set
forth above.  One of those elements is that a defendant engage
in consumer-oriented conduct.  For their pleading to satisfy
that element, plaintiffs must allege that the deceptive or
misleading "acts or practices have a broader impact on consumers
at large."  Oswego, 85 N.Y.2d at 26.  The allegations should
define conduct that "potentially affects similarly situated
consumers."  S.Q.K.F.C., Inc. v. Bell A. TriCon Leasing Corp.,
84 F.3d 629, 636 (2d Cir. 1996) (citation omitted).

The plaintiffs do not contend that the existence of a VIP Host program is per se illegal.  They argue that the way it was conducted by DraftKings violates the law.  The FAC alleges that the VIP Hosts engaged in manipulative and destructive behavior in their interactions with two of the plaintiffs.  The FAC fails to plausibly allege, however, that such statements or conduct were directed to consumers at large.  As described in the FAC, VIP Hosts engage in personalized and targeted outreach to unique consumers to encourage them to gamble.  The FAC alleges that VIP Hosts are trained to cultivate trust with individual users and to use the individual user's data "to give them outreach and attention that feels personalized and fortuitous."  It alleges that the VIP Hosts are trained to follow a user's activity and provide them with offers and credits at moments where the user may be inclined to take a break.  For example, the VIP Hosts sent Mirsberger and Mendez text offers after the plaintiffs informed the Hosts about overdue bills or their desire to set temporary betting limits.  Mendez's VIP Host notified him that DraftKings was available in a jurisdiction each time Mendez visited another state.  In sum, the FAC describes personalized offers sent in response to an individual's situation.  It does not describe communications that were deceptive or misleading

and that were directed to consumers at large or similarly
situated consumers.[9]

Abandoning the thrust of the FAC's description of the role
of VIP Hosts, the plaintiffs argue that the GBL claims survive
because the VIP communications were not "individually tailored."
The plaintiffs point to the FAC's assertion that the Hosts'
statements "were substantially uniform in content, presentation,
and impact upon consumers at large."  That conclusory assertion
in the FAC does not permit these claims to survive.  The more
detailed allegations in the FAC contradict the assertion of
uniformity and require the dismissal of these claims.  See DPWN
Holdings (USA), Inc. v. United Air Lines, Inc., 747 F.3d 145,
151-52 (2d Cir. 2014).

B. Gross Negligence

Plaintiffs Mirsberger and Mendez assert a gross negligence
claim based on the conduct of their VIP hosts.[10]  "Under New York

---

[9]  The FAC does assert that it was false for a VIP Host to
describe to Mirsberger a promotion as available "today only,"
but it does not assert that Mirsberger understood that to be an
assertion of fact or that he relied on it.

[10]  The defendants contend that the app's terms of use ("TOU")
effect a waiver of any claim by the plaintiffs for DraftKings'
negligence.  Even if the TOU were properly considered on this
motion, whether they were effective in waiving liability for
negligence would be a fact intensive inquiry.  Even if an app
user does not have actual knowledge of the contractual terms,
the user will be bound "if (1) a reasonably prudent person would
be on inquiry notice of the terms, and (2) the user

law, a tort plaintiff seeking to prove a defendant's negligence must show (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." Borley v. United States, 22 F.4th 75, 79 (2d Cir. 2021) (citation omitted). "Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party." Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 177 (2d Cir. 2013) (citation omitted). "The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the courts." Id. (citation omitted).

> [C]ourts fix the duty point by balancing factors,
> including the reasonable expectations of the parties
> and society generally, the proliferation of claims,
> the likelihood of unlimited or insurer-like liability,
> disproportionate risk and reparation allocation, and
> public policies affecting the expansion or limitation
> of new channels of liability.

Pasternack v. Lab'y Corp. of Am. Holdings, 27 N.Y.3d 817, 825 (2016) (citation omitted). "Foreseeability, alone, does not

---

unambiguously manifests assent through conduct that a reasonable person would understand to constitute assent." Edmundson v. Klarna, Inc., 85 F.4th 695, 703 (2d Cir. 2023) (citation omitted). The inquiry is "generally measured by an objective standard" and is "fact-intensive." Id. (citation omitted).

define duty -- it merely determines the scope of the duty once
it is determined to exist." Aegis, 737 F.3d at 178 (citation
omitted).

To plead gross negligence, a plaintiff must also allege
that the negligent conduct "evinces a reckless disregard for the
rights of others or smacks of intentional wrongdoing." AT&T v.
City of New York, 83 F.3d 549, 556 (2d Cir. 1996) (citation
omitted). See also Farash v. Cont'l Airlines, Inc., 574 F.
Supp. 2d 356, 368 (S.D.N.Y. 2008), aff'd, 337 F. App'x 7 (2d
Cir. 2009). Finally, as is true for a claim of negligence, in
order to recover for gross negligence under New York law, a
plaintiff must plead physical harm to his person or property.
See Benoit v. Saint-Gobain Performance Plastics Corp., 959 F.3d
491, 498 (2d Cir. 2020); Caronia, 22 N.Y.3d at 446.

The FAC fails to plead a gross negligence claim based on
the activities of VIP Hosts for at least two independent
reasons. It does not allege that Mirsberger or Mendez suffered
a physical injury to their person or property. Instead, it
alleges that they suffered financial losses, damage to
relationships, addiction treatment costs, and emotional damages.
In addition, it fails to plead that the existence of a duty owed
by DraftKings to the plaintiffs that was breached by the VIP
Hosts.

26

In their opposition to this motion, the plaintiffs do not
argue that they experienced any physical injury at the hands of
their VIP Hosts.  Instead, they repeat the arguments that they
put forth in defense of their products liability claims, which
have already been addressed and rejected.  In defending this
claim, the plaintiffs cite 532 Madison Ave. Gourmet Foods, Inc.
v. Finlandia Ctr., Inc., 96 N.Y.2d 280 (2001).  In Gourmet
Foods, however, the Court of Appeals limited the scope of the
defendants' duty to those who "suffered personal injury or
property damage" from the collapse of an office tower's wall and
of a construction elevator tower, reversing the Appellate
Division's decision to allow recovery of economic losses to
businesses in close proximity to the collapsed structures.  Id.
at 292.

Next, in opposition to this motion the plaintiffs attempt
to identify a legal duty of care that was breached.  The FAC
alleged that DraftKings owes a legal duty to those addicted to
gambling.  It pleads the DraftKings has a duty to discover when
its users are gambling beyond their means and to provide them
with help, and to verify the income and source of funds when
users gamble a "substantial" amount on its platform.  In their
opposition, however, the plaintiffs disclaim any request to find
a "freestanding duty to identify addicted gamblers and protect

27

them from themselves."  Instead, the plaintiffs argue that the
decision by DraftKings to "deploy" VIP Hosts created a duty to
act with reasonable care to protect those who were vulnerable to
a gambling addiction.  Alternatively, it argues that the
employment of VIP Hosts created a special relationship with the
users of its app.  The plaintiffs acknowledge that courts have
refused to find such a duty for casinos but argue that
DraftKings is "a new kind" of gambling proprietor.  Plaintiffs
cannot alter or supplement the allegations in their FAC through
their briefing.  In any event, this newly-articulated theory of
a duty also fails.

Courts applying New York law have been hesitant to create a
duty of care premised on a failure to control the conduct of
others.  In refusing to find a duty by manufacturers of
ammunition to protect against misuse of their products, the
Court of Appeals for the Second Circuit observed that "[i]t is
the responsibility of courts in fixing the orbit of duty, to
limit the legal consequences of wrongs to a controllable degree
and to protect against crushing exposure to liability."
McCarthy, 119 F.3d at 157 (citation omitted).  Similarly, the
New York Court of Appeals explained in Hamilton v. Beretta
U.S.A. Corp., 96 N.Y.2d 222 (2001), that "judicial resistance to
the expansion of duty grows out of practical concerns both about

28

potentially limitless liability and about the unfairness of imposing liability for the acts of another." Id. at 233. Plaintiffs have failed to show that there is a reasonable expectation by society that a commercial relationship with a gaming platform creates a duty by the platform's employees to control the consumer's choice to engage in betting. See Antar v. BetMGM, LLC, No. 24-1362, 2025 WL 1219316, at *4 (3d Cir. Apr. 28, 2025). At bottom, the plaintiffs have not shown that DraftKings had a duty to prevent addicted gamblers from using its platform or to protect those that do. In essence, the plaintiffs' theory seeks to circumvent the decision made by New York State's legislature to legalize online gambling in New York State.

C. Breach of Fiduciary Duty

Finally, DraftKings moves to dismiss the claim for breach of a fiduciary duty. That motion is also granted.

Under New York law, "when parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." In re Mid-Island Hosp., Inc., 276 F.3d 123, 130 (2d Cir. 2002) (citation omitted). "[A] relationship of confidence, trust, or superior knowledge or control may indicate that such a relationship

exists." Id. (citation omitted). "Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions." Fox Paine & Co., LLC v. Houston Cas. Co., 60 N.Y.S.3d 294, 297 (N.Y. App. Div. 2d Dept. 2017). Generally, courts look towards an agreement or contract between the parties "to discover the nexus of the parties' relationship and the particular contractual expression establishing the parties' interdependency." EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 20 (2005) (citation omitted). "If the parties do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." Id. (citation omitted). The existence of a fiduciary relationship, however, "is not dependent solely upon an agreement or contractual relation. Rather, the actual relationship between the parties determines the existence of a fiduciary duty." Fox Paine, 60 N.Y.S.3d at 297. "[A]n informal fiduciary relationship may arise when one party places special trust and confidence in another such that the first party becomes dependent upon the second party." P. Chimento Co., Inc. v. Banco Pop. de Puerto Rico, 617 N.Y.S.2d 157, 159 (N.Y. App. Div. 1st Dept. 1994).

The FAC does not plead that the VIP Hosts became the fiduciaries of the plaintiffs. The VIP Hosts engaged in a commercial relationship with plaintiffs, offering them promotions and site credits. The FAC does not plead that the VIP Hosts had the ability to control plaintiffs or to place bets on their behalf. The relationships between the plaintiffs and VIP Hosts are closer to arm's length business transactions than those relationships that create a relationship of higher trust. See P. Chimento, 617 N.Y.S.2d at 159 (friendly bank officers are not fiduciaries of customers).

In support of their claim, plaintiffs rely on a job description for DraftKings' VIP Hosts, which states that the VIP Hosts "[c]reate strong, authentic, and trusted player relationships." This job description, particularly its reference to a "trusted" relationship, did not create a fiduciary relationship under New York law. It does not reflect a relationship greater than that that ordinarily prevails between customer service agents or salespersons and their customers. The allegation in the FAC that VIP Hosts "exercise influence over the gamblers and keep them from limiting their betting" is also insufficient to plead the existence of a fiduciary relationship.

Finally, the plaintiffs rely on Jacobs v. DraftKings, Inc., 2025 WL 746012, at *6 (E.D.N.Y. Mar. 7, 2025). But Jacobs does not assist their argument. The plaintiff in Jacobs alleged, inter alia, that despite promises to keep his personal information secure, a DraftKings employee divulged the plaintiff's personal information to third parties who threatened and attacked the plaintiff to obtain the plaintiff's funds in his DraftKings account. Id. at *1, *6.

## Conclusion

The defendants' June 20, 2025 motion to dismiss is granted.

Dated:    New York, New York
          December 11, 2025

                              _____
                                    DENISE COTE
                              United States District Judge